# EXHIBIT A

William R. Richardson (009278)
**RICHARDSON & RICHARDSON, P.C.**
1745 South Alma School Road
Corporate Center • Suite 100
Mesa, Arizona 85210-3010

Tel:     (480) 464-0600
Fax:     (480) 464-0602
Email:   wrichlaw@aol.com
Attorneys for Plaintiff

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| **NICOLE RICHARDSON**, a single woman,<br>                    Plaintiff,<br>v.<br>**STACI GRIFFIN-BURK a/k/a STACI BURK a/k/a STACI K. GRIFFIN a/k/a STACI KRISTINE LAND a/k/a STACI K. LAND-GRIFFIN**, a single woman, and **GILBERT UNIFIED PUBLIC SCHOOL  DISTRICT No. 41 of MARICOPA COUNTY**, a political subdivision of the State of Arizona,<br><br>                    Defendants. | CV 2014-097350<br><br>**AMENDED COMPLAINT**<br>**and**<br>**DEMAND FOR JURY TRIAL**<br><br>*(Assigned to the Hon. David M. Talamante)* |

Plaintiff, Nicole Richardson ("Plaintiff"), for her Complaint against Defendants Staci Griffin-Burk a/k/a Staci Burk a/k/a Staci K. Griffin a/k/a Staci Kristine Land a/k/a Staci K. Land-Griffin ("Burk") and the Gilbert Unified Public School District No. 41of Maricopa County (the "District") (Burk and the District are hereinafter collectively referred to as "Defendants"), alleges as follows:

## PARTIES AND JURISDICTION

1.     Plaintiff's claims arise under 42 U.S.C. 1983 ("1983") and the common law of the State of Arizona.

2.     Plaintiff a resident of Maricopa County, Arizona.

3.     The District is a school district located in Maricopa County, Arizona, and a political subdivision of the state of Arizona that may sue and be sued pursuant to A.R.S. § 15-326.

4.     Burk is a resident of Maricopa County, Arizona.

5.     Defendants caused events to occur in the State of Arizona out of which Plaintiff's claims for relief arise.

6.     As to all claims against the District, the District acted through a majority of the Gilbert School Board (the "Board") or through its designated officers.

7.     The District is liable for the illegal and tortious actions of the Board and its officers.

8.     This Court has jurisdiction over the parties and the claim asserted herein pursuant to Ariz. Const. Art. 6 Section 14 as well as pursuant to *Haywood v. Drown*, 556 U.S. 729, 735 (2009) and predecessor cases thereto.

9.     Venue is appropriate in this case pursuant to A.R.S. §12-401(5) in that the acts and activities complained of occurred in Maricopa County, Arizona.

10.     Plaintiff is entitled to an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988(b).

## ALLEGATIONS COMMON TO ALL COUNTS

### Plaintiff's Employment with the District

11.     Plaintiff commenced work at the District as a certified teacher almost twenty years ago, commencing in 1995.

12.     Plaintiff initially taught art simultaneously at two grade schools and then moved to Highland High School in approximately August 2000 where she taught courses in Ceramics, Clay 3-D Art, Media Art (website design).

13.     In approximately August of 2003, Plaintiff commenced teaching at Gilbert High School and taught essentially the same curriculum with an additional focus on video production and video broadcasting.

14.     As a result of her video work at Gilbert High School, the District solicited Plaintiff to work in the District offices.

15.     Thus, on June 9, 2008, Plaintiff was hired to work in the District's Community Relations Department for the purpose of providing marketing services under

the supervision of Diane Bowers ("Bowers").

16. Bowers was the director of Community Relations which included, among other things, providing marketing services for the District, video streaming of Board meetings, communicating with District administrators, staff and parents and communicating with media outlets including the press, television and radio.

17. Plaintiff, in her position with the District, provided assistance with all of the above and specifically, Plaintiff was called upon to provide services relating to film and graphic art.

18. In addition to her normal job during normal working hours, Plaintiff also provided after hours audio-visual support during monthly Board meetings.

**Staci Burk's Dealings with and as Part of the Board**

19. During the two years prior to August of 2009, Burk engaged in certain disputes with the District which disputes are outlined in an Arizona Republic article dated August 14, 2009.

20. A true copy of such article is attached hereto as Exhibit A.

21. In 2009, Burk expressed concern that the District considered her (Burk) "a threat."

22. Sometime prior to August of 2009, the District instituted complaints against Burk relating to Burk's claim of a lack of due process involving her children.

23. In 2010, Burk sought and gained election to the Board as member of the Board.

24. Burk was thereafter elected president of the Board.

25. As of 2013, the Board has consisted of the following members in the following positions:

| | |
|---|---|
| Staci Griffin-Burk | President |
| Julie Smith ("Smith") | Member |
| Daryl Colvin ("Colvin") | Clerk |
| Jill Humphreys ("Humphreys") | Member |

Lily Tram ("Tram")                     Member

**Formation of the Triumvirate and the Dismantling of the District**

26.     Soon after their respective election to the Board, Colvin, Smith and Burk formed an uber conservative triumvirate and effectively controlled all of the actions of the Board.

27.     Colvin, Smith and Burk were all dismissive, if not wholly critical, of the members of the District administration and staff from the beginning of their tenure on the Board and commenced a holy war of intimidation against the members of the District staff.

28.     For example, by email from Smith to Burk dated February 7, 2013, in the context of the triumvirate's successful ouster of former superintendent Dr. David Allison, Smith commented about her conversation with Jared Ryan, an administrator that was leaving the District.

29.     With respect to the relationship with the District staff, Smith stated:

> I told Jared that moving forward ***the board needs admin. that we can trust, that will not undermine and will not play a constant chess game with us but instead be respectful***. I told him loyalty is very important to me.

*Id.* (emphasis added).

30.     A true and correct copy of Smith's email to Burk dated February 7, 2013, is attached hereto as Exhibit B.

31.     Similarly, and by way of additional example, on June 14, 2014, the East Valley Tribune reported that Smith voted against a budget override that the District proposed because as Smith stated, "[there] was a lack of trust between the [Board and the] district."

32.     A true and correct copy of the June 6, 2014 East Valley Tribune article is attached hereto as Exhibit C.

33.     Indeed, the triumvirate of Colvin, Smith and Burk formed a cabal (the "Cabal") whereby they conferred regarding the operation of the District and did so in apparent violation of the open meetings laws of the State of Arizona.

34.     Aside from their voting as an uber conservative block on the Board, they each individually frequently used public media for purposes of denigrating District staff and in promoting their uber conservative positions.

35.     In addition to their communications within their own ranks, Plaintiff is informed and believes and therefore alleges that the Cabal, and Burk in particular, covertly conveyed (leaked) information to certain individuals in and outside of the District who were supportive of the Cabal's policies and positions.

## **Dissembling and Retaliation**

36.     Central to their attacks as they apply to Plaintiff, was the attack that was commenced as a result of the employment of Kami Cottle ("Cottle") in the Community Relations Department of the District.

37.     Cottle was hired in late April of 2013 to write news releases and to provide photography for the District.

38.     It soon became apparent that Cottle was not well suited for the position largely because of her lack of writing skills.

39.     In November of 2014, Cottle wrote an email entitled "Constructive Discharge Termination" and sent it to the Board and to the District's Human Relations Department (the "Cottle Resignation") pursuant to which Cottle resigned her position with the District.

40.     Plaintiff is informed and believes and therefore alleges that Burk[1] supplied specific information regarding the Cottle Resignation to Thomas and Denise Green (the "Greens"), detractors of District personnel, who bombastically and sarcastically disseminate innuendo (yet little factual information) that they receive from "birdies" who supply them with information about the District.

41.     Thus, in December of 2013, the Greens made a request to the District that they be granted access to email in the possession of the District that had been generated

---

[1]

*See* Conrad Report identified in ¶51 at 1, 5. *See also,* ¶54 below where Dr. Keegan reminds the Board that they all received a copy of the Cottle Resignation.

1 | during the period relevant to the Cottle Resignation.

2 |     42.    When the Greens reviewed the requested email, they did not find the Cottle

3 | Resignation because the District had a policy of not releasing information concerning

4 | ongoing personnel matters.

5 |     43.    At that time, the Cottle Resignation was unresolved.

6 |     44.    Yet, on January 10, 2014, the Greens submitted a new request under the

7 | Arizona Freedom of Information Act (A.R.S. §39-121 et seq.) pursuant to which the Greens

8 | requested "the emails (sic) from employees regarding the GPS working environment that

9 | were missing from the public records we inspected in December of 2013, when we

10 | reviewed board email messages."

11 |     45.    The Greens further specified in their request that "These emails (sic) we seek

12 | were sent in November 2013."

13 |     46.    The Cottle Resignation was included in the requested email messages and was

14 | ultimately provided to the Greens without redaction and despite the fact that the Cottle

15 | allegations were under investigation and had not been substantiated.

16 |     47.    The Cottle Resignation contained allegations against the District staff

17 | (including both Bowers and Plaintiff) that were spurious and, accordingly, wholly false.

18 |     48.    Cottle contended that she had secretly recorded conversations with District

19 | staff that supported her false allegation yet, she has never produced such recordings.

20 |     49.    Plaintiff is informed and believes and therefore alleges that because the Cottle

21 | Resignation contained allegations against District staff including both Bowers and Plaintiff,

22 | Burk made sure that such information was made available to the Greens for dissemination.

23 |     50.    The District, through its then Superintendent, Dr. Jack Keegan ("Dr.

24 | Keegan"), commissioned an outside investigation of the Cottle allegations as such were

25 | contained in the Cottle Resignation.

26 |     51.    The investigation was implemented under the direction of attorney Georgia

27 | A. Staton ("Staton") of the Jones, Skelton and Hochuli law firm.

28 |     52.    Plaintiff is informed and believes and therefore alleges that Staton, with the

approval of the District, hired attorney Don Conrad ("Conrad") to undertake an outside investigation of the allegations contained in the Cottle Resignation (the "Cottle Allegations").

53.     Via a report dated February 14, 2014 (the "Cottle Report"), Conrad found no basis in fact for the Cottle Allegations which included allegations of wrongdoing on the part of the District or District staff, including Plaintiff.

54.     As the holder of the right to disclose any confidential or attorney client information to Plaintiff, Dr. Keegan provided a copy of the Cottle Report to Plaintiff.

55.     A true copy of the report is attached hereto as Exhibit D.

56.     The report found, among other things, as follows:

> No specific evidence was identified in this investigation which would support Cottle's claims that she was bullied and intimidated by Bowers and Richardson. No specific examples of conduct that could be characterized as bullying or intimidation were set out in Cottle's complaints that were investigated by McIntosh. Richardson specifically denies engaging in such behavior and she says that she never witnessed any bullying or intimidating conduct directed at Cottle by Bowers. (Interview of Nicole Richardson, December 27, 2013.) Bowers, in a written response to Cottle's complaint provided to McIntosh for his investigation, says that Cottle was "treated with respect and compassion" and that from the beginning of her employment at GPS she "was welcomed" into the Community Relations Department. Bowers also wrote that Cottle never expressed any dissatisfaction until the PIP was put in place. (Exhibit 16; see specifically document from Diane Bowers dated October 4, 2013.) Bowers categorically denies ever having treated Cottle in an intimidating or bullying fashion. (Interview of Dianne Bowers, January 22, 2013.)

Cottle Report at 6. ("PIP" refers to a personal improvement plan).

57.     Additionally, Conrad noted that although he tried to contact Cottle for purposes of concluding his investigation, Cottle failed to respond to or refused Conrad's attempts to contact her.

58.     The Cottle Report provides as follows:

> As Cottle has never responded to a request to be interviewed as a part of this investigation, it is impossible now to provide specific examples of the conduct she believed to be intimidating or bullying. It is significant that Cottle apparently did not feel bullied or intimidated until the PIP was implemented.

*Id.*

59.     By memorandum dated February 21, 2014 (the "Keegan Memo"), Dr. Keegan forwarded a copy of the Cottle Report to the members of the Board and stated:

Enclosed in your packet is a report from Don Conrad regarding his investigation of Kami Cottle's letter entitled Constructive Discharge Resignation. You received a copy of the [Cottle Resignation] letter and I informed the Board in executive session the action the administration was going to take. We had Don review the activities that led up to her resignation to be sure that we had provided the support that was necessary that we felt we followed all appropriate personnel rules in working with Kami. As you can see from the report, the District provided the adequate support necessary.

60.    A true copy of the February 21, 2014 Keegan Memo is attached hereto as Exhibit E.

61.    In his memorandum, Keegan also addresses First Amendment issues in great detail and explains to the Board that "even though [District employees] work for a public agency, [they] do not give up their right to speak about that agency . . . ." *Id.* at 2.

62.    Plaintiff is informed and believes and therefore alleges that the Cabal individually or collectively, intended to use, and did use, the Cottle Resignation and investigation to foment distrust, dissent and suspicion of, and to intimidate the District staff, including Plaintiff.

63.    Plaintiff is informed and believes and therefore alleges that aside from the Greens, the Cabal utilized other abettors and proxies to foment distrust of, stress upon, and intimidation of the District Staff including Plaintiff.

64.    Plaintiff is informed and believes and therefore alleges that among others, the Cabal (individually or collectively) provided information to Joe and Lisa Nicita who are abettors and acolytes of the Cabal for purposes of fomenting distrust of, stress upon, and intimidation of the District Staff including Plaintiff.

65.    For example, in a blog authored by Lisa Nicita, Ms. Nicita posted information from the Cottle Resignation as truth when the allegations were not supported by any credible evidence.

66.    In her own words, Ms. Nicita purports to "expos[e] some iffy practices of school district personnel, using anonymous sources."

67.    Ms. Nicita further purports to expose "[t]he web of manipulation, malice, cover-ups and lies that has entangled Gilbert Public Schools."

68.    Nicita states unequivocally, that based on unnamed sources, the information

in her blog "are facts" and that she is going to "set the record straight about what is going on [in the District]."

69. As part of her purported exposé of the District staff, Ms. Nicita quotes from the Cottle Resignation stating that the "District management officials hold a 'direct disregard for the truth'" and that "high-ranking administrative officials used intimidation and harassment and allowed for an environment of hostility in the workplace." *See* blog post "MySoCalledCrisis," dated February 24, 2014 the ("Nicita Blog Post").

70. A true copy of the Nicita Blog Post entitled "One 'Sinking Ship' and Oodles of Anonymous Sources" is attached hereto as Exhibit F.

71. Plaintiff is informed and believes and therefore alleges that Burk or another member of the Cabal provided a copy of the Cottle Resignation to the Nicitas.

72. The Nicitas never made a request for the Cottle Resignation from the District prior to the time the Nicita Blog Post was published.

73. Plaintiff is informed and believes and therefore alleges that the Nicitas and the Greens acted in concert with the Cabal and, in particular, Burk, for purposes of promoting distrust of, stress upon, and intimidation of the District Staff including Plaintiff.

74. On February 24, 2014, later during the day the Nicita Blog Post was published, Plaintiff engaged in a colloquy with Joe Nicita on a Facebook page entitled "We Support Gilbert Public Schools" (the "2/24 Nicita FB Transcript").

75. In the 2/24 Nicita FB Transcript, Plaintiff asked Joe Nicita to remove a URL (Universal Resource Locator or web address) link to the Nicita Blog Post containing quotes from the Cottle Resignation.

76. Plaintiff also noted in responding to Joe Nicita's comments that "printing something that isn't true is libel."

77. Plaintiff further noted that "the external investigation said it isn't true," referring to the false allegations that Ms. Nicita posted from the Cottle Resignation.

78. Mr. Nicita responded by stating that his wife published "what is public information from the cottle (sic) resignation."

79. A true copy of a portion of the 2/24 Nicita FB Transcript is attached hereto as Exhibit G.

80. In the evening of February 24, 2014, a subsequent conversation occurred on a Facebook page entitled "Parents for a Responsible School Board."

81. A true copy of a portion of that Facebook page is attached hereto as Exhibit H (the "2/24 Burk FB Transcript").

82. Burk is the administrator of the Parents for a Responsible Gilbert School Board ("PRGSB") Facebook page.

83. Mr. Nicita and other followers of the Cabal carried on a public conversation on the PRGSB Facebook page on February 24, 2014, pertaining to Plaintiff and her comments earlier in the day regarding the Nicita Blog Post.

84. Writing under the pseudonym "Parents for a Responsible Gilbert School Board," Burk addressed Plaintiff directly as follows:

> Nicole, we want to give you ample chance to follow through on your statements. If you would like to post the external investigation, we'd be happy to have it included in the dialogue.

2/24 Burk FB Transcript at 11:00 p.m.

85. On February 25, 2014 (the following day), Burk filed a complaint with the District (the "Burk Complaint") alleging that Plaintiff violated, among other things, an attorney client privilege by publicly disclosing the existence of an external investigation that absolved Plaintiff and other District staff from any wrongdoing.

86. Thus, on February 24, 2014, Burk was attempting to set a trap for Plaintiff by goading Plaintiff into submitting the entire Conrad Report so that Burk could allege an improper disclosure of the Conrad Report in her complaint against Plaintiff the following day.

87. A true copy of the first three pages of the Burk Complaint (for some reason redacted by the District to remove Staci Burk's personal information) is attached hereto as Exhibit I.

88.     As reflected on the first page of the Burk Complaint, Plaintiff was immediately placed on paid administrative leave "until further notice . . . pending investigation." *Id.*

89.     Burk filed the Burk Complaint notwithstanding that she had been instructed only days beforehand through the Keegan Memo that employees of the District retain their First Amendment rights to comment on social media and elsewhere.

90.     Plaintiff's comments, as contained in the 2/24 Nicita FB Transcript, were not made in the course of Plaintiff's duties as an employee of the District.

91.     Plaintiff's comments as contained in the 2/24 Nicita FB Transcript were made pursuant to Plaintiff's right as a citizen pursuant to the First Amendment of the United States Constitution (the "First Amendment") as a matter of free speech.

92.     Plaintiff's comments as contained in the 2/24 Nicita FB Transcript were both true and were proffered to disseminate the truth of the situation and to confront the falsities that were being promulgated by the Cabal individually and through the Greens, the Nicitas and /or other acolytes of the Cabal.

93.     Plaintiff is informed and believes and therefore alleges that Burk filed her complaint against Plaintiff as a component part of her and the Cabal's continuing effort to stigmatize, oppress and intimidate Plaintiff, and the District staff generally, with the goal in mind of making the employment atmosphere so insufferable that the District staff would be forced to resign.

94.     Plaintiff is informed and believes and therefore alleges that Burk filed her complaint against Plaintiff knowing that Plaintiff's comments as set forth in the 2/24 Nicita FB Transcript were not only true, but that such comments constituted protected speech under the terms of the First Amendment as Burk had been informed in the Keegan Memo only days before.

95.     The Burk Complaint was submitted in furtherance of the Cabal's campaign of intimidation and retaliation against the District Staff and against Plaintiff in particular.

96.     Specifically, the Burk Complaint was filed in retaliation for Plaintiff's

exercise of her First Amendment Rights as a citizen.

97.     As a direct result of the Burk Complaint and the Cabal's continuous bombardment of the District staff with retaliation, oppression and intimidation as alleged herein, Plaintiff suffered an intolerable level of distress to the point that she was compelled to seek medical assistance.

98.     Plaintiff thereafter went on medical leave and did not return to work.

99.     Dr. Keegan investigated the Burk Complaint and on March 6, 2014, he wrote a letter to Jeff Filloon, assistant superintendent of human resources, and rescinded the order for administrative leave.

100.    Moreover, in his letter to Mr. Filloon, Dr. Keegan noted that he had released the Conrad Report to Plaintiff after consulting with Ms. Staton, the attorney for the District.

101.    Dr. Keegan further noted that "[b]ecause as superintendent, I was the client, Ms. Staton advised me that I had the authority to release the report." *Id.*

102.    A true and correct copy of Dr. Keegan's investigative memorandum dated March 6, 2014 is attached hereto as Exhibit J (the "Keegan Investigative Memo").

103.    Aside from the Keegan Investigative Memo and the investigation which the Memo recounts, there have been no other investigations of Plaintiff during her employment with the District.

104.    On March 7, 2014, Jeff Filloon delivered a letter to Plaintiff (which included a copy of the Keegan Investigative Memo) pursuant to which Mr. Filloon notified Plaintiff of her reinstatement and Dr. Keegan's findings (the "Filloon Letter").

105.    Among other things, Mr. Filloon reiterated that Dr. Keegan had found no violation of the attorney client privilege and further, that Plaintiff had not made any threats of a lawsuit against anyone.

106.    The Filloon Letter along with the Keegan Investigative Memo terminated the investigation the District initiated against Plaintiff as a result of the Burk Complaint.

### An Environment of Retaliation, Intimidation and Oppression

107.    Through 2014, the Cabal's attacks on the District staff were unceasing as they

1    attempted to retaliate against, intimidate and oppress the District staff.

2      108.   Between, 2012 and 2014, the environment of retaliation, intimidation and

3 oppression that the Cabal both initiated and fostered, caused the mass exodus of over 700

4 certified teachers and administrators from the District.

5      109.   From the beginning of their reign, the Cabal caused the loss of almost the

6 entire District administration due to their creation of an atmosphere of distrust and paranoia

7 together with their incessant spurious allegations against the District staff and

8 administrators.

9      110.   For example, in early 2010, Burk directed the Board's attorney, Susan Segal,

10 ("Segal") to investigate Dianne Bowers and Jennifer Corry, two District staff members,

11 because of one or more Facebook posts that were critical of the Board and particularly the

12 actions of the Cabal as a majority of the Board.

13      111.   The same District staff members were also interrogated over the false

14 allegation that the son of one of them had profited from the District's purchase of certain

15 technology.

16      112.   Burk sent a threatening and angry private Facebook messages to a District

17 psychologist for his constitutionally protected activities.

18      113.   Burk accused a member of the Community Relations staff of engaging in an

19 angry text messaging exchange when, in reality, the messages were coming from Smith's

20 husband.

21      114.   Burk continued with her campaign of retaliation, intimidation and oppression

22 by monitoring employees' public media accounts and posts, and then, either personally

23 threatening the employee herself via email or via classroom visits.

24      115.   Burk also had the Human Relations staff interrogate an employee whose

25 communications had angered Burk.

26      116.   Likewise, on February 18, 2014, Burk and Colvin sought a criminal

27 investigation (the "Burk / Colvin Complaint") into the activities of the District staff

28 pertaining to an alleged destruction of records.

117.    Despite a police investigation, there has been no determination that a crime has been committed as a result of the Burk / Colvin Complaint.

118.    On February 18, 2014, Colvin and one other filed a criminal complaint against assistant superintendents Jeff Filloon and Shane McCord alleging embezzlement of District funds.

119.    Upon investigation, the Gilbert Police Department found no crime had been committed as the funds were paid pursuant to a contract with the District that the Board had approved.

120.    As a result of the Cabal's relentless campaign of retaliation, intimidation and oppression against the District staff, District staff began exhibiting physical symptoms not the least of which included bouts of vomiting, elevated high blood pressure requiring medication, hives, stress related fever blisters, and the need for prescription(s) for anxiety medication.

121.    As a result of the Cabal's campaign of retaliation, intimidation and oppression and the consequent stressful employment environment that Burk individually and that the collective Cabal (and therefore a Board majority) caused, certain employees (including Plaintiff) were compelled to take family medical leave of their jobs.

122.    On or about February 20, 2014, Dr. Keegan informed Plaintiff that her contract for the following year (2014-2015) would not be renewed because the Cabal had made that prior decision as the result of apparent violations of the Arizona open meeting laws.

123.    The Cabal had apparently created a list of 14 District employees whose contracts would not be renewed as a result of the collective prior determination of the Cabal.

124.    In a transparent attempt to circumvent open meetings laws, Plaintiff is informed and believes that the Burk, Colvin and Smith sent their corresponding lists to Susan Segal in an attempt to deceitfully claim that their determinations were proper.

125.    Segal sent the names to Dr. Keegan before the Board meeting at which the

names of those on the list were to be considered.

126.  Plaintiff's name was on the Cabal's list.

127.  Dr. Keegan informed Plaintiff that the Cabal would not approve her contract for the following year based on the list that Segal provided to Dr. Keegan.

128.  The creation of the list of 14 names was in furtherance of the Cabal's attempt to intimidate, pressure and retaliate against the District staff, including Plantiff.

129.  Plaintiff's name was included on the Cabal's list despite the fact that Dr. Keegan had recommended that Plaintiff be granted a contract for the upcoming school year.

130.  During her nineteen years of employment with the district both as a certified teacher and as an employee with the Community Relations staff at the District, the job performance reviews that Plaintiff received were, without exception, superlative.

131.  Prior to February 2014, there had never been any question as to whether Plaintiff would be awarded successive contracts.

132.  Never, until the Cottle Resignation and the Burk Complaint, had Plaintiff ever received a complaint about either her comportment or her abilities as a valued teacher, artist or employee of the District.

133.  Because of the intolerable and discriminatory work environment created by the Cabal and their acolytes and abettors, on March 17, 2014, Plaintiff was compelled to resign her position with the District.

134.  Burk and the Cabal considered anyone who did not embrace their political agenda as enemies and, accordingly, sought to attack and eliminate from employment all such perceived enemies.

135.  Burk and the Cabal (and the Board because of the Cabal's majority status) retaliated against Plaintiff for her personal views and the exercise of her First Amendment rights as a citizen and parent of former District students.

136.  As a result of the incessant attacks on the District and its staff and the Cabal's continued witch hunts pursuant to which the Cabal promoted the idea that the District and its staff were dishonest and untrustworthy, the following individuals (among others) have

resigned their positions:

- Tommie Pearce, Director of Special Education, resigned in early 2010
- Gary Fujino, Educational Services Coordinator, resigned in 2011
- Jacklyn McFarland, Community Relations, resigned in March of 2013
- Dave Allison, Superintendent, resigned in June 2013
- Barbara VeNard, Assistant Superintendent, resigned in January of 2014
- Susan Segal, attorney for the Board, resigned in February 2014
- Jack Keegan, Interim Superintendent, resigned early in March of 2014
- Diane Bowers, Director of Community Relations, resigned in March of 2014
- Kristin Anderson, Asst. Princ., Highland High School, resigned in June of 2014
- Jennifer Corry, District Hearing Officer, resigned in June of 2014
- Clyde Dangerfield, Assistant Superintendent, resigned in June of 2014
- Jeff Filloon, Assistant Superintendent, resigned in June of 2014
- Colin Kelly, Principal, Greenfield Elementary, resigned in June of 2014
- Jane Hecker, Director of Special Education, resigned in June of 2014
- Vicki Hestor, Principal, Meridian Elementary, resigned in June of 2014
- Shane McCord, Assistant Superintendent, resigned in June of 2014
- Jim Pacek, Director of Technology, resigned in June of 2014
- Jared Ryan, Principal, Campo Verde High School, resigned in June of 2014
- Dominic Salce, Principal, Highland High School, resigned in June, 2014
- Debbie Singleton, Principal Spectrum Elementary, resigned in June of 2014

137.    At the time of her resignation (constructive discharge), Plaintiff was one year short of earning her full retirement.

138.    Plaintiff is informed and believes and therefore alleges that Burk and the Cabal were aware of Plaintiff's retirement status and intentionally tried to inflict as much harm on Plaintiff as possible knowing her situation as a single breadwinner and single mother.

139.    Defendants' actions including Defendant's retaliatory conduct as alleged

herein, directly caused Plaintiff extreme emotional distress and financial damage.

140.    Plaintiff was unable to survive financially on the reduced retirement income that she would receive due to her work at the District and therefore, Plaintiff had to seek other employment.

141.    Because of the spurious allegations and the resulting suspension caused by the Burk Complaint, Plaintiff had great difficulty finding substitute employment.

142.    Among other places of employment, Plaintiff sought another position with the District as a certified secondary art teacher, a position she had successfully held for at least nine years in the District (Gilbert High School - six years, and Highland High School - three years).

143.    She interviewed with Gilbert High School officials and was offered a job as a secondary art teacher.

144.    Present Superintendent, Dr. Kristina Kishimoto ("Dr. Kishimoto"), favored the hire and submitted Plaintiff's name to the Board along with the names of several other individuals on the "consent" agenda at a Board Meeting on July 8, 2014 (the "July Board Meeting").

145.    A true and correct transcription of the July Board Meeting commencing at 48:09 is attached hereto as Exhibit K.

146.    During the June, 2014, Board Meeting, the Board approved two other employees who had previously resigned due to the Board's threats that they would not rehire these individuals.

147.    When Plaintiff's name came up at the July 8, 2014, Board Meeting (item 7.03 of the consent agenda), Smith moved to remove Plaintiff's name from the list of seven names that were to be approved which individuals had been recommended by Dr. Kishimoto.

148.    After the unanimous approval of the other six names, Board member Tram moved to approve Plaintiff's employment as an action item.

149.    Smith proposed a substitute motion which was a motion to approve a

secondary art teacher for Gilbert High School but with the removal of Plaintiff's name as the designated teacher to fill the position.

150. During discussion on the Smith motion, Smith stated as follows:

> I don't understand how it is, quite honestly, that she was offered a job again because she was put on administrative leave and there was an investigation going on and my understanding is that at the time of resignation the investigation had not been completed.

*Id.*

151. Smith's statement was categorically false as she had been informed months beforehand that the investigation of the Burk Complaint had been completed and that Plaintiff's suspension had been rescinded.

152. Smith also knew the contents of the Conrad Report and knew that Conrad had found no improper conduct on Plaintiff's part.

153. During the July 8, 2014, Board meeting, Burk and Smith continued to falsely contend that Plaintiff was still somehow under investigation when (1) the entire Board had been informed that the investigation of Plaintiff pursuant to the Burk Complaint had terminated favorably to Plaintiff and (2) where the Conrad Report clearly indicated that there was no evidence to support the Cottle Allegations against Plaintiff.

154. At the time of the July 8, 2014, Board meeting, there was no ongoing investigation of Plaintiff.

155. At the time of the July 8, 2014, Board meeting, the entire Board had been informed that there was no ongoing investigation of Plaintiff.

156. There was no other ostensible reason for refusing to hire Plaintiff at the July 8, 2014, Board meeting other than a retaliatory effort to damage Plaintiff for her protected activities.

157. On July 19, 2014, on the Gilbert Public School Board Observer Facebook page, Burk and others were engaged in a conversation pertaining to the Board's refusal to approve Plaintiff's employment as a secondary art teacher (the "7/19 Burk FB Transcript").

158. A true copy of a portion of the 7/19 Burk FB Transcript is attached hereto as

Exhibit L.

159.     An individual by the name of Myrna Sevey Shepard inquired as to why Plaintiff's name could not be added the Board agenda for the following Tuesday (July 22, 2014).

160.     Others also advocated such a result.

161.     Burk responded to these questions by falsely stating that Keegan had not completed his investigation of the Burk Complaint when the investigation had indeed been completed and Plaintiff had been exonerated.

162.     Then Burk continued and clearly stated that Plaintiff would be a danger to the safety of the students of the District if Plaintiff were hired by the District as proposed by Dr. Kishimoto.

163.     Burk stated as follows:

> If Ms. Richardson wants to return to GPS, *for the safety of our students* given the allegations made by her own staff I would expect that Ms. Richardson would also want the investigation to be completed in its entirety.

7/19 Burk FB Transcript at 9:48 p.m.

164.     There was nothing alleged in the Cottle Resignation that could be remotely considered an allegation that Plaintiff might pose a safety concern for students.

165.     In making her false and defamatory statements about Plaintiff, Burk had no information from any source whatsoever that Plaintiff posed any type of menace to the safety of the District's students.

166.     Burk continues on during the same conversation and falsely states that there was a "mix up between the independent investigator and the support staff" and that the "key witness [Cottle] was not contacted."

167.     Kami Cottle was indeed contacted relative to the Cottle Resignation and Conrad's investigation thereof but Cottle failed to respond and failed to produce her supposed tape recordings.

168.     Both the Conrad Report and the Keegan Memo reflect that Cottle failed to

1 | respond to requests to be interviewed an that the investigation of the Cottle Resignation had
2 | concluded.

3 |      169.   Burk also falsely states during the same conversation (the 7/19 Burk FB
4 | Transcript) that because of Plaintiff's resignation, "it was not necessary to expend the
5 | resources to spend resources to continue the investigation" thereby clearly falsely implying
6 | that Plaintiff was under investigation when she resigned when such was clearly not the case.

7 |      170.   In email correspondence dated March 21, 2014, from Burk to Conrad, Burk
8 | specifically acknowledges the existence and content of the Filloon Letter and the Keegan
9 | Memo (the "3/21 Burk Email").

10 |      171.   A true and correct copy of the 3/21 Burk Email is attached hereto as Exhibit
11 | M.

12 |      172.   In the 3/21 Burk Email, Burk states:

13 | > The former Superintendent Jack Keegan, sent a letter to Jeff
14 | > Filloon condoning this action under the rationale that Ms.
15 | > Staton gave him permission and direction to release the report
16 | > and therefore the behavior of Nicole Richardson was justified."

15 | *Id.*

## Count I

*(Civil Rights violations, constructive discharge, retaliation)*

*(42 U.S. C. §1983)*

19 |      173.   Plaintiff incorporates by reference the allegations contained in paragraphs 1
20 | through 172 above as though fully set forth herein.

21 |      174.   42 U.S.C. §1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State ... subjects, or causes
> to be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress...

26 |      175.   The District is a "person" within the meaning of 42 U.S.C. §1983.

27 |      176.   The District, through the actions of the Cabal as a majority the Board, acted
28 | under color of state law within the meaning of 42 U.S.C. §1983.

177.   The District, through the acts of a majority of the Board adopted a policy and practice of discriminatory and retaliatory conduct toward District staff including Plaintiff.

178.   Plaintiff is informed and believes and therefore alleges that the acts of the Cabal through Smith, Colvin and Burk were intentional with the purpose of intimidating and oppressing the District staff to the point that working at the District would become intolerable.

179.   The actions of the Cabal both individually and collectively on behalf of the Board were purposely and intentionally designed to deprive Plaintiff of her civil rights including her right to freely express herself.

180.   The District retaliated against Plaintiff by placing her on administrative leave with no basis to do so.

181.   Plaintiff's suspension, though unjustified, now must be reported and was reported to prospective employers.

182.   Plaintiff was not considered by both prospective employers and by the District as a result of the suspension and the acts of the Cabal as a majority of the Board.

183.   Plaintiff had a legitimate claim of entitlement to her employment (1) before the Burk Complaint, (2) after her suspension as a result of the Burk complaint and (3) after she was constructively terminated and subsequently reapplied for a position with the District.

184.   Defendants denied Plaintiff her right of free expression and ultimately retaliated against Plaintiff as a result of the exercise of her right of free expression under the terms of the First Amendment.

185.   Plaintiff was constructively discharged and denied her right of employment because of the actions of Defendants in retaliating, intimidating and oppressing both Plaintiff and District staff and thereby creating an intolerable work environment as alleged hereinabove.

186.   Defendants' actions in (1) creating a hostile and intolerable work environment and (2) in retaliating against Plaintiff for exercising her Constitutional rights deprived her

of rights, privileges and immunities within the meaning of 42 U.S.C. §1983.

187. Plaintiff was damaged as a direct and proximate result of Defendants' actions.

188. Plaintiff has been damaged in an amount believed to be in excess of $250,000 due to both the loss of employment and the loss of retirement benefits.

**WHEREFORE**, Plaintiff requests this Court enter judgment against Defendants and all of them, as follows:

A. Awarding Plaintiff just and reasonable compensatory damages in the amount of not less than $250,000.00;

B. Awarding to Plaintiff the reasonable costs and expenses incurred in the prosecution of this action, including but not limited to attorneys' fees and costs pursuant to 42 U.S.C. §1988;

C. Awarding Plaintiff pre and post judgment interest on the foregoing sums at a reasonable or statutory rate (whichever is higher) from the date that Defendants deprived Plaintiff of her rights;

D. Entering a proscriptive injunction against the District requiring the District to employ Plaintiff in whatever position she qualifies for at a rate commensurate with her skills and seniority with no further discrimination or retaliation; and

E. Awarding Plaintiff such other and further relief as is appropriate under the circumstances.

## <u>Count II</u>

*(Intentional Infliction of Emotional Pain and Suffering)*

189. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 188 above as though fully set forth herein.

190. The acts of Burk as alleged herein in, including among other things, filing a baseless complaint, accusing Plaintiff of misdeeds in the public media and in otherwise subjecting Plaintiff to ridicule and scorn, were extreme and outrageous and were intentionally or recklessly designed to cause severe emotional harm and distress to Plaintiff.

191. Such actions were not undertaken within the course and scope of Burk's position as a "public employee" within the meaning of A.R.S. §12-820, but rather as a private citizen.

192. Plaintiff is informed and believes and therefore alleges that Burk's comments in the social media and her filing of a spurious complaint against Plaintiff as alleged herein, were prompted by a personal animus toward Plaintiff.

193. Indeed, the policies of the District impose upon Board Members the following responsibility:

> To accept the responsibility for confidentiality in appropriate matters, *especially those dealing with personnel* and the divulging of privileged information that could cost the District money, support, or public confidence.

GPS Board Policies, sec. B., "Board Powers and Responsibilities," No. BBA (emphasis added).

194. The Cottle Resignation was a personnel matter.

195. Burk's actions as described above did cause Plaintiff severe emotional harm and distress such that, among other things, Plaintiff had to go on medical leave and seek the aid of a physician.

196. Plaintiff continues to suffer emotional pain and distress as a result of Burk's callous, outrageous and intentional acts.

197. Plaintiff has been damaged in an amount to be determined at trial but currently believed to be in excess of $150,000.00.

198. The acts of Defendants were extreme and undertaken with an evil mind sufficient to merit the award of punitive damages.

**WHEREFORE**, Plaintiff requests this Court enter judgment against Defendants and all of them, as follows:

A. Awarding Plaintiff just and reasonable compensatory damages in the amount of not less than $150,000.00;

B. Awarding to Plaintiff exemplary damages in an amount sufficient to punish

1  Burk for her outrageous conduct but in an amount not less than $300,000.00;

2  C.  Awarding Plaintiff her costs of suit; and

3  D.  Awarding Plaintiff such other and further relief as is appropriate under the

4  circumstances.

5  **Count III**

6  *(Defamation)*

7  199.  Plaintiff incorporates by reference the allegations contained in paragraphs 1

8  though 198 above as though fully set forth herein.

9  200.  Burk, acting individually, made false and defamatory statements regarding

10  Plaintiff in writing and published such statements on the internet.

11  201.  The acts of Burk as alleged herein in, among other things, publishing

12  falsehoods against Plaintiff in public media were extreme and outrageous and were

13  intentionally or recklessly designed to cause damage to Plaintiff's reputation within the

14  community, and in particular, the educational community.

15  202.  Such actions were not undertaken within the course and scope of Burk's

16  position as a "public employee" within the meaning of A.R.S. §12-820, but rather as a

17  private citizen.

18  203.  Plaintiff is informed and believes and therefore alleges that Burk's comments

19  in the social media as alleged herein were prompted by a personal animus toward Plaintiff.

20  204.  One of the overriding concerns of the District is to assure the safety of its

21  students.

22  205.  Burk knew that there was no reason or basis to fear for the safety of the

23  students of the District in rehiring Plaintiff.

24  206.  Burk's false allegations to the effect that Plaintiff could possibly pose a threat

25  to the safety of the District's students, is per se defamatory.

26  207.  Burk's statements to the effect that Plaintiff was still somehow under

27  investigation were wholly false and Burk knew of the falsity of such statements when she

28  made them.

208.    Plaintiff is informed and believes and therefore alleges that Burk's comments in the social media as alleged herein were prompted by a personal animus toward Plaintiff.

209.    Burk's published false statements as alleged in this Count constituted a direct attack on Plaintiff's, integrity, virtue, and reputation and brought Plaintiff's reputation into disrepute, contempt, and ridicule both among her peers as an educator and among the public at large who have access to the internet.

210.    Plaintiff was directly horrendously damaged by Plaintiff's outrageous written comments.

211.    Burk's actions were sufficiently callous, outrageous and undertaken with an evil mind, that an award of punitive damages is appropriate.

**WHEREFORE**, Plaintiff requests this Court enter judgment against Burk as follows:

A.    Awarding Plaintiff just and reasonable compensatory damages in the amount of not less than $150,000.00;

B.    Awarding to Plaintiff exemplary damages in an amount sufficient to punish Defendant Burk for her outrageous conduct but in an amount not less than $300,000.00;

C.    Awarding Plaintiff her costs of suit; and

D.    Awarding Plaintiff such other and further relief as is appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, Ariz. R. Civ. P. demand is hereby made that all matters triable by a jury in this case be so tried.

**DATED** this ___21st___ day of January, 2015.

**RICHARDSON & RICHARDSON, P.C.**

By  /s/ William R. Richardson
   William R. Richardson
   1745 South Alma School Road, Suite 100
   Mesa, Arizona 85210-3010
   Attorneys for Plaintiff

# EXHIBIT "A"

http://archive.azcentral.com/community/gilbert/articles/2009/08/14/20090814gr-schoolfight0815
.html

# Mom Charges Retaliation in Fight with Gilbert School District

by Emily Gersema - Aug. 14, 2009 08:49 AM
The Arizona Republic

A Mesa mother alleges she and her family are targets of retaliation by a Gilbert youth football league because it has a business relationship with a school district that has a pending legal case against her.

Staci Griffin-Burk said Gilbert Public Schools filed in the spring a due process complaint against her over her 10-year-old son Josh 's special education services.

She said the district has been trying to place him in a private school for kids with serious disabilities even though he has been in both general education and special education classrooms throughout elementary school.

She said the district has failed to provide proper aides for his vision trouble and learning disabilities.

In response to the district's complaint, she has filed a notice of claim, declaring her right to countersue the district if she chooses.

Gilbert Pop Warner, which rents fields from the school district,won't let her son at the center of the legal dispute play on its teams.

In addition, Paul Watkins, state commissioner of Arizona Pop Warner, last week ordered the release of her older son, Alex Griffin, who was volunteering as a coach on the team, the Aviators.

Watkins did not respond to calls seeking comment.

League officials decided Griffin-Burk's son Josh shouldn't play football in Gilbert when she asked whether any district employees aware of her case have any involvement with her sons' teams.

Griffin-Burk said she was concerned that a conflict of interest could arise and interfere with her sons' play.

Gilbert Pop Warner president Michelle Holmberg told Griffin-Burk late last month that Josh should register and

play in the Queen Creek Pop Warner league - about 15 miles from her house.

Holmberg wrote that letting him play in the Queen Creek league was the best solution since she and Watkins were concerned about the pending case with the district and didn't want to be involved.

Griffin-Burk said she should have been offered the option of enrolling her son on another team within the Gilbert league. She is a single mom with chronic heart and lung trouble who breathes with the aid of an oxygen machine, and said a daily drive of 15 miles to and from Queen Creek is difficult to manage.

Griffin-Burk said she believes the dispute with Pop Warner is symptomatic of the conflict with Gilbert Public Schools.

"This has just gone too far," she said.

Griffin-Burk said she contacted civil rights attorneys because she believes the league is retailiating against her.

Rico said he hopes to negotiate with Gilbert Pop Warner officials to let Josh play football and Alex coach, or issue a full refund and an apology.

The league promised a full refund, but Griffin-Burk said she hasn't received it.

If the group does not choose any of those potential solutions, the case will be referred to the state attorney general's office and the U.S. Department of Justice's civil rights office.

Pop Warner's leagues throughout the country are run solely by volunteers. They follow a set of bylaws that govern their operation and policies for decisions such as when they can or can't switch kids from one team to another.

When asked about the potential legal case with Griffin-Burk, the national spokesman for Pop Warner, Josh Pruce, declined comment.

Griffin-Burk noted a Gilbert Public Schools employee is a volunteer member of the community's Pop Warner board, but district officials said that is completely separate from her job at the school district.

The district is keeping its distance.

"As far as I can tell, this is a private matter," Assistant Superintendent Clyde Dangerfield said of the conflict between Griffin-Burk and Pop Warner. "It doesn't involve the school district."

District officials said they cannot discuss its case against Griffin-Burk; privacy laws require they maintain confidentiality in student matters. Griffin-Burk said she has had a good

working relationship with Pop Warner until now. Her sons have played in the league for several years.

With Gilbert Public Schools, it's another story. She and the district have had a shaky relationship for the past couple of years due to disputes over two of her children's education.

Griffin-Burk also has been an advocate for about a half-dozen other families whose children have special needs, including some whose children attend Gilbert Public Schools.

Griffin-Burk said she has won a few disputes on behalf of the families and wonders if now, because of that, the district considers her a threat.

Dangerfield said in a recent interview that the district tries to do what's best for children with special needs. Sometimes staff recommendations are at odds with what parents want, he said.

He noted, too, that the district has never before filed a case against a parent.

The Arizona Department of Education Web site on special education services shows these cases typically number fewer than a half dozen each year. Usually, they are initiated by parents concerned about special education services for their children.

Hearings for the two due process complaints have not been set yet.

# EXHIBIT "B"

I spoke with Jared just now. I was my honest self. He did admit that he stood in the room at the meeting and stated his support for the years Dr. Allison worked at GPS and encouraged others to attend the meeting. He denied that he phoned, e-mailed or texted anyone to go to the meeting. He denied any intention of wishing to undermine or intimidate the board. He denied any connection with the GEA letter or whipping up a frenzy. Jared said he used to be a GEA member but dropped his membership a while back after getting higher in the ranks and seeing what GEA really represents. I think he is being honest that he wanted to show support for/appreciation of the years that Dave worked but also is being a kiss-up.

I told Jared that moving forward the board needs admin. that we can trust, that will not undermine and will not play a constant chess game with us but instead be respectful. I told him loyalty is very important to me. I spoke specifically of principals and not so much above. He genuinely understood and apologized if there was a misrepresentation of my being at the Tuesday meeting or my statement at the admin. meeting.

He has been offered a job by Chandler district to open a new school. Jared does disagree with a business or private sector superintendent but then did agree with my statement that a different set of skills is necessary to run a district and handle a budget. Jared also agreed that the assistant superintendents have the hands on knowledge of classroom and school challenges that can help shape a superintendent's decision.

I think he is an asset to our district and it would be a loss. I think he appreciates now that we don't like games. I came straight out and told him that he was on my short list of recommendation for assistant superintendent and was removed after the stunt he pulled. He would like it if you can find the time to call him by tomorrow before end of business day. I did let him know you have been testifying in a trial which has taken up a lot of your time.

I would recommend you call him when you get a chance. I think the guy has a lot of talent and will stop the games if he sees the leadership from us. **Jared can be our star pupil we get going in the right direction!**

His cell: 480-262-0643

Take Care,
Julie

# EXHIBIT "C"

http://www.eastvalleytribune.com/local/gilbert/article_a324417e-f354-11e3-b080-001a4bcf887a.
html

# Gilbert Public Schools board votes no on override request

Posted: Saturday, June 14, 2014 8:30 am

By Eric Mungenast, Tribune

Voters in Gilbert won't receive a third opportunity to weigh the pros and cons of an override after the Gilbert Public Schools Governing Board voted down adding it to the November ballot in a heated 3-2 vote.

Board president Staci Burk, Clerk Daryl Colvin and board member Julie Smith opted against placing a 10 percent override on the Nov. 4 election ballot during the board's June 10 meeting. It would have been the third time in the last three years the board asked for an override; voters rejected the district's efforts in 2012 and 2013.

"It's clear that the voters are not in support of this," Burk said.

The measure would have allowed the district to overspend its maintenance and operations by 10 percent starting in the 2015-16 fiscal year. Gilbert first approved an override in 2007, but the inability to renew it in 2012 and 2013 will result in the district losing it in 2016.

The inability to approve another override was one of the reasons Burk cited for her decision to not go for it in 2014,

along with a potential influx in funding in the neighborhood of $8 million for the 2015-16 school year. Board member Lily Tram, who approved the measure alongside Jill Humpherys, said there's no guarantee the district will receive that much funding from the state and other sources next year.

Rather, she said the district could guarantee a source of funding she said Gilbert needs if it could get an override approved by voters.

"I can't see how we can find another $7 million to cut in the budget. We've all seen it, the budgets are presented to us," she said. "It just means further increasing class sizes, cuts of programs, closing of schools, rebounding things. There's really no other way and it's going to be a devastating impact if this override isn't provided to the community to vote."

Tram's reference was the 2014-15 fiscal year budget the board approved shortly before the override vote, which saw the district cut approximately $6 million from the maintenance and operations budget, some of which was a result of the override loss. The district bridged that gap in part by eliminating 80 teaching

positions that will lead to an increase in class sizes among every level.

Smith, however, said the district might have found more areas to cut from the 2014-15 fiscal year budget, which the board also passed during the meeting, had the newly implemented zero-based budgeting system started sooner. Although it was implemented during the budgeting process, Smith said the 2013 override attempt delayed the start of it and impeded on the district's budgeting efforts.

The reason she mentioned for voting against was a lack of trust between the district and the community caused by a collection of contrasting information. Smith said she didn't want to go for another override before incoming Superintendent Christina Kishimoto can regain the community's trust.

Smith's vote, along with those of Burk and Colvin, went against Kishimoto's recommendation to go for the override. In a letter addressed to the board, Kishimoto said the district should pursue an aggressive campaign to provide funding for a "student-centered district." Also supporting the measure were Mayor John Lewis, Gilbert Councilmember Ben Cooper and Gilbert Public Schools Governing Board candidates Reed Carr and Charles Santa Cruz.

The end result of the vote drew a spattering of boos, with audience members shouting "shame on you" and "resign" to the members opposing the measure. The audience consisted largely of parents and community members in support of the override, one of whom presented the board a document with 1,071 signatures in favor of it.

Contact writer: (480) 898-5647 or emungenast@evtrib.com

# EXHIBIT "D"

**DONALD E CONRAD**

**Attorney at Law**

## REPORT OF INVESTIGATION OF ALLEGATIONS OF CONSTRUCTIVE DISMISSAL BY KAMI COTTLE

I. **Introduction**

On April 1, 2013 Gilbert Public Schools (GPS) hired Kami Cottle to fill the position of Marketing Specialist in the Community Relations Department. The responsibility of the position was to identify and write articles for various news outlets, both external and internal to GPS. The articles were to focus on the good work of GPS staff, the GPS learning environment and the accomplishments of its students. Cottle worked under the immediate supervision of Nicole Richardson, Website Communications Supervisor. The head of the department is Dianne Bowers, the Director of Community Relations and Public Information Officer.

Cottle produced a minimal number of articles during the summer break in 2013. By August, deficiencies in her performance were noticed by her supervision. Initially, a decision was made to extend her probationary period. However, that was deemed impossible as Cottle's probation had expired 60 days[1] after she was hired. Instead, a Performance Improvement Plan (PIP) was developed by which Cottle was to demonstrate improvements in her work and an ability to perform the essential functions of the position. Cottle signed the PIP on August 26, 2013.

Over a period of weeks, Cottle's work product was reviewed and meetings were held to compare the work to the criteria set out in the PIP. Cottle's performance was unsatisfactory. On November 18, 2013, Cottle resigned alleging that she had been constructively discharged.

Cottle's allegations were conveyed to the GPS Governing Board. This investigation followed.

II. **Methodology**

After an initial discussion of the issues with Dr. Jack Keegan, acting GPS Superintendent, interviews were conducted of the following persons:

Nicole Richardson, Website Communications Supervisor

Shawn McIntosh, Director of Human Resources

Dianne Bowers, Director of Community Relations and Public Information Officer

---

[1] Probationary periods at GPS vary and depend upon how a position is classified. Only working days are counted in the calculation of a probationary period. (Interview of Shawn McIntosh, January 21, 2014.)

1

Cottle was contacted with a request to be interviewed for this investigation by telephone and by email using a telephone number and address available from the Human Resources Department at GPS. Cottle never responded to either communication.

Vickie Savory, a GPS employee and former colleague of Cottle in the Community Relations Department, was also contacted and asked to participate in an interview. Savory worked until late 2013 in the Community Relations Department as an assistant to Bowers. Savory canceled a scheduled appointment to be interviewed claiming stress related reasons. She has since declined to be interviewed citing the stress of being interviewed as the reason. (See Exhibit 21, email from Vickie Savory dated January 8, 2013.)

Copies of all digital and hard copy documentation related to the hiring of Cottle, the improvement plan, notes related to implementation of the plan and Cottle's resignation were requested from the Human Resources Department. All documentation made available was reviewed.

III.     **Facts**

(a)  **Cottle's Application and Hiring**

Cottle responded to a GPS announcement for a Community Relations Specialist posted on February 27, 2013. Set out in the announcement were essential functions including the development of written and visual content for a variety of communication channels. Those channels include the GPS Facebook account and the GPS website. The writer filling the position also was responsible for press releases to azcentral.com and for the "In Touch" newsletter, a summary of the results of the GPS superintendent's monthly meeting with East Valley mayors and community leaders. That newsletter is also distributed to the Arizona Business and Education Coalition. The minimum qualifications required "excellent visual and written communications skills" and "demonstrated writing experience and familiarity with The Associated Press (AP) style." (Exhibit 1, job description for Community Relations Specialist.) These job requirements were discussed with Cottle at the time of the interview which was attended by Bowers and Richardson. (Interview of Nicole Richardson, December 27, 2013.)

Cottle presented a resume which stated that in previous employment she had written press releases, datasheets, business technical articles for internet and magazine print and speeches for management executives for fund raising events. (Exhibit 2, Cottle resume.) Her stated prior experience included a position for two years as a marketing/writing/sales representative and for three years as a public relations agent.

Cottle provided writing samples at the time of her interview. They are not available at GPS, perhaps returned to Cottle. (Interview of Nicole Richardson, December 27, 2013.)

(b)  **Cottle's Work Performance**

Cottle started her position in April 2013 as the school year was ending. According to Richardson, the work flow during the summer break that followed was abnormally slow. One reason for the diminished work load was that Superintendent David Allison had left the district and no replacement had yet been made. In normal summers, a large part of what the Community Relations Department does is to prepare materials for the upcoming school year, including a welcome back video featuring the

superintendent which is shown to all students at the beginning of the school year. (Exhibit 3, Richardson's email and attachment to Jeff Filloon and Shawn McIntosh re: Response to Kami Cottle dated October 7, 2013.) (Interview of Nicole Richardson, December 27, 2013.)

Cottle posted nine articles to the GPS website during the summer. Richardson noticed that of the nine articles, five were articles the contents of which amounted to cut and paste information from materials given to Cottle. She noticed that one of the articles had a title that seemed inapplicable to the contents. She also noticed punctuation errors and awkward sentence structure. As Richardson had access to the GPS website, she corrected what she termed "glaring" punctuation errors in one story online. When she raised the problem with Cottle, Cottle explained that she had accidentally posted a draft of an article which had not been proofread by Savory. (Interview of Nicole Richardson, December 27, 2013.)

Sometime during the summer, Cottle had begun to be assisted by Savory who served as a grammarian and editor for Cottle's articles. Savory regularly reviewed and corrected Cottle's articles to ensure appropriate punctuation, structure and compliance with the "AP" style. Cottle's reliance on Savory was known to Richardson and Bowers. (Exhibit 22, email from Nicole Richardson dated February 3, 2014.)

In August, three parents contacted Richardson about the poor quality of articles posted on the GPS website. Cottle had written the articles. These parents were known to Richardson as parents who have previously taken a special interest in GPS. (Interview of Nicole Richardson, December 27, 2013.)

Proofreading Cottle's articles was not then an assigned responsibility of Richardson. Her responsibilities were to create film, graphics and maintain the GPS website. Complaints from parents, however, convinced Richardson to take a closer look at the work being produced by Cottle. (Exhibit 3, Richardson's response to Cottle's complaints.)

Richardson brought the issue of the poor quality of Cottle's work to Bower's attention. Based on a review of her written product and other work performance, a decision was made to propose her termination. In consultation with the Human Resources Department it was learned that termination based on a failure to successfully complete probation was not possible as the 60 day probationary period for Cottle's position had already expired. A decision was made to implement a PIP. (Interview of Shawn McIntosh. December 19, 2013.)

Bowers had been advised prior to the expiration of Cottle's probation of the need to complete a probationary evaluation by June 21, 2013. According to McIntosh, a list of probationary employees is sent once a month to administrators to remind them of probationary periods that are expiring. (Exhibit 5, email from Shawn McIntosh dated January 16, 2014.) McIntosh provided copies of three email reminders sent to GPS supervisors reminding them of the need to do evaluations for probationary employees. The emails, from Stella Nora in the Human Resources Department, also include an attachment called "Probationary Employee List" that identifies by department the employee(s) and the date(s) probation expires. (Exhibit 18, email dated May 7, 2013, from Stella Nora with "Probationary employee List" and "Probation Evaluation Checklist" attached; Exhibit 19, email dated June 12, 2013, from Stella Nora; Exhibit 20, email dated July 16, 2013, from Stella Nora.) Bowers and her assistant Savory are listed as recipients of the emails with the attachment naming the employees for whom an evaluation was needed. Cottle is named in the attachments included with each of the emails. The Cottle entry indicates her probation ends on June 21, 2013.

Instead of a probationary evaluation, an intermittent evaluation was completed and a PIP was provided to Cottle. Cottle's overall rating in her evaluation was that she "does not meet standards" in the area of quality of work and that she is "developing/approaching" standards in the area of initiative and quantity of work. Richardson drafted the PIP. Cottle signed her evaluation on August 26. (Exhibit 4, Cottle's evaluation and Performance Improvement Plan dated August 16, 2013.) Cottle was advised by Richardson that but for the expiration of her probation she would have been terminated.[2] (Interview of Nicole Richardson, December 27, 2013.) The PIP originally required improvement by September 20, 2013. (Exhibit 4, Cottle's evaluation and Performance Improvement Plan dated August 16, 2013.) (Interview of Shawn McIntosh. December 19, 2013.) On September 18, the PIP completion date was extended to November 13. (Exhibit 6, calendar of events made by Richardson; constructed from her contemporaneous digital calendar notes.) (Interview of Nicole Richardson, December 27, 2013.) The PIP was extended to allow Cottle more time for improvement.[3] (Interview of Shawn McIntosh, February 3, 2014.)

### (c) Cottle's Improvement Plan

Cottle's PIP was detailed and specific. Included were objectives that required interesting and important ideas for her stories, an organized style, sentence fluency, use of the AP style, and memorable word choices. An objective measure of performance was also included. Cottle was required to generate five stories per week. She was encouraged to use photographs when appropriate. The PIP contemplated that Cottle would present her five stories to Bowers and Richardson before the end of the day each Friday. The PIP also suggested sources for independent study that Cottle could review to improve her writing skills. (Exhibit 4)

Friday meetings were held among Cottle, Richardson and Bowers to address the performance issues identified in the PIP on August 23, August 30, September 5[4], September 20, and September 27. About October 17, 2013, Cottle requested that the Friday meetings be suspended and that she post her stories without the Friday review because she did not find the meetings helpful. The meetings were suspended at Cottle's request. (Interview of Shawn McIntosh, December 19, 2013.) (Exhibit 6)

Prior to the Friday meetings, Bowers and Richardson reviewed Cottle's articles. Feedback was provided to Cottle at the Friday meetings. Significant problems with Cottle's writing were evident in the articles submitted for review by her supervision. Reviews of Cottle's work for October 2, (Exhibit 12), October 16 (Exhibit 13), and October 23 (Exhibit 14) point out the ongoing deficiencies in Cottle's work and her failure to meet the basic requirements of her position.

---

[2] Cottle has complained that Richardson's statement demonstrates that the PIP was a farce intended to drive her from GPS or to set up her dismissal. Richardson admits that she told Cottle of the original intention to dismiss her but that the statement was made to emphasize the district's serious need to have a writer on the Community Relations staff capable of working independently and producing accurate, innovative articles and to convince Cottle to be serious about her need to improve. (Interview of Nicole Richardson, December 27, 2013.)
[3] Cottle was absent for several days during her improvement period due to the death of a family member.
[4] No meeting was held on September 13 due to Cottle's absence for bereavement leave. No meeting was held on October 4 as it is a GPS early release day. None was held on October 11 due to Cottle's vacation absence.

## (d) Review of Cottle's Work Product by Third Parties

On September 25 and after the PIP reviews were initiated, Cottle sent an email to McIntosh in which she complained that Richardson was biased against her. (Exhibit 7, email from Kami Cottle re: HR.) To deal with Cottle's objection, McIntosh arranged for submission of five of Cottle's articles for review by other teachers in the GPS system. Cottle knew of the proposal to have her work reviewed by other than the Community Resources staff. (Exhibit 8, email from Kami Cottle dated October 25, 2013.) (Interview of Shawn McIntosh, December 19, 2013.) Cottle submitted stories for the third party review to McIntosh. Richardson was not involved in the review of these stories. (Exhibit 9, email from Kami Cottle dated October 25 2013 re: stories 10-25.)

McIntosh asked Jack Blanchard, Director of Community Education for GPS, to review Cottle's submissions and to complete the evaluation form being used at the Friday meetings. Blanchard responded that the articles lacked "imagination or a clear sense of purpose." He deemed the articles boring and judged them to be "little more that (sic) bullet points on an outline strung together." Of the identified objectives in the PIP, Blanchard found all but one to be unmet by the five articles he reviewed. (Exhibit 10, email from Jack Blanchard dated October 29, 2013, re: stories.) The articles reviewed by Blanchard had been previously reviewed for grammar by Savory. (Interview of Shawn McIntosh. December 19, 2013.)

Jeff Filloon, Assistant Superintendent for Human Resources, sent another set of Cottle's proposed stories to Cathy Nicholson, a GPS English teacher and Yearbook and Newspaper Advisor. (Interview of Shawn McIntosh, December 19, 2013.) While Nicholson found some merit in the articles, her review noted confusing lead paragraphs, a forced and incomplete style, poor word choices, and the need to edit the text. The stories sent to Nicholson had been reviewed for grammar by Savory. (Exhibit 11, notes of Cathy Nicholson after review of Cottle's articles.)

## (e) Cottle's Allegations re: Constructive Discharge

On November 15, Cottle sent an email to members of the Governing Board and the Human Resources Department staff alleging that she had been forced to resign her job due to mistreatment by Bowers and Richardson at GPS. (Exhibit 15, email dated November 15, 2013, from Cottle entitled Constructive Discharge Resignation.) She complained of a hostile work environment in which she had been exposed to intimidation, bullying and harassment by Bowers and Richardson. In an effort to substantiate her claims, Cottle attached a document to her email (Exhibit 15) entitled "Response to Summary of Investigation-Constructive Discharge Resignation." Cottle's Response targets findings that were made by McIntosh after he conducted an investigation of charges Cottle had made alleging unfairness and mistreatment by Bowers and Richardson in her email of September 25, previously cited in this report. (Exhibit 7) McIntosh's "Summary of Investigation" (Exhibit 16) documents his investigation of Cottle's claims that she was not given an opportunity to improve her job performance and that the PIP was merely part of a predetermined intent to fire her. McIntosh concluded that Cottle's claims regarding the PIP were "unsubstantiated."

The documentary record of the ongoing evaluation of Cottle's job performance as a part of the PIP is replete with examples of her failure to meet the basic requirements of her position. Contrary to her claims that she was not afforded a fair opportunity to improve, the record indicates a substantial effort to allow Cottle to show that she could do the job. Her weekly submissions were reviewed in detail

by Bowers and Richardson and the results of their reviews were discussed weekly at meetings that lasted between two to three hours. (Interview of Dianne Bowers, January 22, 2014.) In the judgment of her supervisors and of third parties not involved in Cottle's supervision, she consistently failed to produce articles suitable for publication.

As to Cottle's claim that firing her was always the intended outcome of the PIP process, Human Resources staff had determined to recommend to the Superintendent that Cottle be retained as an employee but that her work responsibilities be modified to relieve her of the task of writing articles. (Interview of Shawn McIntosh, December 19, 2013.) They intended to propose that Cottle be assigned some of the duties being handled by Savory. Bowers says that she first proposed that Cottle's duties be changed in order to keep Cottle employed at GPS. (Interview of Dianne Bowers, January 22, 2014.) Cottle resigned before that recommendation could be made to the Superintendent. (Interview of Shawn McIntosh. December 19, 2013.)

No specific evidence was identified in this investigation which would support Cottle's claims that she was bullied and intimidated by Bowers and Richardson. No specific examples of conduct that could be characterized as bullying or intimidation were set out in Cottle's complaints that were investigated by McIntosh. Richardson specifically denies engaging in such behavior and she says that she never witnessed any bullying or intimidating conduct directed at Cottle by Bowers. (Interview of Nicole Richardson, December 27, 2013.) Bowers, in a written response to Cottle's complaint provided to McIntosh for his investigation, says that Cottle was "treated with respect and compassion" and that from the beginning of her employment at GPS she "was welcomed" into the Community Relations Department. Bowers also wrote that Cottle never expressed any dissatisfaction until the PIP was put in place. (Exhibit 16; see specifically document from Diane Bowers dated October 4, 2013.) Bowers categorically denies ever having treated Cottle in an intimidating or bullying fashion. (Interview of Dianne Bowers, January 22, 2013.)

As Cottle has never responded to a request to be interviewed as a part of this investigation, it is impossible now to provide specific examples of the conduct she believed to be intimidating or bullying. It is significant that Cottle apparently did not feel bullied or intimidated until the PIP was implemented.

Bowers says that during the period of Cottle's employment she and Cottle met alone on only one occasion. When Cottle began to work at GPS, her office and that of Richardson were not in the same suite where Bowers and Savory were located. Bowers' position requires her to be out of the office a lot. She would often convey instructions to Cottle through Richardson. On one occasion in or about May 2013, she met with Cottle as Cottle had raised an issue regarding her pay. No other person was present. Based on the discussion, Bowers raised the issue with the Superintendent and Cottle was given a higher rate of pay. (Interview of Dianne Bowers, January 22, 2014.) There is no suggestion that any inappropriate conduct took place at that time and it seems highly unlikely in that Bowers agreed to seek approval for a raise for Cottle.

In July, the Community Relations staff were all moved to the same suite just outside the Superintendent's offices. Neither the Superintendent nor his assistant Susan Sokolsky reported having witnessed any of the conduct complained about by Cottle. (Interview of Shawn McIntosh, January 20, 2014.)

6

On every other occasion in which Cottle met with Bowers, another person was present, either an individual from Human Resources or Richardson. McIntosh who attended many meetings also denies he ever saw any behavior that would be construed as bullying or intimidation. (Interview of Shawn McIntosh, January 20, 2014.)

It should be noted that complaints about bullying and intimidation similar to those made by Cottle have been made by Savory. (Exhibit 17, Request for Relief and Redress, November 18, 2013.) Savory's complaint traces conduct beginning with events in the spring of 2009 and extending to November 2013. Savory sought and was granted a transfer to another assignment. She is no longer assigned to the Community Relations Department. (Interview of Shawn McIntosh, December 19, 2013.) Savory's allegations were not examined in this investigation.

After Cottle complained about Bower's conduct, Bowers was orally counseled by Filloon and McIntosh. Bowers was told about Cottle's complaint against her and instructed to be polite and considerate to her subordinates. She was told to be careful in the way she addressed the staff in the Department. (Interview of Shawn McIntosh, January 20, 2014.)

Cottle has complained that she was not interviewed as a part of McIntosh's investigation. Her complaint is spurious. McIntosh met with Cottle once per week beginning with the implementation of the PIP to discuss her improvement and any issues that had arisen in the department. After Cottle filed her September 25 email (Exhibit 7) with the Human Resources Department, McIntosh met once per week with Cottle to discuss her improvement and to discuss the issues she had raised in her email. The details of her complaints were the subject of various discussions with Cottle and members of the Human Resources Department, including McIntosh. (Interview of Shawn McIntosh, January 21, 2014.)

IV.    **Conclusions**

The available written evidence indicates that Cottle was never able to perform the essential duties of the Marketing Specialist. It is also evident that substantial time and resources were dedicated to assisting Cottle to become a better writer. The PIP was a fair and appropriate response to the discovery that Cottle could not write quality articles needed by the Community Relations Department. Training Cottle to be a writer in the three months dedicated to the PIP was an impossible task. Three months was, however, a sufficiently long period to establish that Cottle could not perform the essential functions of the job.

It is unfortunate that Cottle's writing deficiencies were not discovered during the probationary period. But the fact that Bowers did not complete a probationary evaluation and that she mistakenly assumed that she could seek Cottle's dismissal in August 2013 for a failure to successfully complete probation does not take away from the legitimacy of the PIP. Cottle had every opportunity to show that she could handle the writer's job. She failed in virtually every respect. She needed constant editing by Savory for grammar. Her stories were not interesting. She did not develop story ideas presented to her. Her sentence structure was often awkward. She was careless about her facts and editing. Her headlines were sometimes not appropriate to the story content. Even when she knew her articles were to be reviewed by outside parties, Cottle did not present articles suitable for publication. Three months was a sufficiently long period for Cottle's skills to be tested.

7

Based on the information provided by Bowers, it is difficult to conclude that Cottle's allegations are true. As Bowers met alone with Cottle on one occasion only, surely another witness would be available to support Cottle's claims if there had been abusive conduct by Bowers. There appears, however, to be no such witness. The fact that Cottle began to complain about intimidation only when her job was threatened is an important consideration that casts doubt on her claims. Cottle's lack of specificity about incidents that amount to bullying or intimidation also creates doubt as to the veracity of her complaints.

## V.    Recommendations

The Governing Board should instruct the GPS staff to reconsider the length of probationary periods for new employees. Even in the best of circumstances, sixty working days is not a sufficient period in which to evaluate an employee's ability to perform job functions. The interests of GPS would be best served with additional time for supervisors to observe new employees before the expiration of probation.

The Board should also instruct GPS staff to implement a more foolproof system for monitoring the completion of evaluations of employees before the expiration of probationary periods. In the Cottle matter, two emails were sent to Bowers and her assistant, Savory, before Cottle's probation expired to remind them of the need to do a probationary evaluation. A third was sent in July after the probation expired. Though three email reminders were sent, there was no follow-up by the Human Resources Department even though no probationary evaluation was filed. The system in place at present has no fail-safe backup to make sure supervisors take the necessary measures to protect the interests of GPS as an employer.

Donald E. Conrad

Dated: 2/4/14

8

# EXHIBIT "E"

February 21, 2014

To:     Board Members
From:   Jack Keegan
Re:     Friday Notes

## Kami Cottle

Enclosed in your packet is a report from Don Conrad regarding his investigation of Kami Cottle's letter entitled, *Constructive Discharge Resignation*. You received a copy of the letter and I informed the board in executive session the action that the administration was going to take. We had Don review the activities that led up to her resignation to be sure that we provided the support that was necessary, that we felt we followed all appropriate personnel rules in working with Cami. As you can see from the report, the District provided the adequate support necessary.

In addition, Don identified some areas of improvement in our procedures and those are in the process of being implemented at this moment. I share with him his concern that our probationary period was so short and we are now changing it to a 6-month probationary period. Shane is putting a process in place that if they do not receive the evaluations back on probationary personnel that action will be taken with the appropriate supervisor.

I am sending you his short summary but his attachments which include samples of her writing and the kinds of corrections that Nicole or Vicky offered and also that the third party people that reviewed her work is available. All attachments that are mentioned in the report are available in my office. If you are inclined to review them.

## Board Meeting

I have asked that we have a uniformed SRO officer available at Tuesday's board meeting. Just to review what an officer can do. He can only take action if an individual person gets out of hand and does something to endanger people. He cannot quiet the crowd if they make noise nor can he clear the room if the board wants that that is the responsibility of the board. I would urge that again we stress to people that there will be no clapping; give everyone the courtesy of hearing what each has to say. I think it also important that we keep to the strict time limits of three minutes and continue our policy of not letting someone hand in a card for someone else to turn time over to them.

## Susan Segal

I was asked to put an item from Daryl regarding the employment of a new attorney from Stems for future consideration. Daryl asked that this go on the 25th Board meeting, however

*if you review the agenda it in.*

not on there. The reason it is not, is that Susan had notified Staci and me prior to my conversation with Daryl stating that she would be finishing up the items she is currently working on for the board and would no longer be serving as the board's attorney.

## Graduation Assignments

We are putting together the graduation assignments. I will have Susan Sokolsky call you next week to find out which high school graduation you would like to attend.

## First Amendment Issues

I have received comments from the school board members regarding employee's use of social media and concerns about comments about the board or specific board members. As you know, last week I sent a notice to parents about rumor mills and staff inappropriately speaking with students about political issues in the classroom. That letter was also sent to all staff members. If staff continues to speak in the classroom about information like that, I can deal with that. However, posting on Facebook pages or blogs is something that is covered through the first amendment and we need to be very very careful about the first amendment rights of public employees. The reason we do, is that they work for a public agency, which is different from working for private business. Even though you work for a public agency, you do not give up your first amendment rights to speak about that agency or any other aspect of government. That is different from what people working for a private company can say about their company. To speak about the company is totally under the control of the company and does not fall on the first amendment.

I have included two pieces of information that I would encourage members of the board to read. The first short one is a three page on free speech rights for public employees. The primary case is the *Pickering vs. the Board of Education* in 1968. It is important to note the ruling on that case. The courts found that a public employee's statements on a matter of public concern could not be the cause for discharge unless the statement contained knowing or reckless falsehoods or the statements were of the sort to cause a substantial interference with the ability of the employee to continue to do his job. That is a fairly high threshold that has to be met prior to stopping someone from exercising their free speech or dismissing them because of their free speech. If they write about the superintendent, not liking a decision I make, there is nothing that can be done about that. Quite frankly, nothing should be done about that. That is one of the consequences of being a public official and/or a public elected official.

Again, I would encourage you to read over the materials. In addition, there is a presentation that was given at the school board association's annual law conference, which I attended. This one deals with social media, the dos and don'ts and the legal areas of it. While the document may look long, it is basically a power point presentation and puts it into very nice bullet points. This is also very important considering some board members concerns about employee's comments on social media. Please be

careful what is said or insinuated because they do have a right to come back at the district for any adverse actions taken against them.

## Ten Worst States Where Students Struggle in Reading

Enclosed is a list and an explanation of why certain states are falling way behind in the writing, solid reading education for their students. I am sending this to you simply for your information.

## John Huppenthal's Letter

Enclosed in your packet is a copy of John Huppenthal's letter that he sent out last week to all educators. This letter was generated because of his doing a robocall talking to parents of private school students. I am including this just for your information.

## Mesquite Pool

Clyde and I met with representatives from the Town regarding redo of the Mesquite Pool. From the Town's study you can see that the Town wishes to put $1.16 million into reconstruction of the pool and they would like to begin this year. We notified them that we did not have the money to pay that half. We are going to go back and take a look at it and we will bring something forward to the board at a later date. However, at this point we are looking at telling them that the district does not have the money. The only way that we could do it is pay our portion over a number of years. We are in the process of trying to figure out and project the number of years that we would need for the pool. If you have any questions regarding this, please do not hesitate to contact me.

# EXHIBIT "F"

# ONE "SINKING SHIP" AND OODLES OF ANONYMOUS SOURCES

Posted on February 24, 2014

past couple of days have been filed with firsts for me, which of course, is why I write this

…day, for the first time, I called Gov. Jan Brewer's office to ask her to veto a bill (SB1062).

…morning, I signed my first Change.org petition.

…ow, I'm writing a story, exposing some iffy practices of school district personnel, using …mous sources. All my years as a reporter, I've never been able to use anonymous sources …log has different rules. The validity of this story, this blog post, is not lessened by the fact …ing unnamed sources. At all. These are facts.

...ient my new experiences, new adventures — with the whole idea that, well, you only live
...a feeling I'd live with regret if I didn't offer true reporting on what's happening in the town
...I live.

...ama surrounding Gilbert Public Schools has made me nauseous. So much so that I felt
...alled to help set the record straight about what is really going on. This is happening in my
...ard. And, it's not right.

...t writing this anonymously. I still have kids who will go through the Gilbert Public Scho
...ct. I help run a PTSO. I'm visible. And for exposing the true facts surrounding the distric
...il, I sincerely hope I don't face consequences.

...s something really wrong with our community. Our community. That's a fact. It's my
...t that there are a few things "wrong" with the school board, but that's only my opinion. A
...s that opinion in the voting booth.

...ommunity, one that worked late nights and long days to save a school from being closed
...ly last year, is being bullied. It's being bullied by people who claim the school board is
...sible for a "mass exodus." It's actually these bullies who are responsible for their so-call
..."exodus."

bullies in effect dropped a match on a dry grassy field and they're watching it burn. It's a
. shame.

think they have power in numbers, but how effective are numbers when those numbers a
ly misinformed? Responsible power is actually gained with truth.

if I report that sources with knowledge have confirmed that top district administrators w
tly resigned, the proverbial match that lit the fire, were involved in an internal investigati
ıas now been turned over to law enforcement?

if I said that?

vhat if I said it was true?

ying it because it is.

ı in our community who do not support certain members of the current school board hea
the resignations, and without knowledge or facts of any kind, claimed those individuals
ut." It was their spark, even though it was flawed. But, the flames spread. Countless

resignations followed.

They sneezed on a doorknob and now everyone is touching it. Now the district is being compared to the Titanic by the very people who steered us into the iceberg.

It's hard to know exactly which resignations have been inspired by the hysteria circulating throughout the district, and which ones are simply part of the business of education. But it is darn sure easy to spot a bully.

Bullies don't follow the rules, while at the same time expecting everyone else to. Bullies push people around. In this case, bullies exclusively welcome like-thinkers, and banish those with a differing perspective. These bullies have scared employees at various levels into thinking their opinion could cost them their jobs. And, in some cases, it appears it already has.

Sources have acknowledged that certain administrators have pushed employees out the door, especially those who question certain activities. Other administrators have destroyed and altered documents to cover up any wrongdoing, and registered false names online for the sole purpose of trolling.

And, who knows exactly what this investigation will uncover. So far, Gilbert PD is still examining the evidence. Whatever the transgressions were, they've added up to about a $2 million loss for the district, according to sources. Sources also confirm that the investigation has been months in the making, confirming that it was not timed to serve as a distraction.

That's just one problem.

One resignation, from Community Relations Department employee Kami Cottle, states that district management officials hold a "direct disregard for the truth." Cottle states that high-ranking administrative officials used intimidation and harassment, and allowed for an environment of

rt of her resignation letter. Cottle said those officials "created a liability" for the district. S

dio recordings to support her claims.

s a snapshot. A peek at how district brass, meaning high-level administrators and

gement, handle those who question.

the imminent arrival of a new superintendent, the district can close a chapter on a previou

ls' chief who had the cojones to offer to cover the cost of moving, and six months rent, fo

ct parent if only that parent would relocate. To another district. If that parent died, and o:

arent died, would the child be welcome to return to the district.

arent was asking too many questions.

happened. And, what's more, the offer is in writing.

is happening now. And soon the public will be privy to all of it. But, until then, we have t

Refrain from making assumptions, because to date, those assumptions have been wrong

ibly damaging, not only in the way of staff departures but in public perception and empl

arent died, would the child be welcome to return to the district.

arent was asking too many questions.

appened. And, what's more, the offer is in writing.

is happening now. And soon the public will be privy to all of it. But, until then, we have ta
Refrain from making assumptions, because to date, those assumptions have been wrong
libly damaging, not only in the way of staff departures but in public perception and emplc
e.

t Public Schools is changing. And change takes time. But positive change only comes wi
The real truth. Facts. Scare tactics and hype only go so far.

# EXHIBIT "G"

# We support Gilbert Public Schools

**PEOPLE**

**764** likes

Invite your friends to like this Page

**ABOUT**

This page is to share updates and give information regarding GPS. We support the community, the students, the parents and the staff.

✓ Suggest Edits

**PHOTOS**






---

**Joe Nicita** This blog isn't going anywhere and the truth refuses to back down from intimidation.

Like · Reply · February 24 at 10:37pm

**Myrna Sevey Sheppard** This blog shouldn't go anywhere. Anyone with the title of "My So Called Crisis" has a lot to offer. But it must be noted that blogs are simply expressions of the opinions of the writers and a reflection of the "truth" as they see it. This one makes me laugh--it reminds me of the journal entries of my Jr. high students, although I finally had to tell them: No more entries about body functions!

Like · February 25 at 10:51am

**Eli Littlefield** Absolutely Myrna--a blog is a modern day version of a diary/journal. It is one person's opinion/perspective not pure fact as Mr. Nicita keeps stating. I can appreciate the blogger taking the time to present her perspective but Mr.Nicita's insistence that it be seen as pure fact is incorrect. In addition, I don't understand why Mr. Nicita feels the need to be insulting and somewhat hostile towards those who don't agree with him-kind of bully-like.

Like 👍 1 · February 25 at 1:21pm · Edited

Write a reply...

**Joe Nicita** EJ... I mean Eli, here is the entire thread.. Joe Nicita Nicole, you should stop intimidating. This reporter has more credentials than you can ever understand. You've already been investigated for this one time before. It is what it is.

about an hour ago · Like · 2

Nicole Richardson Joe, I am not questioning your wife's credentials, I am certain she is a fine reporter. Yes it is what it is, and what she printed is not true. She has been duped and I am just asking that the link be removed. Printing something that isn't true is libel, just sayin'

49 minutes ago · Like · 1

Nicole Richardson BTW, the external investigation says it isn't true. Just wanting to clarify the rumors and gossip.

42 minutes ago · Edited · Like · 1

Joe Nicita Nicole you did question her "understanding on the governing laws" see above.. and in this case it's clear she understands them. She simply wrote what is public information from the cottie resignation. I can post the pdf of the cottie resignation letter here if you like. Cottie is the one who made the accusation in a public record. I'm sorry if you don,t or a agree with what Lisa wrote. However, all her investigative reporting was above board. So I would suggest you accept the article.

Like · Reply · February 24 at 10:36pm

**Eli Littlefield** Joe -quit with the immature name crap...I'm not EJ..no matter how many times you say it, it's not true.

Like · February 24 at 11:49pm

**Eli Littlefield** I have told Mr.Nicita I am not EJ several times-clearly he is not interested in the truth but would rather perpetuate an untruth in multiple posts. I can't control his behavior so am moving on. I am more concerned with the issues related to GPS than with his behavior.

# We support Gilbert Public Schools

**PEOPLE**

764 likes

Invite your friends to like this Page

**ABOUT**

This page is to share updates and give information regarding GPS. We support the community, the students, the parents and the staff.

Suggest Edits

**PHOTOS**



---

and we are seeing some resignations in response to such threats.

Like · 👍 1 · February 25 at 9:54am

View more replies

Write a reply...

We support Gilbert Public Schools Joe Nicita-We are pleased that your wife chose to write and share her blog. As a side note, it does appear that Ms. Richardson removed her post in this thread.

Like · Reply · February 25 at 8:11am

Sonya Belshe Watkins Kinda reminds me of Y2K... We're still waiting.....

Like · Reply · 👍 1 · February 24 at 5:59pm

Joe Nicita I have not insulted anyone with the exception of Allison. As we continue to deal in fact please repost my insulting comments to you. Today was a sad day yet a gratifying day cause I was able to read the tons of emails lisa has been receiving from gilbert teachers past and present for finally saying what they have been so scared to say. So the 3 people who have been so negative on what was written pales in comparison to the literally thousands that have read it and thanked her.

Like · Reply · 👍 2 · February 25 at 2:00pm

Karen Berke Udall I just found out from Parents for a Responsible Gilbert School Board that I am blocked by someone named Nicole Richardson. I do not know her, but I cannot see her posts here, so I didn't understand to whom Joe was posting. Based on posts on that page, there was an external investigation to Kami Cottie's resignation letter. Her letter is public. Hopefully someone can post the external investigation to this page and that one.

Like · Reply · February 24 at 11:34pm

Eli Littlefield Joe-a resignation letter is very different from fact. It's the opinion of the person leaving not necessarily an accurate description of what happened. I believe an investigation into the situation trumps a resignation letter. Just curious as to why the blog post chose to ignore or not look into the situation enough to determine and include all the facts?!?

Like · Reply · 👍 1 · February 24 at 10:52pm

Karen Berke Udall Is the investigation public record? Do you have the info on that investigation?

Like · 👍 1 · February 24 at 11:50pm

Joe Nicita why would you defend a bully? I just don't get it. I'm not so sure an investigation took place. That's the claim. You should see the e-mail upon e-mail of people reaching out to Lisa telling her thier experience with admins in the district. It's stunning, and sad. It will change. No way I'm going to be a part of that kind of behavior.

Like · February 25 at 11:01am

Write a reply...

Joe Nicita Im still in awe and disgusted that the former superintendent of our district would offer to pay someone's moving expenses just so they would stop asking questions. So sad. That document I read was jaw stopping. But the good

# We support Gilbert Public Schools

## PEOPLE

**764 likes**

Invite your friends to like this Page

## ABOUT

This page is to share updates and give information regarding GPS. We support the community, the students, the parents and the staff.

✓ Suggest Edits

## PHOTOS




---

We support Gilbert Public Schools shared a link.
February 24 ✎

Thank you to several local Facebook pages for posting this. It's a great blog post by a mom in Gilbert who sees some serious challenges happening in our community.

"To be perfectly honest, this blog was not designed to scoop. It was desig....
See More

mysocalledcrisis
mysocalledcrisis.wordpress.com

I'm trying new things, and taking everyone with me. Since, it's just about time for that mid-life...

👍 18  💬 15  ↗ 1 Share

Like · Comment · Share

👍 18 people like this.

Top Comments ▾

Write a comment...

 **Frances Holloran** I have three children in Gilbert Schools, high school, middle school and elementary and through my years raising children I have never gotten involved with the school board. Because honestly I don't care. As long as my kids are doing good what the school board does seems irrelevant to my life, until now. Why the change? Because the school district came to, to give my kids a good education seems to be slipping. No matter what side you are on, where there is smoke there is fire. So for the first time in my life I will be attending tonight's board meeting to find out for myself. I can't be the only 'hands off' parent suddenly having a change of heart about my lack of involvement and that should scare all those involved.

Like · Reply · 👍 8 · February 25 at 11:23am

**Dawn Brimhall** I can promise you, you are not. For too long, we "disinterested" parents have let things go. It's time to do our duty and pay attention.

Like · 👍 1 · February 25 at 1:31pm

Write a reply...

**Dawn Youveer Rissi** After reading this, I am even more confused as to what is going on in the district.

Like · Reply · 👍 3 · February 24 at 5:54pm

We support Gilbert Public Schools **Myrna Sevey Sheppard** stated: It must be

# EXHIBIT "H"

# Parents for a Responsible Gilbert School Board

## NOTES

**Superintendent Keegan clears up confusion from re...**
September 14, 2013

## POSTS TO PAGE

Be the first to post on this Page.

Write Post

---



**Highland High School**   [Like]



**Mesquite Jr. High School**   [Like]

South Valley Junior High ...   [Like]

LIKED BY THIS PAGE

English (US) · Privacy · Terms · Cookies · More ▾
Facebook © 2013

---

**Karen Berke Udall** I still have no idea who Nicole is, or what she posted. Does Nicole have a last name? Maybe we can see if we are blocked. And then, maybe she can explain why we are blocked. Without a last name, I'm not even sure I've met her.
February 24 at 10:49pm · Like · 👍 1



**Amy Redin Hagen** Joe or Eli, can you copy/paste Nicole's comments so we can all read them? I'm not very tech-savvy, so I'm not sure how I'm blocked.
February 24 at 11:00pm · Like

**Parents for a Responsible Gilbert School Board** Karen: It appears that Nicole Richardson has blocked you, as well as Julie, Dawn, and Amy from seeing her comments.
February 24 at 11:05pm · Like

**Joe Nicita** E.J. I'm not fully understand what you're saying. However I think you understand exactly what the facts are. Lisa cited the tip of the iceberg. Read the report and if you don't find it as disturbing as I did it's time to look into the glass. I would be surprised if the new superintendent put up with this type of bullying and unethical behavior.
February 24 at 11:05pm · Like

**Amy Redin Hagen** I'm not sure why a stranger would block me. But, if Nicole has an investigation report, it would certainly shed some light on things. In the interest of transparency, I'm sure if the resignation letter is public then the investigation to refute it must be as well.
February 24 at 11:38pm · Like · 👍 2



**Karen Berke Udall** Ditto, Amy. Thank you. I noticed that Joe commented at We support Gilbert Public Schools to Nicole too. I guess if we are blocked here, we are blocked everywhere by her? I've never met her. Not sure why she blocked either one of us.
February 24 at 11:41pm · Like



**Amy Redin Hagen** She works in my District? We are both employed by GPS, and she has blocked me from seeing her posts?
February 24 at 11:48pm · Like



**Amy Redin Hagen** Nicole, I would love to know if we have met at work, and I somehow offended you? I would be happy to apologize. I work hard to have positive relationships with my fellow GPS employees.
February 24 at 11:51pm · Like · 👍 1

**Karen Berke Udall** Amy - I think if she blocked you, she can't see your comments either. At least that's what I've learned from a google search. maybe Eli can pass the word that we don't know why we are blocked, since it's clear Eli can see Nicole's comments.
February 24 at 11:52pm · Like

**Amy Redin Hagen** What on earth? It makes me wonder if I'm blocked by anyone else?
February 24 at 11:55pm · Like



**Parents for a Responsible Gilbert School Board** We certainly hope not, Amy. By

# Parents for a Responsible Gilbert School Board

Parents for a Responsible ...  |  Timeline ▼  |  Recent ▼

 **Joe Nicita** It's clear Nicole blocked you.
February 24 at 10:23pm · Like

 **Karen Berke Udall** I'm confused. Who's Nicole? And why would she block me?
February 24 at 10:25pm · Like

 **Amy Redin Hagen** Blocked me? From what?
February 24 at 10:25pm · Like

 **Julie Scott- Dudley** Nicole who? I don't see any comments from a Nicole.
February 24 at 10:25pm · Like

 **Parents for a Responsible Gilbert School Board** Nicole, we want to give you ample chance to follow through on your statements. If you would like to post the external investigation, we'd be happy to have it included in the dialogue.
February 24 at 10:34pm · Like · 👍 1

 **Dawn Brimhall** It's a one-sided conversation on my side, too.
February 24 at 10:35pm · Like

 **Eli Littlefield** Nicole seems to be referring to an official external investigation document - not sure legalities of that being released. Joe above refers to a resignation letter - which often times are accusatory but not necessarily "fact" from my experience with departing employees.
February 24 at 10:39pm · Like

 **Joe Nicita** EJ. Eli. thanks for sharing this. This is exactly what lisa reported on. Lisa did not make up reports. It's here in black and white. Thank you for sharing.
February 24 at 10:49pm · Like

 **Karen Berke Udall** I still have no idea who Nicole is, or what she posted. Does Nicole have a last name? Maybe we can see if we are blocked. And then, maybe she can explain why we are blocked. Without a last name, I'm not even sure I've met her.
February 24 at 10:49pm · Like · 👍 1

 **Eli Littlefield** Joe -it's Eli not EJ -for clarification, your wife included the official investigation in her blog post? Because a

## NOTES                                                    >

**Superintendent Keegan clears up confusion from re...**
September 14, 2013

---

## POSTS TO PAGE                                            >



Be the first to post on this Page.

Write Post

---

## LIKED BY THIS PAGE                                       >



**Highland High School**          👍 Like →



**Mesquite Jr. High School**      👍 Like

**South Valley Junior High ...**  👍 Like

---

February 24 at 9:26pm · Like · 👍 2

 **Joe Nicita** Nicole, you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote what is public information from the cottle resignation. I can post the pdf of the cottle resignation letter here if you like. Cottle is the one who made the accusation in a public record. I'm sorry if you don;t or a agree with what Lisa wrote. However, all her investigative reporting was above board. So I would suggest you accept the article.
February 24 at 10:03pm · Like

 **Karen Berke Udall** I can't see comments from Nicole, Joe. Who are you talking to?
February 24 at 10:09pm · Like

 **Amy Redin Hagen** Ditto, Karen. I only see comments from Eric and Joe. Where is Nicole disparaging Lisa's credentials?
February 24 at 10:16pm · Like

 **Joe Nicita** It's clear Nicole blocked you.
February 24 at 10:23pm · Like

 **Karen Berke Udall** I'm confused. Who's Nicole? And why would she block me?
February 24 at 10:25pm · Like

 **Amy Redin Hagen** Blocked me? From what?
February 24 at 10:25pm · Like

 **Julie Scott- Dudley** Nicole who? I don't see any comments from a Nicole.
February 24 at 10:25pm · Like

 **Parents for a Responsible Gilbert School Board** Nicole, we want to give you ample chance to follow through on your statements. If you would like to post the external investigation, we'd be happy to have it included in the dialogue.
February 24 at 10:34pm · Like · 👍 1

 **Dawn Brimhall** It's a one-sided conversation on my side, too.
February 24 at 10:35pm · Like

 **Joe Nicita** EJ. Eli, thanks for sharing this. This is exactly what lisa reported on. Lisa did not make up reports. It's here in black and white. Thank you for sharing.
February 24 at 10:49pm · Like

 **Karen Berke Udall** I still have no idea who Nicole is, or what she posted. Does Nicole have a last name? Maybe we can see if we are blocked. And then, maybe she can explain why we are blocked. Without a last name, I'm not even sure I've met her.
February 24 at 10:49pm · Like · 👍 1

 **Amy Redin Hagen** Joe or Eli, can you copy/paste Nicole's comments so we can all read them? I'm not very tech-savy, so I'm not sure how I'm blocked.
February 24 at 11:00pm · Like

 **Parents for a Responsible Gilbert School Board** Karen: It appears that Nicole Richardson has blocked you, as well as Julie, Dawn, and Amy from seeing her comments.





# Parents for a Responsible Gilbert School Board

👍 19

## NOTES

Superintendent Keegan clears up confusion from re...
September 14, 2013

## POSTS TO PAGE

Be the first to post on this Page.

Write Post

## LIKED BY THIS PAGE

Highland High School    👍 Like

Mesquite Jr. High School    👍 Like

South Valley Junior High ...    👍 Like

---

Like · Comment · Share

Parents for a Responsible Gilbert School Board shared a link.
February 24 🔗

Check out this blog from a Gilbert parent viewing the district's drama. Its very insightful.

"This needed to be said. But, even more so, it needs to be heard. Because I value our community, its schools, its teachers and...the truth."
http://mysocalledcrisis.wordpress.com/

mysocalledcrisis
mysocalledcrisis.wordpress.com
I'm trying new things, and taking everyone with me. Since, it's just about time for that mid-life...

Like · Comment · Share     👍 13 💬 28 ↗ 1 Share

👍 13 people like this.

Eric A. Marmont Somehow, I can't see parents wanting the best education for their children being bullies.
February 24 at 5:39pm · Like · 👍 2

Joe Nicita let me clarify since your having trouble... Wanting the best education is much different than laying blame and following blindly.
February 24 at 6:36pm · Like · 👍 4

Joe Nicita Nicole, you should stop intimidating. This reporter has more credentials than you can ever understand. You've already been investigated for this one time before. It is what it is.
February 24 at 9:26pm · Like · 👍 2

Joe Nicita Nicole, you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote whats public information from the cottie resignation. I can post the pdf of the cottie resignation letter here if you like. Cottie is the one who made the accusation in a public record. I'm sorry if you don;t or a agree with what Lisa wrote. However, all her investigative reporting was above board. So I would suggest you accept the article.
February 24 at 10:03pm · Like

Karen Berke Udall I cant see comments from Nicole, Joe. Who are you talking to?
February 24 at 10:09pm · Like

Parents for a Responsible ... | Timeline ▼ | 2014 ▼

 best education is much different than laying false blame and following blindly.
February 24 at 5:36pm · Like · 👍 4

 **Joe Nicita** Nicole, you should stop intimidating. This reporter has more credentials than you can ever understand. You've already been investigated for this one time before. It is what it is.
February 24 at 8:26pm · Like · 👍 2

 **Joe Nicita** Nicole, you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote what is public information from the cottle resignation. I can post the pdf of the cottle resignation letter here if you like. Cottle is the one who made the accusation in a public record. I'm sorry if you don't or a agree with what Lisa wrote. However, all her investigative reporting was above board. So I would suggest you accept the article.
February 24 at 9:03pm · Like

 **Karen Berke Udall** I can't see comments from Nicole, Joe. Who are you talking to?
February 24 at 9:09pm · Like

 **Amy Redin Hagen** Ditto, Karen. I only see comments from Eric and Joe. Where is Nicole disparaging Lisa's credentials?
February 24 at 9:16pm · Like

 **Joe Nicita** it's clear Nicole blocked you.
February 24 at 9:23pm · Like

 **Karen Berke Udall** I'm confused. Who's Nicole? And why would she block me?
February 24 at 9:25pm · Like

 **Amy Redin Hagen** Blocked me? From what?
February 24 at 9:25pm · Like

 **Julie Scott- Dudley** Nicole who? I don't see any comments from a Nicole.
February 24 at 9:25pm · Like

 **Parents for a Responsible Gilbert School Board** Nicole, we want to give you ample chance to follow through on your statements. If you would like to post the external investigation, we'd be happy to have it included in the dialogue.
February 24 at 9:34pm · Like · 👍 1

 **Dawn Brimhall** It's a one-sided conversation on my side, too.
February 24 at 9:35pm · Like

 **Eli Littlefield** Nicole seems to be referring to an official external investigation document - not sure legalities of that being released. Joe above refers to a resignation letter - which often times are accusatory but not necessarily "fact" from my experience with departing employees.
February 24 at 9:39pm · Like

 **Joe Nicita** EJ. Eli. thanks for sharing this. This is exactly what lisa reported on. Lisa did not make up reports. It's here in black and white. Thank you for sharing.
February 24 at 9:49pm · Like

*This is Staci Bark* (handwritten)

# EXHIBIT "I"


**EXPECT SUCCESS**  Gilbert Public Schools

# EMPLOYEE ACTION REQUEST
(Press Firmly or Type)

_2/25/14_
Today's Date

Employee's Name _NICOLE RICHARDSON_

Employee ID Number

Employee's Position _MARKETING SPECIALIST_    Location _COMM. RELATIONS_

Employee's Home Phone Number

**REQUEST FOR:** (check one)
- ☐ New Employee
- ☐ Employee Transfer/Change
- ☐ Job Resignation
- ☒ Other: _PAID ADMINISTRATIVE LEAVE_

**REMARKS:**
_NICOLE RICHARDSON WILL BE PLACED ON PAID ADMINISTRATIVE LEAVE UNTIL FURTHER NOTICE. PENDING INVESTIGATION._

---

_ADMINISTRATIVE USE ONLY FOR EMPLOYMENT RECOMMENDATION_

- ☐ New Position
- ☐ Number of Hours Per Day (Must Complete) _____
- ☐ Replacement For: _____
- ☐ Change in Hours From: _____ To: _____
- ☐ Successful Completion of Probationary Period
  - ☐ Extended Until: _____

Effective Date(s) _2/25/14_

Administrator's Signature

Employee's Signature

Account Code

---

Full-Time: ☐ Yes ☐ No
Position 1: ☐ Add ☐ Inactivate ☐ Change

**HUMAN RESOURCES ONLY**

Benefits: ☐ Yes ☐ No
Position 2: ☐ Add ☐ Inactivate ☐ Change

| | |
|---|---|
| Grade/Range | Grade/Range |
| Step/Cell | Step/Cell |
| Salary | Salary |
| Job Code | Job Code |
| Criteria Code | Criteria Code |
| Account Code | Account Code |
| Sub Location | Sub Location |
| Hours per Day/Week | Hours per Day/Week |
| Effective Date | Effective Date |
| Board Date | Assistant Superintendent / Director of Human Resources |

**COMMENTS:**

EXHIBIT EXHIBIT

K-1481     © 1997 by Arizona School Boards Association     KEB-EA

# PUBLIC CONCERNS / COMPLAINTS ABOUT PERSONNEL

## Public Complaints about School Personnel
This form or a typed document containing all of the requested information should be submitted to the
Department of Human Resources

Date __2/25/14__

Name (print) _____

Name (signature) _____

Address _____

Telephone (day) _____ (cell) _____

E-mail _____

Parent of student in District? __X__ Yes _____ No

Other relationship to the District or the person about whom the complaint is made:
_____

Name and title/position of person(s) about whom you have a concern or complaint:
__Nicole Richardson — Marketing__

Date and time that you met with the employee or the employee's supervisor to discuss this
concern/complaint:

Date: __2/24/14__     Time: __11:00__

Was the employee's supervisor present? _____ Yes __X__ No

Have you discussed this complaint with the employee's supervisor? _____ Yes _____ No

If no, why not: __Policies potential violated GBEF, GBEF-R, GBCB, GBP__
__ARS 38-504 (B)__

Please describe the facts relating to your concern or complaint with as much specificity as possible.
Include relevant dates, times, places, names of witnesses (if applicable). Use additional paper if
necessary.

__Ms. Richardson posted to facebook (publicly)__
__contents of an attorney-client privileged__
__report which parents complained they do__
__not have access to. Also threatened parents__
__with civil lawsuit potential. Note disclosure__
__of confidential info under ARS 38-504(B)__
__carries specific statuatory consequences as__

Received by _____     Date _____
            Name/Title

**GILBERT UNIFIED SCHOOL DISTRICT NO. 41**
Revised: 10-29-04                              Page 1 of 1

__(see attached posts)__


Joe Nicita let me clarify since your having trouble... Wanting the best education is much different than laying false blame and following blindly.

4 hours ago · Unlike · 👍 4


Nicole Richardson I am respectfully asking that you immediately remove the link to this blog. The author, has been seriously duped and as a reporter, she should be familiar with the laws governing libel and how seriously one should investigate claims before printing them.

Miss Cottle's complaint has been thoroughly investigated by an external investigator. Cottle's claims were deemed "spurious" at best. This was not an internal investigation which should set to rest any claim of a cover-up. I am certain the administrators of this page would not want any part of proliferating untruths and further placing the author in financial jeopardy.

2 hours ago · Edited · Like


Joe Nicita Nicole, you should stop intimidating. This reporter has more credentials than you can ever understand. You've already been investigated for this one time before. It is what it is.

2 hours ago · Unlike · 👍 2


Nicole Richardson Joe, I am not questioning your wife's credentials, I am certain she is a fine reporter. Yes it is what it is, and what she printed is not true. She has been duped and I am just asking that the link be removed. Printing something that isn't true is libel, just sayin'

about an hour ago · Like


Nicole Richardson BTW, the external investigation says it isn't true. Just wanting to clarify the rumors and gossip.

about an hour ago · Edited · Like


Joe Nicita Nicole, you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote what is public information from the cottle resignation. I can post the pdf of the cottle resignation letter here if you like. Cottle is the one who made the accusation in a public record. I'm sorry if you don't or a agree with what Lisa wrote.

# EXHIBIT "J"



terim Superintendent
hn J. Keegan, Jr., Ed.D.

GPS Governing Board
President
Staci Burk
Clerk
Julie Smith
Members
Daryl Colvin
Jill Humpherys
Lily Tram

March 6, 2014

To: Jeff Filloon

From: Jack Keegan

Re: Nicole Richardson, Complete

I have reviewed Ms. Staci Burk's complaint regarding Nicole Richardson's posting of information that was allegedly contained in an attorney/client privileged report on the website and the allegation that she threatened a parent with a libel suit as a response to a blog site entitled *mysocalledcrisis*. The blog posting was entitled, '**one "sinking ship" and oodles of anonymous sources**'. I reviewed the material that was posted by Ms. Richardson. I also consulted with Ms. Georgia Staton, our attorney, through whose firm Don Conrad was hired to conduct an investigation of the allegations made by Kami Cottle. Mr. Conrad reviewed and submitted a report detailing the results of his review of Ms. Cottle's charges and allegations. After reviewing Mr. Conrad's report, I submitted a copy of the full report, including attachments, to the Human Resources department for filing with the Cottle file. In addition, I permitted Ms. Richardson to review the report based upon her request and I consulted with Ms. Staton. I was advised that I, as superintendent, was the person who authorized the investigation and hired Ms. Staton's firm. Because as superintendent I was the client, Ms. Staton advised me that I had the authority to release the report. The client was not the School Board because it was important that the investigation be separate from the board in case after the investigation the board needed to hold a due process hearing on one or more individuals identified in the report.

Since the report and Ms. Richardson's posting I have been informed by several board members that they have received communication from Ms. Cottle stating that she would now be willing to talk with our investigator. Our investigator at this point is out of the country. Upon his return, Ms. Staton will ask him to interview Ms. Cottle and then, add an addendum to the report if appropriate. In his report, Mr. Conrad stated that he tried to contact Ms. Cottle but she never returned his calls or emails. The phone number given by Ms. Cottle to the board member is the same number the District gave Mr. Conrad. However, since this request came after the release of the original report, an addendum will also be released once Mr. Conrad completes his interview of Ms. Cottle. If necessary or appropriate, Mr. Conrad may modify his findings in his report.

As to the compliant stating that Ms. Richardson threatened parents with a potential lawsuit, I do not find what she stated on the web as threatening a lawsuit. She did mention that there are laws governing liable and that people can be held accountable for liable, when printing something that is not true. I do not find those statements as necessarily a threat of a suit.

Based on this review I am rescinding Ms. Richardson's suspension. However, she is to receive a letter stating that she did not follow my order not to respond to this posting. If you have any questions regarding this, please do not hesitate to contact me.

# EXHIBIT "K"

# Board Meeting July 8, 2014

*In reference to Gladis Mopecha who was reinstated, similar situation to Sarah Green. They are voting on rehiring her, once again without a position.*

Jill Humphreys: I would like to bring forward, first Gladis Mopecha was placed on an improvement plan.

Staci Burk: Hold one second.....

Daryl Colvin: Madame President Point of Order.

**Staci Burk: I just want to go ahead and say that anything that's said that hasn't been proven in a court of law may subject you to any kind of legal issues and could result in granting Mrs. Mopecha at district cost a potential name clearing hearing and may waive any right to legislative immunity. I just need to make sure that I do that.**

Jill Humphreys: I think I can say that she voluntarily resigned in 2010 and did not complete her improvement plan


48:09

Staci Burk: Moving on to item 7.01 Approval of the Consent Agenda

Lily Tram: I move that we approve the consent agenda items 7.01 through 7.07.

Staci Burk: Oh, um....... per Robert's rules, if there's any item that there is not full consent on the consent agenda, I um.... I meant to ask this in the beginning. Because now that we're doing Robert's Rules, if there's any item on the Consent Agenda that does not have complete consent from all members or by which there's any questions to be asked, that item will automatically be moved to an action item per Robert's Rules so is.... I just want to open it up to board members are there any items on the consent agenda which do not have full consent ... um *(No vote on the consent agenda has ever been preceded by this statement)*

Kishimoto: (Uninteligible) I think we want to....

Staci Burk gives her mic to Julie Smith

Julie Smith: sorry, fellow board members, my microphone just stopped working and my intent was to introduce the approval of consent agenda items with the exception of, under 7.03 Certified personnel, a request to remove the name Nicole Richardson

Dr. Kishimoto: You need to take an action to remove an item.

Staci Burk: The definition of Consent Agenda means that the item is in full consent with the board and so if it's not, then it needs to be moved to action items per Roberts Rules and other boards in Arizona do not require a vote or approval whether they use Roberts Rules or not. They just move it if a board member has a question.

Dr. Kishimoto: My question to the board is process related. And some of that will go through for the first few meetings. My question is to whether there is a motion that needs to be made to remove an item from consent for discussion.

Lily Tram: Is this 7.03 or 7.04? Which one are you referring to?

Staci Burk: I don't know…. the bottom line is any …. the question that I'm asking when I saw that Mrs. Smith had an issue with the consent agenda is, are there any items …. I believe that Mrs. Smith has said … has said a specific item…. 7.03? (Looks to Smith)

Lily Tram: Yes, I see Nicole Richardson Ceramics Teacher for Gilbert High School.

Staci Burk: Okay, so 7.03 will now be moved to an action item. And then if you'd like to remove that particular name and then when we get to it as an action item that would be the time for that motion. So 7.03 will now be moved to an action item because it's no longer on the consent agenda. Item 7.01 through 7.07, not including item 7.03 … is there a motion to approve the consent items besides 7.03?

Julie Smith: I move that the governing board approve the consent agenda 7.01, 7.02, 7.04, 7.05, 7.06 and 7.07

Staci Burk: Thank you Mrs. Smith. Is there a second?

Daryl Colvin: Second

Staci Burk: Thank you Mr. Colvin, having been moved and seconded to approve the consent agenda all those in favor, please vote aye….. motion carries 5-0…. um……

Lily Tram: Your action item.

Staci Burk: I'm looking at… um… okay. I was looking at board committee reports and realized …. sorry…. Item 7.03, action item is the classified personnel…..

Lily Tram: I move to approve action item 7.03 certified personnel.

Staci Burk: Thank you Mrs. Tram. Thank you Mrs. Humphreyss (seconded inaudibly) (Burk turns to Julie Smith)

Julie Smith: I'd like to offer a substitute motion.

Staci Burk: Thank you Mrs. Smith.

Julie Smith: My substitute motion is that we approve items 7.03 certified personnel with the removal of the name Nicole Richardson

Staci Burk: Thank you Mrs. Smith, is there a second?

Daryl Colvin: I'll second that.

Staci Burk: Thank you Mr. Colvin, having been moved and seconded.....

Lily Tram: Discussion Please

Julie Smith: I have two

Staci Burk: What was the substitute motion. Okay, having been moved to approve the consent agenda with the exception of Nicole Richardson.

Lily Tram: There can't be a discussion on that? We need to understand why.

Staci Burk: I'm trying to think if we would then have a discussion about that...

Lily Tram: We typically do.

Staci Burk: No... about...

Lily Tram: It's a motion.

Staci Burk: Will you repeat the motion Mrs. Smith so I make sure I understand.

Julie Smith: The motion is to approve item 7.03 certified personnel with the removal of the name Nicole Richardson off the list.

Staci Burk: So we wouldn't be discussing her in a separate motion, we would just be approving removing the name. Ok, we can go ahead and have debate.

Lily Tram: I need to understand why you have removed the individual.

Julie Smith: I am requesting that her name be removed. I don't understand how it is quite honestly, that she was offered a job again because she was put on administrative leave and there was an investigation going on and my understanding is that at the time of resignation the investigation had not been completed. When I talked to Dr. Keegan about it he said that he didn't finish it because she had resigned. **(See 071314_keegan020.pdf)**

Lily Tram:  No, that's not true. She was on medical leave.  Which we shouldn't be discussing either.

Julie Smith:  I am answering your question.  I am telling you what I was told but I am wondering how it is that someone who was the subject of an investigation and put on administrative leave for not following a…. (someone speaks to her off camera)

Lily Tram:  But what I understand is that she was on leave but not that kind of leave, on a health leave and she hasn't resigned.  And that she applied for something that she qualified for.  And she fit very well in the position.  The investigation… Kami Cottle hasn't even come up to do the investigation, they've been trying to contact her.

Staci Burk:  We cannot discuss an employee that's not listed on the agenda.

Lily Tram:  But the investigation wasn't complete because an individual has not participated when that individual had contacted the board president and Mrs. Humphreys that she wanted to participate now.  At that time the investigation was complete.  Dr. Keegan finished it, we were ready to move on, move forward, and then she called you and Mrs. Humphreys and said that she wanted to participate in the investigation and that was supposed to follow up. And that's why I've been sending you emails Mrs. Burk that, what is the result of the investigation on the individual?

Staci Burk:  I passed those on to Mrs……

Lily Tram:  It's been months.

Staci Burk:  Dr. Kishimoto and Dr. Rice. (facing Kishimoto, I bet you probably …. inaudible) So I passed it on to Dr. Rice. **(Dr. Rice told me that the investigation would not be completed because the board did not want it completed unless they could find an investigator that would give them the result they wanted.  They were having trouble finding someone to do that sort of work.)**

Lily Tram:  She's not on administrative leave. That investigation was complete at that time.  Dr. Keegan finished it.  And that individual has not come forward to meet with the investigator.

Staci Burk:  I have concerns that the salary is not listed.  Is that addressed? I mean I'm noticing there that … inaudible, Kishimoto speaks over her)

Lily Tram:  This appears like retaliation or the list.

Dr. Kishimoto:  For these individuals (Speaking to an HR person in the audience) … at the same salary?  Okay.

Staci Burk: But the salary is not listed so … can we, um…. are you willing to table because typically even when it's a rehire we list the salary **(not true)** . And just in a procedural thing the board is actually approving the salary. So I think that we should…. **(Retaliation)**

Lily Tram: It's not always on there Staci.

Staci Burk: It's supposed to be.

Lily Tram: Yeah, but it's not always and we've approved them before.

Staci Burk: Because, I mean in terms of the legal sense of the word the board is you know, approving and hiring all employees. And so, as that we are entering into a contractual relationship by the approval and so the salaries are usually listed. So I would like to entertain a substitute motion to remove all five employees that do not have a salary listed. Would that create any issues? As far as… um…

Lily Tram: Of course not, we're just down 140 teachers right now.

Dr. Kishimoto: I do think, Madame President, process-wise we had followed previous process, when salaries remained the same they were not reposted. I think there's been some difference here in process. So we just went ahead and followed previous process, so if there is a change in the boards expectation, in seeing the same salary posted, we can do that moving forward. But I am concerned about not moving forward with hires. I do want to say that like this situation with a previous member of the staff, these are hires that I am putting forward. I have not received or been privy to conversations or concerns about any of these staff members. And so if there are concerns, I'd like to be able to have those conversations. These are recommendations that I am making to push these folks forward and start focusing on the other hires.

Staci Burk: When we say that there is a rehire, my understanding is … on the employee that is being discussed, she was in an administrative position **(I was not in an administrative position)** and is now being hired in a teaching position. Does that mean that she would continue at the administrative salary rate? So in that case, it's really appropriate that we do have a salary listed because it's not a rehire in the same position. And I believe that legally we do have to have a salary if its… I mean I can understand maybe why it would be blank if it's the same and you're saying rehire and you are noting it over here. But in this situation it would more or less be a transfer?

HR Person: She's hired as a teacher

Staci Burk: So she's a new hire and comes in at the higher, new hire rate? Higher than the teachers that have been frozen?

HR: I don't have the exact number. In that particular case, she would go from her administrative ...

Staci Burk: (To the audience) PLEASE DO NOT DISRUPT THE MEETING, while Mrs . Zetner is talking.

HR: From her previous her previous position to this new position at the high school level, there would be a pay differential to the lower end. The other employees that are in question would come in at their exit salary at the time that they left the district.

Staci Burk: Mrs. Smith?

Julie Smith: I have several comments. My first comment is, Dr.Kishimoto, I left a very detailed voice mail on your phone, it was I believe on Friday about this issue. My second point is um, Nicole Richardson was on the consent agenda at some point as a resignation so she did resign. My third point is that I only know what I was told by our former superintendent. that doesn't make it true or not true. I am telling you what I was told. I was told that she was put on administrative leave **(not because of the Cottle situation which is what she is talking about),** I asked about the investigation and that it was ceased because she had resigned. And I also wish to point out, I asked for proof that this other individual , that is being claimed refused to participate in the investigation, now is willing to. I asked for proof that this person was notified. I said that there must be a certified letter or something and there was none of the above. The district was unable to provide any proof that this person was contacted and that this person had turned it down. **(See031814_BurkConrad_email.pdf)**

And this is also what this individual is alleging. So we need to be really careful about what we say. It is not fact that she turned it down. There are two sides of the story. So that's why the investigation does need to be completed.

Staci Burk: I believe that I received similar information from the superintendent, I think that we received it in writing. I can't remember. but I do remember receiving information that the reason that the investigation was suspended was because Mrs. Richardson had resigned. I am saying what I was told Mrs. Humphreys, as well as supporting.... **I was told by Jack Keegan that the reason that the investigation didn't continue at that time was because Mrs. Richardson had in fact resigned and was no longer employed and therefore it wasn't necessary expend the resources to conduct an investigation because she would be no longer with us.** So....

Lily Tram: She was on FMLA so you can confirm with HR. They have the documentation.

Staci Burk: None of us really know what's going on here....

Lily Tram: Well we have Mrs. Zettner and I'm sure that ..

Staci Burk: …. in terms of very inconsistent statement of what happened. And I think it can be easy for things like that to slip through the cracks and then become an issue like this. And I realize that it's an awkward issue for you (facing Kishimoto) when we have former superintendents telling some board members some things and other things… so I think it's probably warranted table this item, this person for you to look into what happened and maybe get back to the board with a report of the facts…. as the facts exist.

Dr. Kishimoto: Madame President if I can have the questions that the board has about a particular individual, certainly at any point when an item is posted in advance of a meeting, I know we are in a funny period, a transition. If I could have those questions ahead of time, especially when it has to do with a personnel matter, then I ensure that my staff and I come prepared to answer the questions prior to when we are doing our agenda setting. Prior to it becoming a public discussion.

Certainly I want to make sure that I am respectful of everyone of my individuals that I am putting forward. If the board considers tabling this item, I can certainly collect the questions, get those questions answered in a timely manner before the next board meeting. And have discussions with any board member that would like to discuss an item.

Lily Tram: I have one more comment. It's to be really careful because this could be age discrimination because if someone is qualified and you decide not to hire them and they are at that age, it could be age discrimination. She was not on administrative leave. Actually didn't she get suspended from Facebook, Staci wasn't that your…..

Staci Burk: Did she make some age discrimination allegations? Did Mrs. Richardson make….

Lily Tram: No, but I'm just saying be careful. Because if you don't hire this individual, it could be age discrimination and maybe that needs….

Daryl Colvin: Madame President, Mrs. Burk. I don't think any of us have every bothered to ask Mrs. Richardson about her age. I don't think any of us have dared. But we haven't.

Lily Tram: The age is over 40. so if you don't hire me, that's age discrimination.

Daryl Colvin: I don't have any proof of that and I don't care.

Staci Burk: So I guess the question at this point is we have a motion actually we could move the motin as is, because it's just removing it's removing. In order to remove an employee you could bring it back.

Lily Tram: I would table that one motion if you would.

Staci Burk: So it's not necessary to table.

Staci Burk:  So having … I'm going ahead to move to call the question…

Lily Tram:  You guys won't bring it back.

Staci Burk:  It's Dr. Kishimoto's prerogative to bring it back.

Daryl Colvin:  I'll second your motion to call the question.

Staci Burk:  Thank you Mr. Colvin, all those in favor of calling the question.  Burk, Smith Colvin in favor. Tram, Humphreys against.

Staci Burk:  Having been moved and seconded to approve all employees on the consent agenda with the exception of Nicole Richardson, please vote aye. *Burk, Smith, Colvin in favor.  Tram, Humphreys against.  Motion carries.*  Motion carries 3-2

Lily Tram:  We have hired people back who have resigned.

Staci Burk:  I get that and that's why if it's Dr. Kishimoto's recommendation she can bring it back.

Daryl Colvin:  Point of Order.  Mrs. Burk could you remind Mrs. Tram to follow Roberts Rules of Order…. the extra comments didn't……

Staci Burk:  Let's move on to the next item.

# EXHIBIT "L"



❤ 23 people like this.

Top

Write a comment...

>

**Wendy Peterson** Thank you for this clear information.
Like · Reply · 👍 7 · July 19 at 4:58pm

**Staci Burk** It would be great if you could get your facts straight. I'm ou
for medical care and Daryl Colvin (as acting President) set the agend
participate at all in the agenda setting meeting.
Like · Reply · 👍 2 · Yesterday at 8:11am · Edited

TO PAGE    >

 **Myrna Sevey Sheppard** Good to know, Ms. Burk. Does this me
you will be placing Ms. Richardson's name on the next agenda
rehiring, as per Dr. K's recommendation? It could actually still
the agenda before Tues. night, right?
Like · 👍 5 · Yesterday at 10:20am · Edited

**Jessica Archambault**
July 8 at 4:15pm 🌐

 **Angie Draper** There's time to amend this weeks agenda. Why
request Mr. Colvin add Ms. Richardson's name per Dr. Kishim
recommendation? Then she can start on the first day of schoo
Fill a vacant position with a qualified, dedicated GPS employe
Like · 👍 8 · Yesterday at 10:33am · Edited

ou be tweeting the meeting events this
ng?

Comment    💬 1

 **Gilbert Public School Board Observer** Staci Burk: Thank you
clarification and welcome to our Facebook page. We will upda
with your exact comments above.

**Lisa Miller Lasch**
June 20 at 5:21pm 🌐

all the research you are doing and sharing
is. I'm wonde... See More

Comment    👍 1 💬 2

That being said, wouldn't you say this issue highlights the very
that many community members had when you and your board
changed the policy on who sets the agenda? It is still unclear
why it seems Mr. Colvin had decided to not add Nicole Richard
the agenda. This is a matter of importance since the next boar
will not be until Aug 5th and the 1st day of the school year begi
following day. This seems to further put both the district and M
Richardson in a predicament since her hiring is going to be u
until the last minute. Not quite an efficient way to do business
think? Per our other readers' comments, it seems there is tim
Ms. Richardson to the agenda, will you instruct Mr. Colvin to do

**Lynn Marble**
June 20 at 1:16pm 🌐

s a text I received from a fellow teacher in my
am in GPS.... See More

Comment    👍 7 💬 4

Also if you wouldn't mind could you also help us get the facts s
as to why in the last board meeting you have given everyone th
impression that you are not quite sure with what is happening
happened to Dr. Keegan's investigation of Ms. Richardson. We
Ben Matlock, but we find it quite peculiar that you did not know
investigation you started ended.

Thanks again for your time and we hope that all goes well with
medical care.
Like · 👍 1 · 14 hours ago · Edited

THIS PAGE    >

 **Mike McClellan** Unless the person who now wants to "testify"
Ms. Richardson provided the independent investigator compe
evidence for him to recommend Ms. Richardson not be hired,
reason for the board to delay. In fact, an unnecessary delay wil
our students, leaving GHS students without an art teacher to s
That vacancy will be squarely on the shoulders of Mrs. Smih, N
and you

**Committee to Elect Dr....**    ✓ Liked ▾

**Jessica Archambault**
July 8 at 4:15pm

ı be tweeting the meeting events this
g?

Comment                          💬 1

---

**Lisa Miller Lasch**
June 20 at 5:21pm

ll the research you are doing and sharing
. I'm wonde... See More

Comment                    👍1 💬2

---

**Lynn Marble**
June 20 at 1:16pm

a text I received from a fellow teacher in my
m in GPS.... See More

Comment                    👍7 💬4

---

THIS PAGE                           >

**Committee to Elect Dr....**   ✓ Liked ▼

**SAVE our dedicated G...**   ✓ Liked ▼

**Unite For Education**      ✓ Liked ▼

JS) · Privacy · Terms · Cookies · More ·
© 2014

---

 **Mike McClellan** Unless the person who now wants to "testify" a
Ms. Richardson provided the independent investigator compelli
evidence for him to recommend Ms. Richardson not be hired, th
reason for the board to delay. In fact, an unnecessary delay wil
our students, leaving GHS students without an art teacher to sta
That vacancy will be squarely on the shoulders of Mrs. Smih, Mr.
and you.
Like · 👍2 · 13 hours ago

 Write a reply...

 **Angie Draper** Well that clarifies that! I eagerly await a apology to Mr. Mc
Like · Reply · 👍3 · July 19 at 9:48pm

 **Staci Burk** Mr. McLellan, an independent investigation was not comple
There was a mix up between the independent investigator and the sup
member responsible for setting up the interview with the key witness a
was not contacted for an interview. Dr. Keegan made an administrative
that since Ms. Richardson submitted her resignation, it was not neces
spend resources to continue the investigation. There is a difference be
completed investigation and an "interrupted" investigation. If Ms. Richa
would like to return to GPS, for the safety of our students given the alle
made by her own staff I would expect that Ms. Richardson would also
investigation to be completed in its entirety.
Like · Reply · 👍1 · 4 hours ago

 **Mike McClellan** "Mix up"? How so? Shouldn't there be a record
emails the investigator sent the employee, and her responses?
you define as mix up? Are you suggesting the employee DID re
or emails from the investigator?In addition, you state that "for th
our students" the investigation should be completed. This impli
hiring Ms. Richardson could potentially put the safety of student
jeopardy. That is a very serious charge, Ms. Burk, and I hope yo
defend it.
Like · 👍1 · 3 hours ago

 Write a reply...

 **Staci Burk** I can defend anything I'm willing to say. I do not write posts
articles irresponsibly.
Like · Reply · 3 hours ago

 **Staci Burk** The employee was not contacted. The investigator thought
someone else was going to set up the interview and it was not done. T
investigator misunderstood that that there were no responses from the
when in fact the employee had not been contacted at all.
Like · Reply · 3 hours ago

 **Mike McClellan** So the investigator did not send the employee a
one email asking to interview her?
Like · 3 hours ago

 Write a reply...

 **Staci Burk** I know how the investigation that I requested on behalf of s
parents ended. You have outlined that. There was a letter. There was a
investigation initiated by a district staff member that worked with Ms. R

**Jessica Archambault**
July 8 at 4:15pm

be tweeting the meeting events this
]?

Comment     💬 1

---

**Lisa Miller Lasch**
June 20 at 5:21pm

ll the research you are doing and sharing
. I'm wonde... See More

Comment     👍1 💬 2

---

**Lynn Marble**
June 20 at 1:16pm

a text I received from a fellow teacher in my
m in GPS.... See More

Comment     👍7 💬 4

---

'HIS PAGE      >

**Committee to Elect Dr....**   | ✓ Liked ▼ |

**SAVE our dedicated G...**   | ✓ Liked ▼ |

**Unite For Education**   | ✓ Liked ▼ |

S) · Privacy · Terms · Cookies · More ▾
© 2014

---

or emails from the investigator?In addition, you state that "for th
our students" the investigation should be completed. This impli
hiring Ms. Richardson could potentially put the safety of student
jeopardy. That is a very serious charge, Ms. Burk, and I hope yo
defend it.
Like · 👍1 · 3 hours ago

 Write a reply...

 Staci Burk I can defend anything I'm willing to say. I do not write posts
articles irresponsibly.
Like · Reply · 3 hours ago

 Staci Burk The employee was not contacted. The investigator thought
someone else was going to set up the interview and it was not done.
investigator misunderstood that that there were no responses from th
when in fact the employee had not been contacted at all.
Like · Reply · 3 hours ago

     Mike McClellan So the investigator did not send the employee a
     one email asking to interview her?
     Like · 3 hours ago

 Write a reply...

 Staci Burk I know how the investigation that I requested on behalf of s
parents ended. You have outlined that. There was a letter. There was a
investigation initiated by a district staff member that worked with Ms. R
that has not been completed and has some serious allegations. I hop
clarify any misunderstandings about which investigation we may be ta
Like · Reply · 4 hours ago

 Staci Burk Mrs. Sheppard, you are assuming that Dr. K made a
recommendation to place her on the agenda. Could you please let me
source of this information because I have not heard that directly from D
cannot confirm the accuracy of your implication.
Like · Reply · 4 hours ago

Write a comment...

---

 Gilbert Public School Board Observer shared a link via SAVE our de
GPS employees.
July 19

Our deepest condolences to the Van Briesen family.



# EXHIBIT "M"

**From:**       Staci Burk <stacigriffinburk@yahoo.com>
**To:**         Donald Conrad <conrad.donald@gmail.com>
**CC:**         GEORGIA STATON <GStaton@jshfirm.com>, GPS Board <board@gilbertschools.ne...
**Date:**       3/21/2014 11:02 PM
**Subject:**    Re: Cottle Investigation

Hello Mr. Conrad:

Thank you for being in touch. While it is true that the Board would like an interview of Kami Cottle conducted, I will need to meet with the Board along with our new Superintendent to determine the next steps and direction they would like us to go with this matter.

I will arrange for an executive session as soon as possible and will let you know what the decision is.

I have a personal concern that content from your investigation report was posted by Kami Cottles immediate supervisor Nicole Richardson, on Facebook in a derogatory manner against Ms. Cottle in what I believed was a violation of attorney client privilege and unprofessional behavior from a Supervisor. The former Superintendent Jack Keegan, sent a letter to Jeff Filloon condoning this action under the rationale that Ms. Staton gave him permission and direction to release the report and therefore the behavior of Nicole Richardson was justified.

I believe that the Board expects a higher level of professionalism and integrity out of the investigations we request. Based on comments from Board members in recent meetings, I do not believe that the Board would not support the release of investigation results in the form of social media comments.

Therefore, please do not take it personally if the Board were to seek a different individual to interview Kami Cottle. It would certainly not be about you if that were to happen. Again, it would be about protecting the rights of our employees and ensuring the highest level of professionalism in our business dealings. Again, this is not my concern about you, but rather what happens with your investigation report once it is completed.

I will let you know the results of the Board and Superintendents decision as soon as possible.

Thanks again for all of your help.

Warm regards,

Staci Burk

Sent from my iPad

On Mar 18, 2014, at 6:32 PM, Donald Conrad <conrad.donald@gmail.com> wrote:

> Dear Staci,
>
> I received a call from Shawn Mcintosh in which he told me that the Board wanted to me to conduct an interview of Ms. Cottle who has alleged that I did not contact her to request an interview as a part of the investigatin that I recently concluded.
>
> I have no doubt about Shawn's reporting of the board's decision, but I wanted to hear from you that the Board wanted me to contact Cottle.
>
> Pease confirm that the board wants me to conduct further investigation. In that my time is being billed through Ms. Staton's firm, I have copied her with this correspondence.
>
> Sincerely,

>
> Don Conrad

 **TurboCourt**

## Filing Details

📇 Add Keyword/Matter # | ✉ Change My Notification Status | ✉ Request My Forms | 🗐 Copy for New Form Set | 🗐 List My Forms

### Filing Details

📋 Filing Details

✉ Messages

💲 Your Payments

📄 E-Service

| | | | |
|---|---|---|---|
| **Form Set #** ⓘ | 1323505 | **Case #** ⓘ | CV2014-097350 |
| **Keyword/Matter #** ⓘ | | **Status** ⓘ | Delivered |
| **Filing Type** | General Civil - Superior Court | **Location #** ⓘ | Maricopa - Superior Court |
| **Customer Name** | William R Richardson | **Customer Email** | wrichlaw@aol.com |
| **Delivery Date & Time** | 01/21/2015 1:16 PM MST | **Filing Date & Time** | |
| **Notification Status** | Email notification with filing/case details shown in the body of the email, plus a link to the website | | |

Your filing was successfully completed and delivered. You will be notified when your forms have been accepted. Then a case number will be assigned and a stamped and endorsed copy will be ready for you to print.

### Your Forms                                                                                    ⓘinfo

✓ **Summary Sheet (This summary sheet will not be filed with the court. This sheet is for your personal records only.)**                                                                    🗐 View

### Attached Documents                                                                          ⓘinfo

✓ **Amended Complaint: Amended Complaint and Demand for Jury Trial**                        🗐 View

└ **Exhibit/Attachment (Supporting): Exhibits A - E to Amended Complaint**                  🗐 View

└ **Exhibit/Attachment (Supporting): Exhibits F - K to Amended Complaint**                  🗐 View

└ **Exhibit/Attachment (Supporting): Exhibits L - M to Amended Complaint**                  🗐 View

# Payment Details

| | |
|---|---|
| **Filing Type** | General Civil - Superior Court |
| **Jurisdiction** | Maricopa - Superior Court |
| **Form Set #** | 1323505 |
| **Case #** | CV2014-097350 |
| **Keyword/Matter #** | |
| **Submission Name** | Richardson Vs. Griffin-Burk, Et.Al. |
| **Transaction Date** | 01/21/2015 1:16 PM MST |
| **Transaction #** | 68D22948DR772854R |
| **Payment Status** | Paid |
| **Paid By Credit Card** | Visa Last 4 digits: 9198, Expiration: 09/18 |
| **Service** | e-File & e-Serve |

| | |
|---|---|
| **Application Fee** | $ 12.00 |
| **Total** | $ 12.00 |

Print Payment Details    Close Window

ver. 10.12.1-s19                                        Copyright © 2014 Intresys, Inc.



MICHAEL K. JEANES
Clerk of the Superior Court
By sheila ponicki, Deputy
Date 12/31/2014 Time 14:22:51
Description                    Amount
--------- CASE# CV2014-097350 ---------
CIVIL NEW COMPLAINT            319.00
---------------------------------------
TOTAL AMOUNT                   319.00
          Receipt# 24231571

William R. Richardson (009278)
**RICHARDSON & RICHARDSON, P.C.**
1745 South Alma School Road
Corporate Center • Suite 100
Mesa, Arizona 85210-3010

Tel:    (480) 464-0600
Fax:    (480) 464-0602
Email:  wrichlaw@aol.com
Attorneys for Plaintiff

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

CV2014-097350

NICOLE RICHARDSON, a single woman,

            Plaintiff,

v.

**STACI GRIFFIN-BURK a/k/a STACI BURK a/k/a STACI K. GRIFFIN a/k/a STACI KRISTINE LAND a/k/a STACI K. LAND-GRIFFIN**, a single woman, and **GILBERT UNIFIED PUBLIC SCHOOL DISTRICT No. 41 of MARICOPA COUNTY**, a political subdivision of the State of Arizona,

            Defendants.

CV _____

**COMPLAINT**

**and**

**DEMAND FOR JURY TRIAL**

Plaintiff, Nicole Richardson ("Plaintiff"), for her Complaint against Defendants Staci Griffin-Burk a/k/a Staci Burk a/k/a Staci K. Griffin a/k/a Staci Kristine Land a/k/a Staci K. Land-Griffin ("Burk") and the Gilbert Unified Public School District No. 41 of Maricopa County (the "District") (Burk and the District are hereinafter collectively referred to as "Defendants"), alleges as follows:

## PARTIES AND JURISDICTION

1.    Plaintiff's claims arise under 42 U.S.C. 1983 ("1983") and the common law of the State of Arizona.

2.    Plaintiff a resident of Maricopa County, Arizona.

3.    The District is a school district located in Maricopa County, Arizona, and a political subdivision of the state of Arizona that may sue and be sued pursuant to A.R.S.

§ 15-326.

4. Burk is a resident of Maricopa County, Arizona.

5. Defendants caused events to occur in the State of Arizona out of which Plaintiff's claims for relief arise.

6. As to all claims against the District, the District acted through a majority of the Gilbert School Board (the "Board") or through its designated officers.

7. The District is liable for the illegal and tortious actions of the Board and its officers.

8. This Court has jurisdiction over the parties and the claim asserted herein pursuant to Ariz. Const. Art. 6 Section 14 as well as pursuant to *Haywood v. Drown*, 556 U.S. 729, 735 (2009) and predecessor cases thereto.

9. Venue is appropriate in this case pursuant to A.R.S. §12-401(5) in that the acts and activities complained of occurred in Maricopa County, Arizona.

10. Plaintiff is entitled to an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988(b).

## ALLEGATIONS COMMON TO ALL COUNTS

### Plaintiff's Employment with the District

11. Plaintiff commenced work at the District as a certified teacher almost twenty years ago, commencing in 1995.

12. Plaintiff initially taught art simultaneously at two grade schools and then moved to Highland High School in approximately August 2000 where she taught courses in Ceramics, Clay 3-D Art, Media Art (website design).

13. In approximately August of 2003, Plaintiff commenced teaching at Gilbert High School and taught essentially the same curriculum with an additional focus on video production and video broadcasting.

14. As a result of her video work at Gilbert High School, the District solicited Plaintiff to work in the District offices.

15. Thus, on June 9, 2008, Plaintiff was hired to work in the District's

Community Relations Department for the purpose of providing marketing services under the supervision of Diane Bowers ("Bowers").

16. Bowers was the director of Community Relations which included, among other things, providing marketing services for the District, video streaming of Board meetings, communicating with District administrators, staff and parents and communicating with media outlets including the press, television and radio.

17. Plaintiff, in her position with the District, provided assistance with all of the above and specifically, Plaintiff was called upon to provide services relating to film and graphic art.

18. In addition to her normal job during normal working hours, Plaintiff also provided after hours audio-visual support during monthly Board meetings.

**Staci Burk's Dealings with and as Part of the Board**

19. During the two years prior to August of 2009, Burk engaged in certain disputes with the District which disputes are outlined in an Arizona Republic article dated August 14, 2009.

20. A true copy of such article is attached hereto as Exhibit A.

21. In 2009, Burk expressed concern that the District considered her (Burk) "a threat."

22. Sometime prior to August of 2009, the District instituted complaints against Burk relating to Burk's claim of a lack of due process involving her children.

23. In 2010, Burk sought and gained election to the Board as member of the Board.

24. Burk was thereafter elected president of the Board.

25. As of 2013, the Board has consisted of the following members in the following positions:

| | |
|---|---|
| Staci Griffin-Burk | President |
| Julie Smith ("Smith") | Member |
| Daryl Colvin ("Colvin") | Clerk |

| | |
|---|---|
| Jill Humphreys ("Humphreys") | Member |
| Lily Tram ("Tram") | Member |

### Formation of the Triumvirate and the Dismantling of the District

26.     Soon after their respective election to the Board, Colvin, Smith and Burk formed an uber conservative triumvirate and effectively controlled all of the actions of the Board.

27.     Colvin, Smith and Burk were all dismissive, if not wholly critical, of the members of the District administration and staff from the beginning of their tenure on the Board and commenced a holy war of intimidation against the members of the District staff.

28.     For example, by email from Smith to Burk dated February 7, 2013, in the context of the triumvirate's successful ouster of former superintendent Dr. David Allison, Smith commented about her conversation with Jared Ryan, an administrator that was leaving the District.

29.     With respect to the relationship with the District staff, Smith stated:

> I told Jared that moving forward *the board needs admin. that we can trust, that will not undermine and will not play a constant chess game with us but instead be respectful.* I told him loyalty is very important to me.

*Id.* (emphasis added).

30.     A true and correct copy of Smith's email to Burk dated February 7, 2013, is attached hereto as Exhibit B.

31.     Similarly, and by way of additional example, on June 14, 2014, the East Valley Tribune reported that Smith voted against a budget override that the District proposed because as Smith stated, "[there] was a lack of trust between the [Board and the] district."

32.     A true and correct copy of the June 6, 2014 East Valley Tribune article is attached hereto as Exhibit C.

33.     Indeed, the triumvirate of Colvin, Smith and Burk formed a cabal (the "Cabal") whereby they conferred regarding the operation of the District and did so in

apparent violation of the open meetings laws of the State of Arizona.

34. Aside from their voting as an uber conservative block on the Board, they each individually frequently used public media for purposes of denigrating District staff and in promoting their uber conservative positions.

35. In addition to their communications within their own ranks, Plaintiff is informed and believes and therefore alleges that the Cabal, and Burk in particular, covertly conveyed (leaked) information to certain individuals in and outside of the District who were supportive of the Cabal's policies and positions.

## Dissembling and Retaliation

36. Central to their attacks as they apply to Plaintiff, was the attack that was commenced as a result of the employment of Kami Cottle ("Cottle") in the Community Relations Department of the District.

37. Cottle was hired in late April of 2013 to write news releases and to provide photography for the District.

38. It soon became apparent that Cottle was not well suited for the position largely because of her lack of writing skills.

39. In November of 2014, Cottle wrote an email entitled "Constructive Discharge Termination" and sent it to the Board and to the District's Human Relations Department (the "Cottle Resignation") pursuant to which Cottle resigned her position with the District.

40. Plaintiff is informed and believes and therefore alleges that Burk[1] supplied specific information regarding the Cottle Resignation to Thomas and Denise Green (the "Greens"), detractors of District personnel, who bombastically and sarcastically disseminate innuendo (yet little factual information) that they receive from "birdies" who supply them with information about the District.

41. Thus, in December of 2013, the Greens made a request to the District that

---

[1]

*See* Conrad Report identified in ¶51 at 1, 5. *See also,* ¶54 below where Dr. Keegan reminds the Board that they all received a copy of the Cottle Resignation.

they be granted access to email in the possession of the District that had been generated during the period relevant to the Cottle Resignation.

42. When the Greens reviewed the requested email, they did not find the Cottle Resignation because the District had a policy of not releasing information concerning ongoing personnel matters.

43. At that time, the Cottle Resignation was unresolved.

44. Yet, on January 10, 2014, the Greens submitted a new request under the Arizona Freedom of Information Act (A.R.S. §39-121 et seq.) pursuant to which the Greens requested "the emails (sic) from employees regarding the GPS working environment that were missing from the public records we inspected in December of 2013, when we reviewed board email messages."

45. The Greens further specified in their request that "These emails (sic) we seek were sent in November 2013."

46. The Cottle Resignation was included in the requested email messages and was ultimately provided to the Greens without redaction and despite the fact that the Cottle allegations were under investigation and had not been substantiated.

47. The Cottle Resignation contained allegations against the District staff (including both Bowers and Plaintiff) that were spurious and, accordingly, wholly false.

48. Cottle contended that she had secretly recorded conversations with District staff that supported her false allegation yet, she has never produced such recordings.

49. Plaintiff is informed and believes and therefore alleges that because the Cottle Resignation contained allegations against District staff including both Bowers and Plaintiff, Burk made sure that such information was made available to the Greens for dissemination.

50. The District, through its then Superintendent, Dr. Jack Keegan ("Dr. Keegan"), commissioned an outside investigation of the Cottle allegations as such were contained in the Cottle Resignation.

51. The investigation was implemented under the direction of attorney Georgia

1    A. Staton ("Staton") of the Jones, Skelton and Hochuli law firm.

2        52.    Plaintiff is informed and believes and therefore alleges that Staton, with the

3    approval of the District, hired attorney Don Conrad ("Conrad") to undertake an outside

4    investigation of the allegations contained in the Cottle Resignation (the "Cottle

5    Allegations").

6        53.    Via a report dated February 14, 2014 (the "Cottle Report"), Conrad found

7    no basis in fact for the Cottle Allegations which included allegations of wrongdoing on the

8    part of the District or District staff, including Plaintiff.

9        54.    As the holder of the right to disclose any confidential or attorney client

10    information to Plaintiff, Dr. Keegan provided a copy of the Cottle Report to Plaintiff.

11        55.    A true copy of the report is attached hereto as Exhibit D.

12        56.    The report found, among other things, as follows:

13        No specific evidence was identified in this investigation which would support Cottle's claims that
        she was bullied and intimidated by Bowers and Richardson. No specific examples of conduct that could
14        be characterized as bullying or intimidation were set out in Cottle's complaints that were investigated by
        McIntosh. Richardson specifically denies engaging in such behavior and she says that she never
15        witnessed any bullying or intimidating conduct directed at Cottle by Bowers. (Interview of Nicole
16        Richardson, December 27, 2013.) Bowers, in a written response to Cottle's complaint provided to
        McIntosh for his investigation, says that Cottle was "treated with respect and compassion" and that
17        from the beginning of her employment at GPS she "was welcomed" into the Community Relations
18        Department. Bowers also wrote that Cottle never expressed any dissatisfaction until the PIP was put in
        place. (Exhibit 16; see specifically document from Diane Bowers dated October 4, 2013.) Bowers
19        categorically denies ever having treated Cottle in an intimidating or bullying fashion. (Interview of
20        Dianne Bowers, January 22, 2013.)

    Cottle Report at 6. ("PIP" refers to a personal improvement plan).
21
22        57.    Additionally, Conrad noted that although he tried to contact Cottle for

23    purposes of concluding his investigation, Cottle failed to respond to or refused Conrad's

24    attempts to contact her.

25        58.    The Cottle Report provides as follows:

26        As Cottle has never responded to a request to be interviewed as a part of this investigation, it is
        impossible now to provide specific examples of the conduct she believed to be intimidating or bullying.
27        It is significant that Cottle apparently did not feel bullied or intimidated until the PIP was implemented.

28    *Id.*

59.    By memorandum dated February 21, 2014 (the "Keegan Memo"), Dr. Keegan forwarded a copy of the Cottle Report to the members of the Board and stated:

> Enclosed in your packet is a report from Don Conrad regarding his investigation of Kami Cottle's letter entitled Constructive Discharge Resignation. You received a copy of the [Cottle Resignation] letter and I informed the Board in executive session the action the administration was going to take. We had Don review the activities that led up to her resignation to be sure that we had provided the support that was necessary that we felt we followed all appropriate personnel rules in working with Kami. As you can see from the report, the District provided the adequate support necessary.

60.    A true copy of the February 21, 2014 Keegan Memo is attached hereto as Exhibit E.

61.    In his memorandum, Keegan also addresses First Amendment issues in great detail and explains to the Board that "even though [District employees] work for a public agency, [they] do not give up their right to speak about that agency . . . ." *Id.* at 2.

62.    Plaintiff is informed and believes and therefore alleges that the Cabal individually or collectively, intended to use, and did use, the Cottle Resignation and investigation to foment distrust, dissent and suspicion of, and to intimidate the District staff, including Plaintiff.

63.    Plaintiff is informed and believes and therefore alleges that aside from the Greens, the Cabal utilized other abettors and proxies to foment distrust of, stress upon, and intimidation of the District Staff including Plaintiff.

64.    Plaintiff is informed and believes and therefore alleges that among others, the Cabal (individually or collectively) provided information to Joe and Lisa Nicita who are abettors and acolytes of the Cabal for purposes of fomenting distrust of, stress upon, and intimidation of the District Staff including Plaintiff.

65.    For example, in a blog authored by Lisa Nicita, Ms. Nicita posted information from the Cottle Resignation as truth when the allegations were not supported by any credible evidence.

66.    In her own words, Ms. Nicita purports to "expos[e] some iffy practices of school district personnel, using anonymous sources."

67.    Ms. Nicita further purports to expose "[t]he web of manipulation, malice,

cover-ups and lies that has entangled Gilbert Public Schools."

68.     Nicita states unequivocally, that based on unnamed sources, the information in her blog "are facts" and that she is going to "set the record straight about what is going on [in the District]."

69.     As part of her purported exposé of the District staff, Ms. Nicita quotes from the Cottle Resignation stating that the "District management officials hold a 'direct disregard for the truth'" and that "high-ranking administrative officials used intimidation and harassment and allowed for an environment of hostility in the workplace." *See* blog post "MySoCalledCrisis," dated February 24, 2014 the ("Nicita Blog Post").

70.     A true copy of the Nicita Blog Post entitled "One 'Sinking Ship' and Oodles of Anonymous Sources" is attached hereto as Exhibit F.

71.     Plaintiff is informed and believes and therefore alleges that Burk or another member of the Cabal provided a copy of the Cottle Resignation to the Nicitas.

72.     The Nicitas never made a request for the Cottle Resignation from the District prior to the time the Nicita Blog Post was published.

73.     Plaintiff is informed and believes and therefore alleges that the Nicitas and the Greens acted in concert with the Cabal and, in particular, Burk, for purposes of promoting distrust of, stress upon, and intimidation of the District Staff including Plaintiff.

74.     On February 24, 2014, later during the day the Nicita Blog Post was published, Plaintiff engaged in a colloquy with Joe Nicita on a Facebook page entitled "We Support Gilbert Public Schools" (the "2/24 Nicita FB Transcript").

75.     In the 2/24 Nicita FB Transcript, Plaintiff asked Joe Nicita to remove a URL (Universal Resource Locator or web address) link to the Nicita Blog Post containing quotes from the Cottle Resignation.

76.     Plaintiff also noted in responding to Joe Nicita's comments that "printing something that isn't true is libel."

77. .    Plaintiff further noted that "the external investigation said it isn't true," referring to the false allegations that Ms. Nicita posted from the Cottle Resignation.

78. Mr. Nicita responded by stating that his wife published "what is public information from the cottle (sic) resignation."

79. A true copy of a portion of the 2/24 Nicita FB Transcript is attached hereto as Exhibit G.

80. In the evening of February 24, 2014, a subsequent conversation occurred on a Facebook page entitled "Parents for a Responsible School Board."

81. A true copy of a portion of that Facebook page is attached hereto as Exhibit H (the "2/24 Burk FB Transcript").

82. Burk is the administrator of the Parents for a Responsible Gilbert School Board ("PRGSB") Facebook page.

83. Mr. Nicita and other followers of the Cabal carried on a public conversation on the PRGSB Facebook page on February 24, 2014, pertaining to Plaintiff and her comments earlier in the day regarding the Nicita Blog Post.

84. Writing under the pseudonym "Parents for a Responsible Gilbert School Board," Burk addressed Plaintiff directly as follows:

> Nicole, we want to give you ample chance to follow through on your statements. If you would like to post the external investigation, we'd be happy to have it included in the dialogue.

2/24 Burk FB Transcript at 11:00 p.m.

85. On February 25, 2014 (the following day), Burk filed a complaint with the District (the "Burk Complaint") alleging that Plaintiff violated, among other things, an attorney client privilege by publicly disclosing the existence of an external investigation that absolved Plaintiff and other District staff from any wrongdoing.

86. Thus, on February 24, 2014, Burk was attempting to set a trap for Plaintiff by goading Plaintiff into submitting the entire Conrad Report so that Burk could allege an improper disclosure of the Conrad Report in her complaint against Plaintiff the following day.

87. A true copy of the first three pages of the Burk Complaint (for some reason

redacted by the District to remove Staci Burk's personal information) is attached hereto as Exhibit I.

88.     As reflected on the first page of the Burk Complaint, Plaintiff was immediately placed on paid administrative leave "until further notice . . . pending investigation." *Id.*

89.     Burk filed the Burk Complaint notwithstanding that she had been instructed only days beforehand through the Keegan Memo that employees of the District retain their First Amendment rights to comment on social media and elsewhere.

90.     Plaintiff's comments, as contained in the 2/24 Nicita FB Transcript, were not made in the course of Plaintiff's duties as an employee of the District.

91.     Plaintiff's comments as contained in the 2/24 Nicita FB Transcript were made pursuant to Plaintiff's right as a citizen pursuant to the First Amendment of the United States Constitution (the "First Amendment") as a matter of free speech.

92.     Plaintiff's comments as contained in the 2/24 Nicita FB Transcript were both true and were proffered to disseminate the truth of the situation and to confront the falsities that were being promulgated by the Cabal individually and through the Greens, the Nicitas and /or other acolytes of the Cabal.

93.     Plaintiff is informed and believes and therefore alleges that Burk filed her complaint against Plaintiff as a component part of her and the Cabal's continuing effort to stigmatize, oppress and intimidate Plaintiff, and the District staff generally, with the goal in mind of making the employment atmosphere so insufferable that the District staff would be forced to resign.

94.     Plaintiff is informed and believes and therefore alleges that Burk filed her complaint against Plaintiff knowing that Plaintiff's comments as set forth in the 2/24 Nicita FB Transcript were not only true, but that such comments constituted protected speech under the terms of the First Amendment as Burk had been informed in the Keegan Memo only days before.

95.     The Burk Complaint was submitted in furtherance of the Cabal's campaign

of intimidation and retaliation against the District Staff and against Plaintiff in particular.

96. Specifically, the Burk Complaint was filed in retaliation for Plaintiff's exercise of her First Amendment Rights as a citizen.

97. As a direct result of the Burk Complaint and the Cabal's continuous bombardment of the District staff with retaliation, oppression and intimidation as alleged herein, Plaintiff suffered an intolerable level of distress to the point that she was compelled to seek medical assistance.

98. Plaintiff thereafter went on medical leave and did not return to work.

99. Dr. Keegan investigated the Burk Complaint and on March 6, 2014, he wrote a letter to Jeff Filloon, assistant superintendent of human resources, and rescinded the order for administrative leave.

100. Moreover, in his letter to Mr. Filloon, Dr. Keegan noted that he had released the Conrad Report to Plaintiff after consulting with Ms. Staton, the attorney for the District.

101. Dr. Keegan further noted that "[b]ecause as superintendent, I was the client, Ms. Staton advised me that I had the authority to release the report." *Id.*

102. A true and correct copy of Dr. Keegan's investigative memorandum dated March 6, 2014 is attached hereto as Exhibit J (the "Keegan Investigative Memo").

103. Aside from the Keegan Investigative Memo and the investigation which the Memo recounts, there have been no other investigations of Plaintiff during her employment with the District.

104. On March 7, 2014, Jeff Filloon delivered a letter to Plaintiff (which included a copy of the Keegan Investigative Memo) pursuant to which Mr. Filloon notified Plaintiff of her reinstatement and Dr. Keegan's findings (the "Filloon Letter").

105. Among other things, Mr. Filloon reiterated that Dr. Keegan had found no violation of the attorney client privilege and further, that Plaintiff had not made any threats of a lawsuit against anyone.

106. The Filloon Letter along with the Keegan Investigative Memo terminated the

investigation the District initiated against Plaintiff as a result of the Burk Complaint.

## An Environment of Retaliation, Intimidation and Oppression

107. Through 2014, the Cabal's attacks on the District staff were unceasing as they attempted to retaliate against, intimidate and oppress the District staff.

108. Between, 2012 and 2014, the environment of retaliation, intimidation and oppression that the Cabal both initiated and fostered, caused the mass exodus of over 700 certified teachers and administrators from the District.

109. From the beginning of their reign, the Cabal caused the loss of almost the entire District administration due to their creation of an atmosphere of distrust and paranoia together with their incessant spurious allegations against the District staff and administrators.

110. For example, in early 2010, Burk directed the Board's attorney, Susan Segal, ("Segal") to investigate Dianne Bowers and Jennifer Corry, two District staff members, because of one or more Facebook posts that were critical of the Board and particularly the actions of the Cabal as a majority of the Board.

111. The same District staff members were also interrogated over the false allegation that the son of one of them had profited from the District's purchase of certain technology.

112. Burk sent a threatening and angry private Facebook messages to a District psychologist for his constitutionally protected activities.

113. Burk accused a member of the Community Relations staff of engaging in an angry text messaging exchange when, in reality, the messages were coming from Smith's husband.

114. Burk continued with her campaign of retaliation, intimidation and oppression by monitoring employees' public media accounts and posts, and then, either personally threatening the employee herself via email or via classroom visits.

115. Burk also had the Human Relations staff interrogate an employee whose communications had angered Burk.

116.    Likewise, on February 18, 2014, Burk and Colvin sought a criminal investigation (the "Burk / Colvin Complaint") into the activities of the District staff pertaining to an alleged destruction of records.

117.    Despite a police investigation, there has been no determination that a crime has been committed as a result of the Burk / Colvin Complaint.

118.    On February 18, 2014, Colvin and one other filed a criminal complaint against assistant superintendents Jeff Filloon and Shane McCord alleging embezzlement of District funds.

119.    Upon investigation, the Gilbert Police Department found no crime had been committed as the funds were paid pursuant to a contract with the District that the Board had approved.

120.    As a result of the Cabal's relentless campaign of retaliation, intimidation and oppression against the District staff, District staff began exhibiting physical symptoms not the least of which included bouts of vomiting, elevated high blood pressure requiring medication, hives, stress related fever blisters, and the need for prescription(s) for anxiety medication.

121.    As a result of the Cabal's campaign of retaliation, intimidation and oppression and the consequent stressful employment environment that Burk individually and that the collective Cabal (and therefore a Board majority) caused, certain employees (including Plaintiff) were compelled to take family medical leave of their jobs.

122.    On or about February 20, 2014, Dr. Keegan informed Plaintiff that her contract for the following year (2014-2015) would not be renewed because the Cabal had made that prior decision as the result of apparent violations of the Arizona open meeting laws.

123.    The Cabal had apparently created a list of 14 District employees whose contracts would not be renewed as a result of the collective prior determination of the Cabal.

124.    In a transparent attempt to circumvent open meetings laws, Plaintiff is

informed and believes that the Burk, Colvin and Smith sent their corresponding lists to Susan Segal in an attempt to deceitfully claim that their determinations were proper.

125. Segal sent the names to Dr. Keegan before the Board meeting at which the names of those on the list were to be considered.

126. Plaintiff's name was on the Cabal's list.

127. Dr. Keegan informed Plaintiff that the Cabal would not approve her contract for the following year based on the list that Segal provided to Dr. Keegan.

128. The creation of the list of 14 names was in furtherance of the Cabal's attempt to intimidate, pressure and retaliate against the District staff, including Plantiff.

129. Plaintiff's name was included on the Cabal's list despite the fact that Dr. Keegan had recommended that Plaintiff be granted a contract for the upcoming school year.

130. During her nineteen years of employment with the district both as a certified teacher and as an employee with the Community Relations staff at the District, the job performance reviews that Plaintiff received were, without exception, superlative.

131. Prior to February 2014, there had never been any question as to whether Plaintiff would be awarded successive contracts.

132. Never, until the Cottle Resignation and the Burk Complaint, had Plaintiff ever received a complaint about either her comportment or her abilities as a valued teacher, artist or employee of the District.

133. Because of the intolerable and discriminatory work environment created by the Cabal and their acolytes and abettors, on March 17, 2014, Plaintiff was compelled to resign her position with the District.

134. Burk and the Cabal considered anyone who did not embrace their political agenda as enemies and, accordingly, sought to attack and eliminate from employment all such perceived enemies.

135. Burk and the Cabal (and the Board because of the Cabal's majority status) retaliated against Plaintiff for her personal views and the exercise of her First Amendment

1 | rights as a citizen and parent of former District students.

2 |      136.   As a result of the incessant attacks on the District and its staff and the Cabal's

3 | continued witch hunts pursuant to which the Cabal promoted the idea that the District and

4 | its staff were dishonest and untrustworthy, the following individuals (among others) have

5 | resigned their positions:

6 |      ● Tommie Pearce, Director of Special Education, resigned in early 2010

7 |      ● Gary Fujino, Educational Services Coordinator, resigned in 2011

8 |      ● Jacklyn McFarland, Community Relations, resigned in March of 2013

9 |      ● Dave Allison, Superintendent, resigned in June 2013

10 |      ● Barbara VeNard, Assistant Superintendent, resigned in January of 2014

11 |      ● Susan Segal, attorney for the Board, resigned in February 2014

12 |      ● Jack Keegan, Interim Superintendent, resigned early in March of 2014

13 |      ● Diane Bowers, Director of Community Relations, resigned in March of 2014

14 |      ● Kristin Anderson, Asst. Princ., Highland High School, resigned in June of 2014

15 |      ● Jennifer Corry, District Hearing Officer, resigned in June of 2014

16 |      ● Clyde Dangerfield, Assistant Superintendent, resigned in June of 2014

17 |      ●Jeff Filloon, Assistant Superintendent, resigned in June of 2014

18 |      ● Colin Kelly, Principal, Greenfield Elementary, resigned in June of 2014

19 |      ● Jane Hecker, Director of Special Education, resigned in June of 2014

20 |      ● Vicki Hestor, Principal, Meridian Elementary, resigned in June of 2014

21 |      ● Shane McCord, Assistant Superintendent, resigned in June of 2014

22 |      ● Jim Pacek, Director of Technology, resigned in June of 2014

23 |      ● Jared Ryan, Principal, Campo Verde High School, resigned in June of 2014

24 |      ● Dominic Salce, Principal, Highland High School, resigned in June, 2014

25 |      ● Debbie Singleton, Principal Spectrum Elementary, resigned in June of 2014

26 |      137.   At the time of her resignation (constructive discharge), Plaintiff was one year

27 | short of earning her full retirement.

28 |      138.   Plaintiff is informed and believes and therefore alleges that Burk and the

1  Cabal were aware of Plaintiff's retirement status and intentionally tried to inflict as much

2  harm on Plaintiff as possible knowing her situation as a single breadwinner and single

3  mother.

4      139.  Defendants' actions including Defendant's retaliatory conduct as alleged

5  herein, directly caused Plaintiff extreme emotional distress and financial damage.

6      140.  Plaintiff was unable to survive financially on the reduced retirement income

7  that she would receive due to her work at the District and therefore, Plaintiff had to seek

8  other employment.

9      141.  Because of the spurious allegations and the resulting suspension caused by

10  the Burk Complaint, Plaintiff had great difficulty finding substitute employment.

11      142.  Among other places of employment, Plaintiff sought another position with

12  the District as a certified secondary art teacher, a position she had successfully held for at

13  least nine years in the District (Gilbert High School - six years, and Highland High School

14  - three years).

15      143.  She interviewed with Gilbert High School officials and was offered a job as

16  a secondary art teacher.

17      144.  Present Superintendent, Dr. Kristina Kishimoto ("Dr. Kishimoto"), favored

18  the hire and submitted Plaintiff's name to the Board along with the names of several other

19  individuals on the "consent" agenda at a Board Meeting on July 8, 2014 (the "July Board

20  Meeting").

21      145.  A true and correct transcription of the July Board Meeting commencing at

22  48:09 is attached hereto as Exhibit K.

23      146.  During the June, 2014, Board Meeting, the Board approved two other

24  employees who had previously resigned due to the Board's threats that they would not

25  rehire these individuals.

26      147.  When Plaintiff's name came up at the July 8, 2014, Board Meeting (item 7.03

27  of the consent agenda), Smith moved to remove Plaintiff's name from the list of seven

28  names that were to be approved which individuals had been recommended by Dr.

1     Kishimoto.

2         148.    After the unanimous approval of the other six names, Board member Tram

3     moved to approve Plaintiff's employment as an action item.

4         149.    Smith proposed a substitute motion which was a motion to approve a

5     secondary art teacher for Gilbert High School but with the removal of Plaintiff's name as

6     the designated teacher to fill the position.

7         150.    During discussion on the Smith motion, Smith stated as follows:

8       I don't understand how it is, quite honestly, that she was offered a job again
       because she was put on administrative leave and there was an investigation
9       going on and my understanding is that at the time of resignation the
       investigation had not been completed.
10
    *Id.*
11
        151.    Smith's statement was categorically false as she had been informed months
12
    beforehand that the investigation of the Burk Complaint had been completed and that
13
    Plaintiff's suspension had been rescinded.
14
        152.    Smith also knew the contents of the Conrad Report and knew that Conrad
15
    had found no improper conduct on Plaintiff's part.
16
        153.    During the July 8, 2014, Board meeting, Burk and Smith continued to falsely
17
    contend that Plaintiff was still somehow under investigation when (1) the entire Board had
18
    been informed that the investigation of Plaintiff pursuant to the Burk Complaint had
19
    terminated favorably to Plaintiff and (2) where the Conrad Report clearly indicated that
20
    there was no evidence to support the Cottle Allegations against Plaintiff.
21
        154.    At the time of the July 8, 2014, Board meeting, there was no ongoing
22
    investigation of Plaintiff.
23
        155.    At the time of the July 8, 2014, Board meeting, the entire Board had been
24
    informed that there was no ongoing investigation of Plaintiff.
25
        156.    There was no other ostensible reason for refusing to hire Plaintiff at the July
26
    8, 2014, Board meeting other than a retaliatory effort to damage Plaintiff for her protected
27
    activities.
28

157. On July 19, 2014, on the Gilbert Public School Board Observer Facebook page, Burk and others were engaged in a conversation pertaining to the Board's refusal to approve Plaintiff's employment as a secondary art teacher (the "7/19 Burk FB Transcript").

158. A true copy of a portion of the 7/19 Burk FB Transcript is attached hereto as Exhibit L.

159. An individual by the name of Myrna Sevey Shepard inquired as to why Plaintiff's name could not be added the Board agenda for the following Tuesday (July 22, 2014).

160. Others also advocated such a result.

161. Burk responded to these questions by falsely stating that Keegan had not completed his investigation of the Burk Complaint when the investigation had indeed been completed and Plaintiff had been exonerated.

162. Then Burk continued and clearly stated that Plaintiff would be a danger to the safety of the students of the District if Plaintiff were hired by the District as proposed by Dr. Kishimoto.

163. Burk stated as follows:

> If Ms. Richardson wants to return to GPS, *for the safety of our students* given the allegations made by her own staff I would expect that Ms. Richardson would also want the investigation to be completed in its entirety.

7/19 Burk FB Transcript at 9:48 p.m.

164. There was nothing alleged in the Cottle Resignation that could be remotely considered an allegation that Plaintiff might pose a safety concern for students.

165. In making her false and defamatory statements about Plaintiff, Burk had no information from any source whatsoever that Plaintiff posed any type of menace to the safety of the District's students.

166. Burk continues on during the same conversation and falsely states that there was a "mix up between the independent investigator and the support staff" and that the "key witness [Cottle] was not contacted."

167. Kami Cottle was indeed contacted relative to the Cottle Resignation and Conrad's investigation thereof but Cottle failed to respond and failed to produce her supposed tape recordings.

168. Both the Conrad Report and the Keegan Memo reflect that Cottle failed to respond to requests to be interviewed an that the investigation of the Cottle Resignation had concluded.

169. Burk also falsely states during the same conversation (the 7/19 Burk FB Transcript) that because of Plaintiff's resignation, "it was not necessary to expend the resources to spend resources to continue the investigation" thereby clearly falsely implying that Plaintiff was under investigation when she resigned when such was clearly not the case.

170. In email correspondence dated March 21, 2014, from Burk to Conrad, Burk specifically acknowledges the existence and content of the Filloon Letter and the Keegan Memo (the "3/21 Burk Email").

171. A true and correct copy of the 3/21 Burk Email is attached hereto as Exhibit M.

172. In the 3/21 Burk Email, Burk states:

> The former Superintendent Jack Keegan, sent a letter to Jeff Filloon condoning this action under the rationale that Ms. Staton gave him permission and direction to release the report and therefore the behavior of Nicole Richardson was justified."

*Id.*

### Count I

*(Civil Rights violations, constructive discharge, retaliation)*

*(42 U.S. C. §1983)*

173. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 172 above as though fully set forth herein.

174. 42 U.S.C. §1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes

> to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

175. The District is a "person" within the meaning of 42 U.S.C. §1983.

176. The District, through the actions of the Cabal as a majority the Board, acted under color of state law within the meaning of 42 U.S.C. §1983.

177. The District, through the acts of a majority of the Board adopted a policy and practice of discriminatory and retaliatory conduct toward District staff including Plaintiff.

178. Plaintiff is informed and believes and therefore alleges that the acts of the Cabal through Smith, Colvin and Burk were intentional with the purpose of intimidating and oppressing the District staff to the point that working at the District would become intolerable.

179. The actions of the Cabal both individually and collectively on behalf of the Board were purposely and intentionally designed to deprive Plaintiff of her civil rights including her right to freely express herself.

180. The District retaliated against Plaintiff by placing her on administrative leave with no basis to do so.

181. Plaintiff's suspension, though unjustified, now must be reported and was reported to prospective employers.

182. Plaintiff was not considered by both prospective employers and by the District as a result of the suspension and the acts of the Cabal as a majority of the Board.

183. Plaintiff had a legitimate claim of entitlement to her employment (1) before the Burk Complaint, (2) after her suspension as a result of the Burk complaint and (3) after she was constructively terminated and subsequently reapplied for a position with the District.

184. Defendants denied Plaintiff her right of free expression and ultimately retaliated against Plaintiff as a result of the exercise of her right of free expression under the terms of the First Amendment.

1    185.   Plaintiff was constructively discharged and denied her right of employment
2    because of the actions of Defendants in retaliating, intimidating and oppressing both
3    Plaintiff and District staff and thereby creating an intolerable work environment as alleged
4    hereinabove.

5    186.   Defendants' actions in (1) creating a hostile and intolerable work
6    environment and (2) in retaliating against Plaintiff for exercising her Constitutional rights
7    deprived her of rights, privileges and immunities within the meaning of 42 U.S.C. §1983.

8    187.   Plaintiff was damaged as a direct and proximate result of Defendants'
9    actions.

10   188.   Plaintiff has been damaged in an amount believed to be in excess of
11   $250,000 due to both the loss of employment and the loss of retirement benefits.

12   **WHEREFORE**, Plaintiff requests this Court enter judgment against Defendants
13   and all of them, as follows:

14       A.   Awarding Plaintiff just and reasonable compensatory damages in the amount
15            of not less than $250,000.00;

16       B.   Awarding to Plaintiff the reasonable costs and expenses incurred in the
17            prosecution of this action, including but not limited to attorneys' fees and
18            costs pursuant to 42 U.S.C. §1988;

19       C.   Awarding Plaintiff pre and post judgment interest on the foregoing sums at
20            a reasonable or statutory rate (whichever is higher) from the date that
21            Defendants deprived Plaintiff of her rights;

22       D.   Entering a proscriptive injunction against the District requiring the District
23            to employ Plaintiff in whatever position she qualifies for at a rate
24            commensurate with her skills and seniority with no further discrimination or
25            retaliation; and

26       E.   Awarding Plaintiff such other and further relief as is appropriate under the
27            circumstances.

28

*(Intentional Infliction of Emotional Pain and Suffering)*

189.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 188 above as though fully set forth herein.

190.   The acts of Defendants as alleged herein were extreme and outrageous and were intentionally or recklessly designed to cause severe emotional harm and distress to Plaintiff.

191.   Defendants' actions as described above did cause Plaintiff severe emotional harm and distress such that, among other things, Plaintiff had to go on medical leave and seek the aid of a physician.

192.   Plaintiff continues to suffer emotional pain and distress as a result of Defendants' callous, outrageous and intentional acts.

193.   Plaintiff has been damaged in an amount to be determined at trial but currently believed to be in excess of $150,000.00.

194.   The acts of Defendants were extreme and undertaken with an evil mind sufficient to merit the award of punitive damages.

**WHEREFORE,** Plaintiff requests this Court enter judgment against Defendants and all of them, as follows:

A.   Awarding Plaintiff just and reasonable compensatory damages in the amount of not less than $150,000.00;

B.   Awarding to Plaintiff exemplary damages in an amount sufficient to punish Defendants for their outrageous conduct but in an amount not less than $300,000.00;

C.   Awarding Plaintiff her costs of suit; and

D.   Awarding Plaintiff such other and further relief as is appropriate under the circumstances.

//

//

## Count III

### (Defamation)

195.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 though 194 above as though fully set forth herein.

196.   Burk, acting individually, made false and defamatory statements regarding Plaintiff in writing and published such statements on the internet.

197.   One of the overriding concerns of the District is to assure the safety of its students.

198.   Burk knew that there was no reason or basis to fear for the safety of the students of the District in rehiring Plaintiff.

199.   Burk's written statements to the effect that Plaintiff might pose a safety hazard for the students of the District was wholly false and Burk knew of the falsity of her statement when she made it.

200.   Burk's statements to the effect that Plaintiff was still somehow under investigation were wholly false and Burk knew of the falsity of such statements when she made them.

201.   Burk's published false statements as alleged in this Count constituted a direct attack on Plaintiff's, integrity, virtue, and reputation and brought Plaintiff's reputation into disrepute, contempt, and ridicule both among her peers as an educator and among the public at large who have access to the internet.

202.   Plaintiff was directly horrendously damaged by Plaintiff's outrageous written comments.

203.   Burk's actions were sufficiently callous, outrageous and undertaken with an evil mind, that an award of punitive damages is appropriate.

**WHEREFORE**, Plaintiff requests this Court enter judgment against Burk as follows:

A.   Awarding Plaintiff just and reasonable compensatory damages in the amount of not less than $150,000.00;

B.  Awarding to Plaintiff exemplary damages in an amount sufficient to punish Defendant Burk for her outrageous conduct but in an amount not less than $300,000.00;

C.  Awarding Plaintiff her costs of suit; and

D.  Awarding Plaintiff such other and further relief as is appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, Ariz. R. Civ. P. demand is hereby made that all matters triable by a jury in this case be so tried.

DATED this 31⁵ᵗ day of December, 2014.

RICHARDSON & RICHARDSON, P.C.

By _____
William R. Richardson
1745 South Alma School Road
Corporate Center • Suite 100
Mesa, Arizona 85210-3010
Attorneys for Plaintiff

File No. 8007.17NR

# EXHIBIT "A"

http://archive.azcentral.com/community/gilbert/articles/2009/08/14/20090814gr-schoolfight0815.html

# Mom Charges Retaliation in Fight with Gilbert School District

by Emily Gersema - Aug. 14, 2009 08:49 AM
The Arizona Republic

A Mesa mother alleges she and her family are targets of retaliation by a Gilbert youth football league because it has a business relationship with a school district that has a pending legal case against her.

Staci Griffin-Burk said Gilbert Public Schools filed in the spring a due process complaint against her over her 10-year-old son Josh 's special education services.

She said the district has been trying to place him in a private school for kids with serious disabilities even though he has been in both general education and special education classrooms throughout elementary school.

She said the district has failed to provide proper aides for his vision trouble and learning disabilities.

In response to the district's complaint, she has filed a notice of claim, declaring her right to countersue the district if she chooses.

Gilbert Pop Warner, which rents fields from the school district,won't let her son at the center of the legal dispute play on its teams.

In addition, Paul Watkins, state commissioner of Arizona Pop Warner, last week ordered the release of her older son, Alex Griffin, who was volunteering as a coach on the team, the Aviators.

Watkins did not respond to calls seeking comment.

League officials decided Griffin-Burk's son Josh shouldn't play football in Gilbert when she asked whether any district employees aware of her case have any involvement with her sons' teams.

Griffin-Burk said she was concerned that a conflict of interest could arise and interfere with her sons' play.

Gilbert Pop Warner president Michelle Holmberg told Griffin-Burk late last month that Josh should register and

1

play in the Queen Creek Pop Warner league - about 15 miles from her house.

Holmberg wrote that letting him play in the Queen Creek league was the best solution since she and Watkins were concerned about the pending case with the district and didn't want to be involved.

Griffin-Burk said she should have been offered the option of enrolling her son on another team within the Gilbert league. She is a single mom with chronic heart and lung trouble who breathes with the aid of an oxygen machine, and said a daily drive of 15 miles to and from Queen Creek is difficult to manage.

Griffin-Burk said she believes the dispute with Pop Warner is symptomatic of the conflict with Gilbert Public Schools.

"This has just gone too far," she said.

Griffin-Burk said she contacted civil rights attorneys because she believes the league is retailiating against her.

Rico said he hopes to negotiate with Gilbert Pop Warner officials to let Josh play football and Alex coach, or issue a full refund and an apology.

The league promised a full refund, but Griffin-Burk said she hasn't received it.

If the group does not choose any of those potential solutions, the case will be referred to the state attorney general's office and the U.S. Department of Justice's civil rights office.

Pop Warner's leagues throughout the country are run solely by volunteers. They follow a set of bylaws that govern their operation and policies for decisions such as when they can or can't switch kids from one team to another.

When asked about the potential legal case with Griffin-Burk, the national spokesman for Pop Warner, Josh Pruce, declined comment.

Griffin-Burk noted a Gilbert Public Schools employee is a volunteer member of the community's Pop Warner board, but district officials said that is completely separate from her job at the school district.

The district is keeping its distance.

"As far as I can tell, this is a private matter," Assistant Superintendent Clyde Dangerfield said of the conflict between Griffin-Burk and Pop Warner. "It doesn't involve the school district."

District officials said they cannot discuss its case against Griffin-Burk; privacy laws require they maintain confidentiality in student matters. Griffin-Burk said she has had a good

2

working relationship with Pop Warner until now. Her sons have played in the league for several years.

With Gilbert Public Schools, it's another story. She and the district have had a shaky relationship for the past couple of years due to disputes over two of her children's education.

Griffin-Burk also has been an advocate for about a half-dozen other families whose children have special needs, including some whose children attend Gilbert Public Schools.

Griffin-Burk said she has won a few disputes on behalf of the families and wonders if now, because of that, the district considers her a threat.

Dangerfield said in a recent interview that the district tries to do what's best for children with special needs. Sometimes staff recommendations are at odds with what parents want, he said.

He noted, too, that the district has never before filed a case against a parent.

The Arizona Department of Education Web site on special education services shows these cases typically number fewer than a half dozen each year. Usually, they are initiated by parents concerned about special education services for their children.

Hearings for the two due process complaints have not been set yet.

# EXHIBIT "B"

I spoke with Jared just now. I was my honest self. He did admit that he stood in the room at the meeting and stated his support for the years Dr. Allison worked at GPS and encouraged others to attend the meeting. He denied that he phoned, e-mailed or texted anyone to go to the meeting. He denied any intention of wishing to undermine or intimidate the board. He denied any connection with the GEA letter or whipping up a frenzy. Jared said he used to be a GEA member but dropped his membership a while back after getting higher in the ranks and seeing what GEA really represents. I think he is being honest that he wanted to show support for/appreciation of the years that Dave worked but also is being a kiss-up.

I told Jared that moving forward the board needs admin. that we can trust, that will not undermine and will not play a constant chess game with us but instead be respectful. I told him loyalty is very important to me. I spoke specifically of principals and not so much above. He genuinely understood and apologized if there was a misrepresentation of my being at the Tuesday meeting or my statement at the admin. meeting.

He has been offered a job by Chandler district to open a new school. Jared does disagree with a business or private sector superintendent but then did agree with my statement that a different set of skills is necessary to run a district and handle a budget. Jared also agreed that the assistant superintendents have the hands on knowledge of classroom and school challenges that can help shape a superintendent's decision.

I think he is an asset to our district and it would be a loss. I think he appreciates now that we don't like games. I came straight out and told him that he was on my short list of recommendation for assistant superintendent and was removed after the stunt he pulled. He would like it if you can find the time to call him by tomorrow before end of business day. I did let him know you have been testifying in a trial which has taken up a lot of your time.

I would recommend you call him when you get a chance. I think the guy has a lot of talent and will stop the games if he sees the leadership from us. **Jared can be our star pupil we get going in the right direction!**

His cell: 480-262-0643

Take Care,
Julie

# EXHIBIT "C"

http://www.eastvalleytribune.com/local/gilbert/article_a324417e-f354-11e3-b080-001a4bcf887a.
html

# Gilbert Public Schools board votes no on override request

Posted: Saturday, June 14, 2014 8:30 am

By Eric Mungenast, Tribune

Voters in Gilbert won't receive a third opportunity to weigh the pros and cons of an override after the Gilbert Public Schools Governing Board voted down adding it to the November ballot in a heated 3-2 vote.

Board president Staci Burk, Clerk Daryl Colvin and board member Julie Smith opted against placing a 10 percent override on the Nov. 4 election ballot during the board's June 10 meeting. It would have been the third time in the last three years the board asked for an override; voters rejected the district's efforts in 2012 and 2013.

"It's clear that the voters are not in support of this," Burk said.

The measure would have allowed the district to overspend its maintenance and operations by 10 percent starting in the 2015-16 fiscal year. Gilbert first approved an override in 2007, but the inability to renew it in 2012 and 2013 will result in the district losing it in 2016.

The inability to approve another override was one of the reasons Burk cited for her decision to not go for it in 2014,

along with a potential influx in funding in the neighborhood of $8 million for the 2015-16 school year. Board member Lily Tram, who approved the measure alongside Jill Humpherys, said there's no guarantee the district will receive that much funding from the state and other sources next year.

Rather, she said the district could guarantee a source of funding she said Gilbert needs if it could get an override approved by voters.

"I can't see how we can find another $7 million to cut in the budget. We've all seen it, the budgets are presented to us," she said. "It just means further increasing class sizes, cuts of programs, closing of schools, reboundaring things. There's really no other way and it's going to be a devastating impact if this override isn't provided to the community to vote."

Tram's reference was the 2014-15 fiscal year budget the board approved shortly before the override vote, which saw the district cut approximately $6 million from the maintenance and operations budget, some of which was a result of the override loss. The district bridged that gap in part by eliminating 80 teaching

positions that will lead to an increase in class sizes among every level.

Smith, however, said the district might have found more areas to cut from the 2014-15 fiscal year budget, which the board also passed during the meeting, had the newly implemented zero-based budgeting system started sooner. Although it was implemented during the budgeting process, Smith said the 2013 override attempt delayed the start of it and impeded on the district's budgeting efforts.

The reason she mentioned for voting against was a lack of trust between the district and the community caused by a collection of contrasting information. Smith said she didn't want to go for another override before incoming Superintendent Christina Kishimoto can regain the community's trust.

Smith's vote, along with those of Burk and Colvin, went against Kishimoto's recommendation to go for the override. In a letter addressed to the board, Kishimoto said the district should pursue an aggressive campaign to provide funding for a "student-centered district." Also supporting the measure were Mayor John Lewis, Gilbert Councilmember Ben Cooper and Gilbert Public Schools Governing Board candidates Reed Carr and Charles Santa Cruz.

The end result of the vote drew a spattering of boos, with audience members shouting "shame on you" and "resign" to the members opposing the measure. The audience consisted largely of parents and community members in support of the override, one of whom presented the board a document with 1,071 signatures in favor of it.

Contact writer: (480) 898-5647 or emungenast@evtrib.com

# EXHIBIT "D"

**DONALD E CONRAD**

**Attorney at Law**

## REPORT OF INVESTIGATION OF ALLEGATIONS OF CONSTRUCTIVE DISMISSAL BY KAMI COTTLE

### I.   Introduction

On April 1, 2013 Gilbert Public Schools (GPS) hired Kami Cottle to fill the position of Marketing Specialist in the Community Relations Department. The responsibility of the position was to identify and write articles for various news outlets, both external and internal to GPS. The articles were to focus on the good work of GPS staff, the GPS learning environment and the accomplishments of its students. Cottle worked under the immediate supervision of Nicole Richardson, Website Communications Supervisor. The head of the department is Dianne Bowers, the Director of Community Relations and Public Information Officer.

Cottle produced a minimal number of articles during the summer break in 2013. By August, deficiencies in her performance were noticed by her supervision. Initially, a decision was made to extend her probationary period. However, that was deemed impossible as Cottle's probation had expired 60 days[1] after she was hired. Instead, a Performance Improvement Plan (PIP) was developed by which Cottle was to demonstrate improvements in her work and an ability to perform the essential functions of the position. Cottle signed the PIP on August 26, 2013.

Over a period of weeks, Cottle's work product was reviewed and meetings were held to compare the work to the criteria set out in the PIP. Cottle's performance was unsatisfactory. On November 18, 2013, Cottle resigned alleging that she had been constructively discharged.

Cottle's allegations were conveyed to the GPS Governing Board. This investigation followed.

### II.   Methodology

After an initial discussion of the issues with Dr. Jack Keegan, acting GPS Superintendent, interviews were conducted of the following persons:

Nicole Richardson, Website Communications Supervisor

Shawn McIntosh, Director of Human Resources

Dianne Bowers, Director of Community Relations and Public Information Officer

---

[1] Probationary periods at GPS vary and depend upon how a position is classified. Only working days are counted in the calculation of a probationary period. (Interview of Shawn McIntosh, January 21, 2014.)

Cottle was contacted with a request to be interviewed for this investigation by telephone and by email using a telephone number and address available from the Human Resources Department at GPS. Cottle never responded to either communication.

Vickie Savory, a GPS employee and former colleague of Cottle in the Community Relations Department, was also contacted and asked to participate in an interview. Savory worked until late 2013 in the Community Relations Department as an assistant to Bowers. Savory canceled a scheduled appointment to be interviewed claiming stress related reasons. She has since declined to be interviewed citing the stress of being interviewed as the reason. (See Exhibit 21, email from Vickie Savory dated January 8, 2013.)

Copies of all digital and hard copy documentation related to the hiring of Cottle, the improvement plan, notes related to implementation of the plan and Cottle's resignation were requested from the Human Resources Department. All documentation made available was reviewed.

## III.    Facts

### (a)  Cottle's Application and Hiring

Cottle responded to a GPS announcement for a Community Relations Specialist posted on February 27, 2013. Set out in the announcement were essential functions including the development of written and visual content for a variety of communication channels. Those channels include the GPS Facebook account and the GPS website. The writer filling the position also was responsible for press releases to azcentral.com and for the "In Touch" newsletter, a summary of the results of the GPS superintendent's monthly meeting with East Valley mayors and community leaders. That newsletter is also distributed to the Arizona Business and Education Coalition. The minimum qualifications required "excellent visual and written communications skills" and "demonstrated writing experience and familiarity with The Associated Press (AP) style." (Exhibit 1, job description for Community Relations Specialist.) These job requirements were discussed with Cottle at the time of the interview which was attended by Bowers and Richardson. (Interview of Nicole Richardson, December 27, 2013.)

Cottle presented a resume which stated that in previous employment she had written press releases, datasheets, business technical articles for internet and magazine print and speeches for management executives for fund raising events. (Exhibit 2, Cottle resume.) Her stated prior experience included a position for two years as a marketing/writing/sales representative and for three years as a public relations agent.

Cottle provided writing samples at the time of her interview. They are not available at GPS, perhaps returned to Cottle. (Interview of Nicole Richardson, December 27, 2013.)

### (b)  Cottle's Work Performance

Cottle started her position in April 2013 as the school year was ending. According to Richardson, the work flow during the summer break that followed was abnormally slow. One reason for the diminished work load was that Superintendent David Allison had left the district and no replacement had yet been made. In normal summers, a large part of what the Community Relations Department does is to prepare materials for the upcoming school year, including a welcome back video featuring the

2

superintendent which is shown to all students at the beginning of the school year. (Exhibit 3, Richardson's email and attachment to Jeff Filloon and Shawn McIntosh re: Response to Kami Cottle dated October 7, 2013.) (Interview of Nicole Richardson, December 27, 2013.)

Cottle posted nine articles to the GPS website during the summer. Richardson noticed that of the nine articles, five were articles the contents of which amounted to cut and paste information from materials given to Cottle. She noticed that one of the articles had a title that seemed inapplicable to the contents. She also noticed punctuation errors and awkward sentence structure. As Richardson had access to the GPS website, she corrected what she termed "glaring" punctuation errors in one story online. When she raised the problem with Cottle, Cottle explained that she had accidentally posted a draft of an article which had not been proofread by Savory. (Interview of Nicole Richardson, December 27, 2013.)

Sometime during the summer, Cottle had begun to be assisted by Savory who served as a grammarian and editor for Cottle's articles. Savory regularly reviewed and corrected Cottle's articles to ensure appropriate punctuation, structure and compliance with the "AP" style. Cottle's reliance on Savory was known to Richardson and Bowers. (Exhibit 22, email from Nicole Richardson dated February 3, 2014.)

In August, three parents contacted Richardson about the poor quality of articles posted on the GPS website. Cottle had written the articles. These parents were known to Richardson as parents who have previously taken a special interest in GPS. (Interview of Nicole Richardson, December 27, 2013.)

Proofreading Cottle's articles was not then an assigned responsibility of Richardson. Her responsibilities were to create film, graphics and maintain the GPS website. Complaints from parents, however, convinced Richardson to take a closer look at the work being produced by Cottle. (Exhibit 3, Richardson's response to Cottle's complaints.)

Richardson brought the issue of the poor quality of Cottle's work to Bower's attention. Based on a review of her written product and other work performance, a decision was made to propose her termination. In consultation with the Human Resources Department it was learned that termination based on a failure to successfully complete probation was not possible as the 60 day probationary period for Cottle's position had already expired. A decision was made to implement a PIP. (Interview of Shawn McIntosh. December 19, 2013.)

Bowers had been advised prior to the expiration of Cottle's probation of the need to complete a probationary evaluation by June 21, 2013. According to McIntosh, a list of probationary employees is sent once a month to administrators to remind them of probationary periods that are expiring. (Exhibit 5, email from Shawn McIntosh dated January 16, 2014.) McIntosh provided copies of three email reminders sent to GPS supervisors reminding them of the need to do evaluations for probationary employees. The emails, from Stella Nora in the Human Resources Department, also include an attachment called "Probationary Employee List" that identifies by department the employee(s) and the date(s) probation expires. (Exhibit 18, email dated May 7, 2013, from Stella Nora with "Probationary employee List" and "Probation Evaluation Checklist" attached; Exhibit 19, email dated June 12, 2013, from Stella Nora; Exhibit 20, email dated July 16, 2013, from Stella Nora.) Bowers and her assistant Savory are listed as recipients of the emails with the attachment naming the employees for whom an evaluation was needed. Cottle is named in the attachments included with each of the emails. The Cottle entry indicates her probation ends on June 21, 2013.

3

Instead of a probationary evaluation, an intermittent evaluation was completed and a PIP was provided to Cottle. Cottle's overall rating in her evaluation was that she "does not meet standards" in the area of quality of work and that she is "developing/approaching" standards in the area of initiative and quantity of work. Richardson drafted the PIP. Cottle signed her evaluation on August 26. (Exhibit 4, Cottle's evaluation and Performance Improvement Plan dated August 16, 2013.) Cottle was advised by Richardson that but for the expiration of her probation she would have been terminated.[2] (Interview of Nicole Richardson, December 27, 2013.) The PIP originally required improvement by September 20, 2013. (Exhibit 4, Cottle's evaluation and Performance Improvement Plan dated August 16, 2013.) (Interview of Shawn McIntosh. December 19, 2013.) On September 18, the PIP completion date was extended to November 13. (Exhibit 6, calendar of events made by Richardson; constructed from her contemporaneous digital calendar notes.) (Interview of Nicole Richardson, December 27, 2013.) The PIP was extended to allow Cottle more time for improvement.[3] (Interview of Shawn McIntosh, February 3, 2014.)

### (c) Cottle's Improvement Plan

Cottle's PIP was detailed and specific. Included were objectives that required interesting and important ideas for her stories, an organized style, sentence fluency, use of the AP style, and memorable word choices. An objective measure of performance was also included. Cottle was required to generate five stories per week. She was encouraged to use photographs when appropriate. The PIP contemplated that Cottle would present her five stories to Bowers and Richardson before the end of the day each Friday. The PIP also suggested sources for independent study that Cottle could review to improve her writing skills. (Exhibit 4)

Friday meetings were held among Cottle, Richardson and Bowers to address the performance issues identified in the PIP on August 23, August 30, September 5[4], September 20, and September 27. About October 17, 2013, Cottle requested that the Friday meetings be suspended and that she post her stories without the Friday review because she did not find the meetings helpful. The meetings were suspended at Cottle's request. (Interview of Shawn McIntosh, December 19, 2013.) (Exhibit 6)

Prior to the Friday meetings, Bowers and Richardson reviewed Cottle's articles. Feedback was provided to Cottle at the Friday meetings. Significant problems with Cottle's writing were evident in the articles submitted for review by her supervision. Reviews of Cottle's work for October 2, (Exhibit 12), October 16 (Exhibit 13), and October 23 (Exhibit 14) point out the ongoing deficiencies in Cottle's work and her failure to meet the basic requirements of her position.

---

[2] Cottle has complained that Richardson's statement demonstrates that the PIP was a farce intended to drive her from GPS or to set up her dismissal. Richardson admits that she told Cottle of the original intention to dismiss her but that the statement was made to emphasize the district's serious need to have a writer on the Community Relations staff capable of working independently and producing accurate, innovative articles and to convince Cottle to be serious about her need to improve. (Interview of Nicole Richardson, December 27, 2013.)
[3] Cottle was absent for several days during her improvement period due to the death of a family member.
[4] No meeting was held on September 13 due to Cottle's absence for bereavement leave. No meeting was held on October 4 as it is a GPS early release day. None was held on October 11 due to Cottle's vacation absence.

### (d) Review of Cottle's Work Product by Third Parties

On September 25 and after the PIP reviews were initiated, Cottle sent an email to McIntosh in which she complained that Richardson was biased against her. (Exhibit 7, email from Kami Cottle re: HR.) To deal with Cottle's objection, McIntosh arranged for submission of five of Cottle's articles for review by other teachers in the GPS system. Cottle knew of the proposal to have her work reviewed by other than the Community Resources staff. (Exhibit 8, email from Kami Cottle dated October 25, 2013.) (Interview of Shawn McIntosh, December 19, 2013.) Cottle submitted stories for the third party review to McIntosh. Richardson was not involved in the review of these stories. (Exhibit 9, email from Kami Cottle dated October 25 2013 re: stories 10-25.)

McIntosh asked Jack Blanchard, Director of Community Education for GPS, to review Cottle's submissions and to complete the evaluation form being used at the Friday meetings. Blanchard responded that the articles lacked "imagination or a clear sense of purpose." He deemed the articles boring and judged them to be "little more that (sic) bullet points on an outline strung together." Of the identified objectives in the PIP, Blanchard found all but one to be unmet by the five articles he reviewed. (Exhibit 10, email from Jack Blanchard dated October 29, 2013, re: stories.) The articles reviewed by Blanchard had been previously reviewed for grammar by Savory. (Interview of Shawn McIntosh. December 19, 2013.)

Jeff Filloon, Assistant Superintendent for Human Resources, sent another set of Cottle's proposed stories to Cathy Nicholson, a GPS English teacher and Yearbook and Newspaper Advisor. (Interview of Shawn McIntosh, December 19, 2013.) While Nicholson found some merit in the articles, her review noted confusing lead paragraphs, a forced and incomplete style, poor word choices, and the need to edit the text. The stories sent to Nicholson had been reviewed for grammar by Savory. (Exhibit 11, notes of Cathy Nicholson after review of Cottle's articles.)

### (e) Cottle's Allegations re: Constructive Discharge

On November 15, Cottle sent an email to members of the Governing Board and the Human Resources Department staff alleging that she had been forced to resign her job due to mistreatment by Bowers and Richardson at GPS. (Exhibit 15, email dated November 15, 2013, from Cottle entitled Constructive Discharge Resignation.) She complained of a hostile work environment in which she had been exposed to intimidation, bullying and harassment by Bowers and Richardson. In an effort to substantiate her claims, Cottle attached a document to her email (Exhibit 15) entitled "Response to Summary of Investigation-Constructive Discharge Resignation." Cottle's Response targets findings that were made by McIntosh after he conducted an investigation of charges Cottle had made alleging unfairness and mistreatment by Bowers and Richardson in her email of September 25, previously cited in this report. (Exhibit 7) McIntosh's "Summary of Investigation" (Exhibit 16) documents his investigation of Cottle's claims that she was not given an opportunity to improve her job performance and that the PIP was merely part of a predetermined intent to fire her. McIntosh concluded that Cottle's claims regarding the PIP were "unsubstantiated."

The documentary record of the ongoing evaluation of Cottle's job performance as a part of the PIP is replete with examples of her failure to meet the basic requirements of her position. Contrary to her claims that she was not afforded a fair opportunity to improve, the record indicates a substantial effort to allow Cottle to show that she could do the job. Her weekly submissions were reviewed in detail

by Bowers and Richardson and the results of their reviews were discussed weekly at meetings that lasted between two to three hours. (Interview of Dianne Bowers, January 22, 2014.) In the judgment of her supervisors and of third parties not involved in Cottle's supervision, she consistently failed to produce articles suitable for publication.

As to Cottle's claim that firing her was always the intended outcome of the PIP process, Human Resources staff had determined to recommend to the Superintendent that Cottle be retained as an employee but that her work responsibilities be modified to relieve her of the task of writing articles. (Interview of Shawn McIntosh, December 19, 2013) They intended to propose that Cottle be assigned some of the duties being handled by Savory. Bowers says that she first proposed that Cottle's duties be changed in order to keep Cottle employed at GPS. (Interview of Dianne Bowers, January 22, 2014.) *Cottle resigned before that recommendation could be made to the Superintendent. (Interview of Shawn McIntosh. December 19, 2013.)*

No specific evidence was identified in this investigation which would support Cottle's claims that she was bullied and intimidated by Bowers and Richardson. No specific examples of conduct that could be characterized as bullying or intimidation were set out in Cottle's complaints that were investigated by McIntosh. Richardson specifically denies engaging in such behavior and she says that she never witnessed any bullying or intimidating conduct directed at Cottle by Bowers. (Interview of Nicole Richardson, December 27, 2013.) Bowers, in a written response to Cottle's complaint provided to McIntosh for his investigation, says that Cottle was "treated with respect and compassion" and that from the beginning of her employment at GPS she "was welcomed" into the Community Relations Department. Bowers also wrote that Cottle never expressed any dissatisfaction until the PIP was put in place. (Exhibit 16; see specifically document from Diane Bowers dated October 4, 2013.) Bowers categorically denies ever having treated Cottle in an intimidating or bullying fashion. (Interview of Dianne Bowers, January 22, 2013.)

As Cottle has never responded to a request to be interviewed as a part of this investigation, it is impossible now to provide specific examples of the conduct she believed to be intimidating or bullying. It is significant that Cottle apparently did not feel bullied or intimidated until the PIP was implemented.

Bowers says that during the period of Cottle's employment she and Cottle met alone on only one occasion. When Cottle began to work at GPS, her office and that of Richardson were not in the same suite where Bowers and Savory were located. Bowers' position requires her to be out of the office a lot. She would often convey instructions to Cottle through Richardson. On one occasion in or about May 2013, she met with Cottle as Cottle had raised an issue regarding her pay. No other person was present. Based on the discussion, Bowers raised the issue with the Superintendent and Cottle was given a higher rate of pay. (Interview of Dianne Bowers, January 22, 2014.) *There is no suggestion that any inappropriate conduct took place at that time and it seems highly unlikely in that Bowers agreed to seek approval for a raise for Cottle.*

In July, the Community Relations staff were all moved to the same suite just outside the Superintendent's offices. *Neither the Superintendent nor his assistant Susan Sokolsky reported having witnessed any of the conduct complained about by Cottle. (Interview of Shawn McIntosh, January 20, 2014.)*

6

On every other occasion in which Cottle met with Bowers, another person was present, either an individual from Human Resources or Richardson. McIntosh who attended many meetings also denies he ever saw any behavior that would be construed as bullying or intimidation. (Interview of Shawn McIntosh, January 20, 2014.)

It should be noted that complaints about bullying and intimidation similar to those made by Cottle have been made by Savory. (Exhibit 17, Request for Relief and Redress, November 18, 2013.) Savory's complaint traces conduct beginning with events in the spring of 2009 and extending to November 2013. Savory sought and was granted a transfer to another assignment. She is no longer assigned to the Community Relations Department. (Interview of Shawn McIntosh, December 19, 2013.) Savory's allegations were not examined in this investigation.

After Cottle complained about Bower's conduct, Bowers was orally counseled by Filloon and McIntosh. Bowers was told about Cottle's complaint against her and instructed to be polite and considerate to her subordinates. She was told to be careful in the way she addressed the staff in the Department. (Interview of Shawn McIntosh, January 20, 2014.)

Cottle has complained that she was not interviewed as a part of McIntosh's investigation. Her complaint is spurious. McIntosh met with Cottle once per week beginning with the implementation of the PIP to discuss her improvement and any issues that had arisen in the department. After Cottle filed her September 25 email (Exhibit 7) with the Human Resources Department, McIntosh met once per week with Cottle to discuss her improvement and to discuss the issues she had raised in her email. The details of her complaints were the subject of various discussions with Cottle and members of the Human Resources Department, including McIntosh. (Interview of Shawn McIntosh, January 21, 2014.)

IV.    **Conclusions**

The available written evidence indicates that Cottle was never able to perform the essential duties of the Marketing Specialist. It is also evident that substantial time and resources were dedicated to assisting Cottle to become a better writer. The PIP was a fair and appropriate response to the discovery that Cottle could not write quality articles needed by the Community Relations Department. Training Cottle to be a writer in the three months dedicated to the PIP was an impossible task. Three months was, however, a sufficiently long period to establish that Cottle could not perform the essential functions of the job.

It is unfortunate that Cottle's writing deficiencies were not discovered during the probationary period. But the fact that Bowers did not complete a probationary evaluation and that she mistakenly assumed that she could seek Cottle's dismissal in August 2013 for a failure to successfully complete probation does not take away from the legitimacy of the PIP. Cottle had every opportunity to show that she could handle the writer's job. She failed in virtually every respect. She needed constant editing by Savory for grammar. Her stories were not interesting. She did not develop story ideas presented to her. Her sentence structure was often awkward. She was careless about her facts and editing. Her headlines were sometimes not appropriate to the story content. Even when she knew her articles were to be reviewed by outside parties, Cottle did not present articles suitable for publication. Three months was a sufficiently long period for Cottle's skills to be tested.

Based on the information provided by Bowers, it is difficult to conclude that Cottle's allegations are true. As Bowers met alone with Cottle on one occasion only, surely another witness would be available to support Cottle's claims if there had been abusive conduct by Bowers. There appears, however, to be no such witness. The fact that Cottle began to complain about intimidation only when her job was threatened is an important consideration that casts doubt on her claims. Cottle's lack of specificity about incidents that amount to bullying or intimidation also creates doubt as to the veracity of her complaints.

## V.    Recommendations

The Governing Board should instruct the GPS staff to reconsider the length of probationary periods for new employees. Even in the best of circumstances, sixty working days is not a sufficient period in which to evaluate an employee's ability to perform job functions. The interests of GPS would be best served with additional time for supervisors to observe new employees before the expiration of probation.

The Board should also instruct GPS staff to implement a more foolproof system for monitoring the completion of evaluations of employees before the expiration of probationary periods. In the Cottle matter, two emails were sent to Bowers and her assistant, Savory, before Cottle's probation expired to remind them of the need to do a probationary evaluation. A third was sent in July after the probation expired. Though three email reminders were sent, there was no follow-up by the Human Resources Department even though no probationary evaluation was filed. The system in place at present has no fail-safe backup to make sure supervisors take the necessary measures to protect the interests of GPS as an employer.

Donald E. Conrad

Dated: 2/4/14

# EXHIBIT "E"

February 21, 2014

To:     Board Members

From:   Jack Keegan

Re:     Friday Notes

## Kami Cottle

Enclosed in your packet is a report from Don Conrad regarding his investigation of Kami Cottle's letter entitled, *Constructive Discharge Resignation*. You received a copy of the letter and I informed the board in executive session the action that the administration was going to take. We had Don review the activities that led up to her resignation to be sure that we provided the support that was necessary, that we felt we followed all appropriate personnel rules in working with Cami. As you can see from the report, the District provided the adequate support necessary.

In addition, Don identified some areas of improvement in our procedures and those are in the process of being implemented at this moment. I share with him his concern that our probationary period was so short and we are now changing it to a 6-month probationary period. Shane is putting a process in place that if they do not receive the evaluations back on probationary personnel that action will be taken with the appropriate supervisor.

I am sending you his short summary but his attachments which include samples of her writing and the kinds of corrections that Nicole or Vicky offered and also that the third party people that reviewed her work is available. All attachments that are mentioned in the report are available in my office. If you are inclined to review them.

## Board Meeting

I have asked that we have a uniformed SRO officer available at Tuesday's board meeting. Just to review what an officer can do. He can only take action if an individual person gets out of hand and *does something to endanger people. He cannot quiet the crowd if they make noise nor can he clear the room if the board wants that that is the responsibility of the board.* I would urge that again we stress to people that there will be no clapping; give everyone the courtesy of hearing what each has to say. I think it also important that we keep to the strict time limits of three minutes and continue our policy of not letting someone hand in a card for someone else to turn time over to them.

## Susan Segal

I was asked to put an item from Daryl regarding the employment of a new attorney from Stoms for Institute consideration. Daryl asked that this go on the 2st Board meeting, however

*if you review the agenda it is*

not on there. The reason it is not, is that Susan had notified Staci and me prior to my conversation with Daryl stating that she would be finishing up the items she is currently working on for the board and would no longer be serving as the board's attorney.

## Graduation Assignments

We are putting together the graduation assignments. I will have Susan Sokolsky call you next week to find out which high school graduation you would like to attend.

## First Amendment Issues

I have received comments from the school board members regarding employee's use of social media and concerns about comments about the board or specific board members. As you know, last week I sent a notice to parents about rumor mills and staff inappropriately speaking with students about political issues in the classroom. That letter was also sent to all staff members. If staff continues to speak in the classroom about information like that, I can deal with that. However, posting on Facebook pages or blogs is something that is covered through the first amendment and we need to be very very careful about the first amendment rights of public employees. The reason we do, is that they work for a public agency, which is different from working for private business. Even though you work for a public agency, you do not give up your first amendment rights to speak about that agency or any other aspect of government. That is different from what people working for a private company can say about their company. To speak about the company is totally under the control of the company and does not fall on the first amendment.

I have included two pieces of information that I would encourage members of the board to read. The first short one is a three page on free speech rights for public employees. The primary case is the *Pickering vs. the Board of Education* in 1968. It is important to note the ruling on that case. The courts found that a public employee's statements on a matter of public concern could not be the cause for discharge unless the statement contained knowing or reckless falsehoods or the statements were of the sort to cause a substantial interference with the ability of the employee to continue to do his job. That is a fairly high threshold that has to be met prior to stopping someone from exercising their free speech or dismissing them because of their free speech. If they write about the superintendent, not liking a decision I make, there is nothing that can be done about that. Quite frankly, nothing should be done about that. That is one of the consequences of being a public official and/or a public elected official.

Again, I would encourage you to read over the materials. In addition, there is a presentation that was given at the school board association's annual law conference, which I attended. This one deals with social media, the dos and don'ts and the legal areas of it. While the document may look long, it is basically a power point presentation and puts it into very nice bullet points. This is also very important considering some board members concerns about employee's comments on social media. Please be

careful what is said or insinuated because they do have a right to come back at the district for any adverse actions taken against them.

## Ten Worst States Where Students Struggle in Reading

Enclosed is a list and an explanation of why certain states are falling way behind in the writing, solid reading education for their students. I am sending this to you simply for your information.

## John Huppenthal's Letter

Enclosed in your packet is a copy of John Huppenthal's letter that he sent out last week to all educators. This letter was generated because of his doing a robocall talking to parents of private school students. I am including this just for your information.

## Mesquite Pool

Clyde and I met with representatives from the Town regarding redo of the Mesquite Pool. From the Town's study you can see that the Town wishes to put $1.16 million into reconstruction of the pool and they would like to begin this year. We notified them that we did not have the money to pay that half. We are going to go back and take a look at it and we will bring something forward to the board at a later date. However, at this point we are looking at telling them that the district does not have the money. The only way that we could do it is pay our portion over a number of years. We are in the process of trying to figure out and project the number of years that we would need for the pool. If you have any questions regarding this, please do not hesitate to contact me.

# EXHIBIT "F"

mysocalledcrisis

HOME ABOUT

# ONE "SINKING SHIP" AND OODLES OF ANONYMOUS SOURCES

4

Posted on February 24, 2014

These past couple of days have been filled with firsts for me, which of course, is why I write this blog.

Yesterday, for the first time, I called Gov. Jan Brewer's office to ask her to veto a bill (SB1062).

This morning, I signed my first Change.org petition.

And now, I'm writing a story, exposing some iffy practices of school district personnel, using anonymous sources. All my years as a reporter, I've never been able to use anonymous sources. But, this blog has different rules. The validity of this story, this blog post, is not lessened by the fact that I'm using unnamed sources. At all. These are facts.

My sources are anonymous because they are fearful for the consequences that await them for speaking out.

The web of manipulation, malice, cover-ups and lies that has entangled Gilbert Public Schools is that serious. People who are "in the know" are scared. They're scared for different reasons, but nonetheless, they are scared.

The web of manipulation, malice, cover-ups and lies that has entangled Gilbert Public Schools is that serious. People who are "in the know" are scared. They're scared for different reasons, but nonetheless, they are scared.

To be perfectly honest, this blog was not designed to scoop. It was designed with the intent to document my new experiences, new adventures — with the whole idea that, well, you only live once. I had a feeling I'd live with regret if I didn't offer true reporting on what's happening in the town in which I live.

The drama surrounding Gilbert Public Schools has made me nauseous. So much so that I felt compelled to help set the record straight about what is really going on. This is happening in my backyard. And, it's not right.

I'm not writing this anonymously. I still have kids who will go through the Gilbert Public School District. I help run a PTSO. I'm visible. And for exposing the true facts surrounding the district's turmoil, I sincerely hope I don't face consequences.

There's something really wrong with our community. Our community. **That's a fact.** It's my *opinion* that there are a few things "wrong" with the school board, but that's only my opinion. And, I express that opinion in the voting booth.

Our community, one that worked late nights and long days to save a school from being closed illegally last year, is being bullied. It's being bullied by people who claim the school board is responsible for a "mass exodus." It's actually these bullies who are responsible for their so-called "mass exodus."

These bullies in effect dropped a match on a dry grassy field and they're watching it burn. It's a damn shame.

They think th **mysocalledcrisis** nbers are

Our community, one that worked late nights and long days to save a school from being closed illegally last year, is being bullied. It's being bullied by people who claim the school board is responsible for a "mass exodus." It's actually these bullies who are responsible for their so-called "mass exodus."

These bullies in effect dropped a match on a dry grassy field and they're watching it burn. It's a damn shame.

They think they have power in numbers, but how effective are numbers when those numbers are grossly misinformed? Responsible power is actually gained with truth.

What if I report that sources with knowledge have confirmed that top district administrators who recently resigned, the proverbial match that lit the fire, were involved in an internal investigation that has now been turned over to law enforcement?

What if I said that?

And what if I said it was true?

I'm saying it because it is.

Those in our community who do not support certain members of the current school board heard about the resignations, and without knowledge or facts of any kind, claimed those individuals were "run out." It was their spark, even though it was flawed. But, the flames spread. Countless resignations followed.

They sneezed on a doorknob and now everyone is touching it. Now the district is being compared to the Titanic by the very people who steered us into the iceberg.



resignations followed.

They sneezed on a doorknob and now everyone is touching it. Now the district is being compared to the Titanic by the very people who steered us into the iceberg.

It's hard to know exactly which resignations have been inspired by the hysteria circulating throughout the district, and which ones are simply part of the business of education. But it is darn sure easy to spot a bully.

Bullies don't follow the rules, while at the same time expecting everyone else to. Bullies push people around. In this case, bullies exclusively welcome like-thinkers, and banish those with a differing perspective. These bullies have scared employees at various levels into thinking their opinion could cost them their jobs. And, in some cases, it appears it already has.

Sources have acknowledged that certain administrators have pushed employees out the door, especially those who question certain activities. Other administrators have destroyed and altered documents to cover up any wrongdoing, and registered false names online for the sole purpose of trolling.

And, who knows exactly what this investigation will uncover. So far, Gilbert PD is still examining the evidence. Whatever the transgressions were, they've added up to about a $2 million loss for the district, according to sources. Sources also confirm that the investigation has been months in the making, confirming that it was not timed to serve as a distraction.

That's just one problem.

One resignation, from Community Relations Department employee Kami Cottle, states that district management officials hold a "direct disregard for the truth." Cottle states that high-ranking administrative officials used intimidation and harassment, and allowed for an environment of hostility in the workplace, all the while failing to properly investigate claims that such behavior existed or was...

mysocalledcrisis        Blog at WordPress.com. The Even Afar Theme

One resignation, from Community Relations Department employee Kami Cottle, states that district management officials hold a "direct disregard for the truth." Cottle states that high-ranking administrative officials used intimidation and harassment, and allowed for an environment of hostility in the workplace, all the while failing to properly investigate claims that such behavior existed or was even inappropriate.

As part of her resignation letter, Cottle said those officials "created a liability" for the district. She has audio recordings to support her claims.

That's a snapshot. A peek at how district brass, meaning high-level administrators and management, handle those who question.

With the imminent arrival of a new superintendent, the district can close a chapter on a previous schools' chief who had the cojones to offer to cover the cost of moving, and six months rent, for a district parent if only that parent would relocate. To another district. If that parent died, and only if that parent died, would the child be welcome to return to the district.

The parent was asking too many questions.

That happened. And, what's more, the offer is in writing.

More is happening now. And soon the public will be privy to all of it. But, until then, we have to sit tight. Refrain from making assumptions, because to date, those assumptions have been wrong and incredibly damaging, not only in the way of staff departures but in public perception and employee morale.

Gilbert Public Schools is changing. And change takes time. But positive change only comes with truth. The real truth. Facts. Scare tactics and hype only go so far.

That's a snapshot. A peek at how district brass, meaning high-level administrators and management, handle those who question.

With the imminent arrival of a new superintendent, the district can close a chapter on a previous schools' chief who had the cojones to offer to cover the cost of moving, and six months rent, for a district parent if only that parent would relocate. To another district. If that parent died, and only if that parent died, would the child be welcome to return to the district.

The parent was asking too many questions.

That happened. And, what's more, the offer is in writing.

More is happening now. And soon the public will be privy to all of it. But, until then, we have to sit tight. Refrain from making assumptions, because to date, those assumptions have been wrong and incredibly damaging, not only in the way of staff departures but in public perception and employee morale.

Gilbert Public Schools is changing. And change takes time. But positive change only comes with truth. The real truth. Facts. Scare tactics and hype only go so far.

## MY HEAD ITCHES JUST THINKING ABOUT IT.... 0

Posted on December 6, 2013

Totally didn't see today coming. At all.

If you would   mysocalledcrisis          Blog at WordPress.com. The Ever After Theme   v picked

# EXHIBIT "G"

f **We support Gilbert Public Schools**

PEOPLE

**764 likes**

Invite your friends to like this Page

ABOUT

This page is to share updates and give information regarding GPS. We support the community, the students, the parents and the staff.

Suggest Edits

PHOTOS





---

**Joe Nicita** This blog isn't going anywhere and the truth refuses to back down from intimidation.
Like · Reply · February 24 at 10:37pm

**Myrna Servey Sheppard** This blog shouldn't go anywhere. Anyone with the title of "My So Called Crisis" has a lot to offer. But it must be noted that blogs are simply expressions of the opinions of the writers and a reflection of the "truth" as they see it. This one makes me laugh—it reminds me of the journal entries of my jr. high students, although I finally had to tell them: No more entries about body functions!
Like · February 25 at 10:51am

**Eli Littlefield** Absolutely. Myrna a blog is a modern day version of a diary/journal. It is one person's opinion/perspective not pure fact as Mr. Nicita keeps stating. I can appreciate the blogger taking the time to present her perspective but Mr.Nicita's insistence that it be seen as pure fact is incorrect. In addition, I don't understand why Mr. Nicita feels the need to be insulting and somewhat hostile towards those who don't agree with him-kind of bully-like.
Like · 1 · February 25 at 2:1pm · Edited

| Write a reply...

**Joe Nicita** EJ... I mean Eli, here is the entire thread. Joe Nicita Nicole, you should stop intimidating. This reporter has more credentials than you can ever understand. You've already been investigated for this one time before. It is what it is.
about an hour ago · Like · 2
**Nicole Richardson** Joe, I am not questioning your wife's credentials, I am certain she is a fine reporter. Yes it is what it is, and what she printed is not true. She has been duped and I am just asking that the link be removed. Printing something that isn't true is libel, just sayin
49 minutes ago · Like · 1
**Nicole Richardson** BTW, the external investigation says it isn't true. Just wanting to clarify the rumors and gossip.
42 minutes ago · Edited · Like · 1
**Joe Nicita** Nicole, you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote what is public information from the cottle resignation. I can post the pdf of the cottle resignation letter here if you like. Cottle is the one who made the accusation in a public record. I'm sorry if you don't or a agree with what Lisa wrote. However, all her investigative reporting was above board. So I would suggest you accept the article.
Like · Reply · February 24 at 10:36pm

**Eli Littlefield** Joe quit with the immature name cap.. I'm not EJ, no matter how many times you say it, it's not true.
Like · February 24 at 11:49pm

**Eli Littlefield** I have told Mr.Nicita I am not EJ several times-clearly he is not interested in the truth but would rather perpetuate an untruth in multiple posts. I can't control his behavior so am moving on. I am more concerned with the issues related to GPS than with his behavior.



**We support Gilbert Public Schools**

**PEOPLE**

764 likes

Invite your friends to like this Page

**ABOUT**

This page is to share updates and give information regarding GPS. We support the community, the students, the parents and the staff.

Suggest Edits

**PHOTOS**

English (US) · Privacy · Terms · Cookies
Facebook © 2014

---

and like are seeing some resignations in response to such threads.
Like · ♡ 1 · February 25 at 9:54am

Richardson removed her post in this thread.
Like · Reply · February 25 at 8:11am

View more replies

Write a reply...

We support Gilbert Public Schools Joe Nicita:We are pleased that your wife chose to write and share her blog. As a side note, it does appear that Ms. Richardson removed her post in this thread.
Like · Reply · February 25 at 8:11am

Sonya Belshe Watkins Kinda reminds me of Y2K... We're still waiting...
Like · Reply · ♡ 1 · February 24 at 5:59pm

Joe Nicita I have not insulted anyone with the exception of Allison. As we continue to deal with please repost my insulting comments to you. Today was a sad day yet a gratifying day cause I was able to read the tons of emails has has been receiving from gilbert teachers past and present for finally saying what they have been so scared to say. So the 3 people who have been so negative on what was written pales in comparison to the literally thousands that have read it and thanked her.
Like · Reply · ♡ 2 · February 25 at 2:00pm

Karen Berke Udall I just found out from Parents for a Responsible Gilbert School Board that I am blocked by someone named Nicole Richardson. I do not know her, but I cannot see her posts here, so I didn't understand to whom Joe was posting. Based on posts on that page, there was an external investigation to Kami Cottle's resignation letter. Her letter is public. Hopefully someone can post the external investigation to this page and that one.
Like · Reply · February 24, at 11:44pm

Ell Littlefield Joe-a resignation letter is very different from fact. It's the opinion of the person leaving not necessarily an accurate description of what happened. I believe an investigation into the situation trumps a resignation letter. Just curious as to why the blog post chose to ignore or not look into the situation enough to determine and include all the facts?!?
Like · Reply · February 24, at 10:52pm

Karen Berke Udall Is the investigation public record? Do you have the info on that investigation?
Like · ♡ 1 · February 24, at 11:50pm

Joe Nicita why would you defend a bully? I just don't get it. I'm not so sure an investigation took place. That's the claim. You should see the e-mail upon e-mail of people reaching out to Lisa telling her thier experience with admins in the district. It's stunning and sad. It will change. No way I'm going to be a part of that kind of behavior.
Like · February 25 at 11:01am

Write a reply...

Joe Nicita Im still in awe and disgusted that the former superintendent of our district would offer to pay someone's moving expenses just so they would stop asking questions. So sad. That comment read was. Jay stagnant. But he good

# We support Gilbert Public Schools

**PEOPLE**

**784 likes**

Invite your friends to like this Page

**ABOUT**

This page is to share updates and give information regarding GPS. We support the community, the students, the parents and the staff.

✓ Suggest Edits

**PHOTOS**

---

**We support Gilbert Public Schools** shared a link.
February 24

Thank you to several local Facebook pages for posting this. It's a great blog post by a mom in Gilbert who sees some serious challenges happening in our community.

"To be perfectly honest, this blog was not designed to scoop. It was design...
See More

mysocalledcrisis
mysocalledcrisis.wordpress.com

I'm trying new things, and taking everyone with me. Since, it's just about time for that mid-life...

👍 18 💬 15 ↗ 1 Share

Like · Comment · Share                                    Top Comments ▾

👍 10 people like this.

Write a comment...

**Frances Hollorani** I have three children in Gilbert Schools, high school, middle school and elementary and through my years raising children I have never gotten involved with the school board. Because honestly I don't care. As long as my kids are doing good what the school board does seems irrelevant to my life, until now. Why the change? Because the school district I came to, to give my kids a good education seems to be slipping. No matter what side you are on, where there is smoke there is fire. So for the first time in my life I will be attending tonight's board meeting to find out for myself. I can't be the only 'handsoff' parent suddenly having a change of heart about my lack of involvement and that should scare all those involved.
Like · Reply · 👍 8 · February 25 at 11:23am

**Dawn Brimhall** I can promise you, you are not. For too long, we disinterested parents have let things go. It's time to do our duty and pay attention.
Like · 👍 1 · February 25 at 11:31pm

Write a reply...

**Dawn Youwer Rissi** After reading this, I am even more confused as to what is going on in the district.
Like · Reply · 👍 3 · February 24 at 5:54pm

**We support Gilbert Public Schools** Myrna Sevey Sheppard stated: it must be

---

English (US) · Privacy · Terms · Cookies · More
Facebook © 2014

# EXHIBIT "H"

# Parents for a Responsible Gilbert School Board

Q

**NOTES**

Superintendent Keegan clears up confusion from re...
September 14, 2013

---

**POSTS TO PAGE**

Be the first to post on this Page.

Write Post

---

**LIKED BY THIS PAGE**

Highland High School — 👍 Like

Mesquite Jr. High School — 👍 Like

South Valley Junior High ... — 👍 Like

---

**Karen Berke Udall** I still have no idea who Nicole is, or what she posted. Does Nicole have a last name? Maybe we can see if we are blocked. And then, maybe she can explain why we are blocked. Without a last name, I'm not even sure I've met her.
February 24 at 10:49pm · Like · 👍 1

**Amy Redin Hagen** Joe or EJ, can you copy/paste Nicole's comments so we can all read them? I'm not very tech-savvy, so I'm not sure how I'm blocked.
February 24 at 11:00pm · Like

**Parents for a Responsible Gilbert School Board** Karen: It appears that Nicole Richardson has blocked you, as well as Julie, Dawn, and Amy from seeing her comments.
February 24 at 11:05pm · Like

**Joe Nicita** EJ. I'm not fully understand what you're saying. However I think you understand exactly what the facts are. Lisa cited the tip of the iceberg. Read the report and if you don't find it as disturbing as I did it's time to look into the glass. I would be surprised if the new superintendent put up with this type of bullying and unethical behavior.
February 24 at 11:05pm · Like

**Amy Redin Hagen** I'm not sure why a stranger would block me. But, if Nicole has an investigation report, it would certainly shed some light on things. In the interest of transparency, I'm sure if the resignation letter is public then the investigation report is public too. It must be as well.
February 24 at 11:39pm · Like · 👍 2

**Karen Berke Udall** Ditto, Amy. Thank you. I noticed that Joe commented at We support Gilbert Public Schools to Nicole too. I guess if we are blocked here, we are blocked everywhere by her? I've never met her. Not sure why she blocked either one of us.
February 24 at 11:41pm · Like

**Amy Redin Hagen** She works in my District? We are both employed by GPS, and she has blocked me from seeing her posts?.
February 24 at 11:48pm · Like

**Amy Redin Hagen** Nicole, I would love to know if we have met at work, and I somehow offended you? I would be happy to apologize. I work hard to have positive relationships with my fellow GPS employees.
February 24 at 11:51pm · Like · 👍 1

**Karen Berke Udall** Amy - I think if she blocked you, she can't see your comments either. At least that's what I've learned from a google search. maybe EJ can pass the word that we don't know why we are blocked, since it's clear EJ can see Nicole's comments.
February 24 at 11:52pm · Like

**Amy Redin Hagen** What on earth? It makes me wonder if I'm blocked by anyone else?
February 24 at 11:55pm · Like

**Parents for a Responsible Gilbert School Board** We certainly hope not, Amy. By the way, congratulations on your recent "Difference Maker in Education" award! We

 **Parents for a Responsible Gilbert School Board**

| Parents for a Responsible ... | Timeline ▼ | Recent ▼ |

 **Joe Nicita** It's clear Nicole blocked you.
February 24 at 10:23pm · Like

 **Karen Berke Udall** I'm confused. Who's Nicole? And why would she block me?
February 24 at 10:25pm · Like

 **Amy Redin Hagen** Blocked me? From what?
February 24 at 10:25pm · Like

 **Julie Scott-Dudley** Nicole who? I don't see any comments from a Nicole.
February 24 at 10:25pm · Like

 **Parents for a Responsible Gilbert School Board** Nicole, we want to give you ample chance to follow through on your statements. If you would like to post the external investigation, we'd be happy to have it included in the dialogue.
February 24 at 10:34pm · Like · 👍 1

 **Dawn Brimhall** It's a one-sided conversation on my side, too.
February 24 at 10:35pm · Like

 **Eli Littlefield** Nicole seems to be referring to an official external investigation document - not sure legalites of that being released. Joe above refers to a resignation letter - which often times are accusatory but not necessarily "fact" from my experience with departing employees.
February 24 at 10:39pm · Like

 **Joe Nicita** EJ. Eli, thanks for sharing this. This is exactly what lisa reported on. Lisa did not make up reports. It's here in black and white. Thank you for sharing.
February 24 at 10:49pm · Like

 **Karen Berke Udall** I still have no idea who Nicole is, or what she posted. Does Nicole have a last name? Maybe we can see if we are blocked. And then, maybe she can explain why we are blocked. Without a last name, I'm not even sure I've met her.
February 24 at 10:49pm · Like · 👍 1

 **Eli Littlefield** Joe -it's Eli not EJ -for clarification, your wife included the official investigation in her blog post? Because a

NOTES                                                    >

Superintendent Keegan clears up confusion from re...
September 14, 2013

POSTS TO PAGE                                            >

Be the first to post on this Page.

Write Post

LIKED BY THIS PAGE                                       >

Highland High School                    [👍 Like]

Mesquite Jr. High School                 [👍 Like]

South Valley Junior High ...             [👍 Like]

English (US)  Privacy  Terms  Cookies  More
Facebook © 2014

February 24 at 9:26pm · Like · 👍 2

Joe Nicita Nicole, you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote what is public information from the cottle resignation. I can post the pdf of the cottle resignation letter here if you like. Cottle is the one who made the accusation in a public record. I'm sorry if you don't or a agree with what Lisa wrote. However, all her investigative reporting was above board. So I would suggest you accept the article.
February 24 at 10:03pm · Like

Karen Berke Udall I can't see comments from Nicole, Joe. Who are you talking to?
February 24 at 10:09pm · Like

Amy Redin Hagen Ditto, Karen. I only see comments from Eric and Joe. Where is Nicole disparaging Lisa's credentials?
February 24 at 10:16pm · Like

Joe Nicita It's clear Nicole blocked you.
February 24 at 10:23pm · Like

Karen Berke Udall I'm confused. Who's Nicole? And why would she block me?
February 24 at 10:25pm · Like

Amy Redin Hagen Blocked me? From what?
February 24 at 10:25pm · Like

Julie Scott-Dudley Nicole who? I don't see any comments from a Nicole.
February 24 at 10:25pm · Like

Parents for a Responsible Gilbert School Board Nicole, we want to give you ample chance to follow through on your statements. If you would like to post the external investigation, we'd be happy to have it included in the dialogue.
February 24 at 10:34pm · Like · 👍 1

Dawn Brimhall It's a one-sided conversation on my side, too.
February 24 at 10:35pm · Like

Joe Nicita EJ. Eli, thanks for sharing this. This is exactly what lisa reported on. Lisa did not make up reports. It's here in black and white. Thank you for sharing.
February 24 at 10:49pm · Like

Karen Berke Udall I still have no idea who Nicole is, or what she posted. Does Nicole have a last name? Maybe we can see if we are blocked. And then, maybe she can explain why we are blocked. Without a last name, I'm not even sure I've met her.
February 24 at 10:49pm · Like · 👍 1

Amy Redin Hagen Joe or Eli, can you copy/paste Nicole's comments so we can all read them? I'm not very tech-savvy, so I'm not sure how I'm blocked.
February 24 at 11:00pm · Like

Parents for a Responsible Gilbert School Board Karen: It appears that Nicole Richardson has blocked you, as well as Julie, Dawn, and Amy from seeing her comments.

NOTES                                                                    >

Superintendent Keegan clears up confusion from re...
September 14, 2013

POSTS TO PAGE                                                            >

Be the first to post on this Page.

Write Post

LIKED BY THIS PAGE                                                       >

Highland High School                    👍 Like

Mesquite Jr. High School                 👍 Like

South Valley Junior High ...             👍 Like

English (US) · Privacy · Terms · Cookies · More
Facebook © 2014

---

Like · Comment · Share

Parents for a Responsible Gilbert School Board shared a link.
February 24

Check out this blog from a Gilbert parent viewing the district's drama. Its very insightful.

"This needed to be said. But, even more so, it needs to be heard. Because I value our community, Its schools, Its teachers and...the truth."
http://mysocalledcrisis.wordpress.com/

mysocalledcrisis
mysocalledcrisis.wordpress.com
I'm trying new things, and taking everyone with me. Since, it's just about time for that mid-life...

                                          👍 13  💬 28  ⤴ 1 Share

Like · Comment · Share

👍 13 people like this.

Eric A. Marmont Somehow, I can't see parents wanting the best education for their children being bullies.
February 24 at 5:39pm · Like · 👍 2

Joe Nicita let me clarify since your having trouble... Wanting the best education is much different than laying false blame and following blindly.
February 24 at 6:36pm · Like · 👍 4

Joe Nicita Nicole, you should stop intimidating. This reporter has more credentials then you can ever understand. You've already been investigated for this one time before. It is what it is.
February 24 at 9:26pm · Like · 👍 2

Joe Nicita Nicole, you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote what is public information from the cottie resignation. I can post the pdf of the cottie resignation letter here if you like. Cottie is the one who made the accusation in a public record. I'm sorry if you don't or a agree with what Lisa wrote. However, all her investigative reporting was above board. So I would suggest you accept the article.
February 24 at 10:03pm · Like

Karen Berke Udall I can't see comments from Nicole, Joe. Who are you talking to?
February 24 at 10:09pm · Like

 Parents for a Responsible ... | Timeline ▼ | 2014 ▼

best education is much different than laying false blame and following
blindly.
February 24 at 5:36pm · Like · 👍 4

 **Joe Nicita** Nicole, you should stop intimidating. This reporter has
more credentials than you can ever understand. You've already been
investigated for this one time before. It is what it is.
February 24 at 8:26pm · Like · 👍 2

 **Joe Nicita** Nicole, you did question her "understanding on the
governing laws" see above...and in this case it's clear she
understands them. She simply wrote what is public information from
the cottle resignation. I can post the pdf of the cottle resignation
letter here if you like. Cottle is the one who made the accusation in a
public record. I'm sorry if you don;t or a agree with what Lisa wrote.
However, all her investigative reporting was above board. So I would
suggest you accept the article.
February 24 at 9:03pm · Like

 **Karen Berke Udall** I can't see comments from Nicole, Joe. Who
are you talking to?
February 24 at 9:09pm · Like

 **Amy Redin Hagen** Ditto, Karen. I only see comments from Eric
and Joe. Where is Nicole disparaging Lisa's credentials?
February 24 at 9:16pm · Like

 **Joe Nicita** It's clear Nicole blocked you.
February 24 at 9:23pm · Like

 **Karen Berke Udall** I'm confused. Who's Nicole? And why would
she block me?
February 24 at 9:25pm · Like

 **Amy Redin Hagen** Blocked me? From what?
February 24 at 9:25pm · Like

 **Julie Scott-Dudley** Nicole who? I don't see any comments from a
Nicole.
February 24 at 9:25pm · Like

 **Parents for a Responsible Gilbert School Board** Nicole, we
want to give you ample chance to follow through on your statements.
If you would like to post the external investigation, we'd be happy to
have it included in the dialogue.
February 24 at 9:34pm · Like · 👍 1

 **Dawn Brimhall** It's a one-sided conversation on my side, too.
February 24 at 9:36pm · Like

 **Eli Littlefield** Nicole seems to be referring to an official external
investigation document - not sure legalities of that being released. Joe
above refers to a resignation letter - which often times are accusatory
but not necessarily "fact" from my experience with departing
employees.
February 24 at 9:39pm · Like

 **Joe Nicita** Eli, thanks for sharing this. This is exactly what lisa
reported on. Lisa did not make up reports. It's here in black and white.
Thank you for sharing.
February 24 at 9:49pm · Like



*This is
Staci Bark* →

# EXHIBIT "I"


**GPS** Gilbert Public Schools
EXPECT SUCCESS

# EMPLOYEE ACTION REQUEST
(Press Firmly or Type)

Today's Date: 2/25/14

Employee's Name: NICOLE RICHARDSON

Employee ID Number:

Employee's Position: MARKETING SPECIALIST   Location: COMM. RELATIONS

Employee's Home Phone Number:

## REQUEST FOR:   (check one)
- ☐ New Employee
- ☐ Employee Transfer/Change
- ☐ Job Resignation
- ☒ Other: PAID ADMINISTRATIVE LEAVE

## REMARKS:
NICOLE RICHARDSON WILL BE PLACED ON PAID ADMINISTRATIVE LEAVE UNTIL FURTHER NOTICE. PENDING INVESTIGATION.

Effective Date(s): 2/25/14

Administrator's Signature: _____

Employee's Signature: _____

---

*ADMINISTRATIVE USE ONLY FOR EMPLOYMENT RECOMMENDATION*

- ☐ New Position
- ☐ Number of Hours Per Day (Must Complete)
- ☐ Replacement For:
- ☐ Change in Hours From: _____ To: _____
- ☐ Successful Completion of Probationary Period
  - ☐ Extended Until:

Account Code:

---

Full-Time: ☐ Yes ☐ No
Position 1: ☐ Add ☐ Inactivate ☐ Change

**HUMAN RESOURCES ONLY**

Benefits: ☐ Yes ☐ No
Position 2: ☐ Add ☐ Inactivate ☐ Change

| | |
|---|---|
| Grade/Range | Grade/Range |
| Step/Cell | Step/Cell |
| Salary | Salary |
| Job Code | Job Code |
| Criteria Code | Criteria Code |
| Account Code | Account Code |
| Sub Location | Sub Location |
| Hours per Day/Week | Hours per Day/Week |
| Effective Date | Effective Date |
| Board Date | Assistant Superintendent / Director of Human Resources |

COMMENTS:

White/Yellow/Pink: Personnel   Gold: Originator        Revised 4/06

| EXHIBIT | EXHIBIT |
|---|---|

## PUBLIC CONCERNS / COMPLAINTS ABOUT PERSONNEL

### Public Complaints about School Personnel
This form or a typed document containing all of the requested information should be submitted to the
Department of Human Resources

Date _3/25/14_

Name (print)

Name (signature)

Address

Telephone (day) _____ (cell) __

E-mail __

Parent of student in District? _____X_____ Yes _____ No

Other relationship to the District or the person about whom the complaint is made:

Name and title/position of person(s) about whom you have a concern or complaint:
_Nicole Richardson — Marketing_

Date and time that you met with the employee or the employee's supervisor to discuss this
concern/complaint:

Date: _2/24/14_      Time: _11:00 a_

Was the employee's supervisor present? _____ Yes __X__ No

Have you discussed this complaint with the employee's supervisor? _____ Yes _____ No

If no, why not: _Policies potential violated GBEF, GBEF-R, GBCB, GBP_
_ARS 38-504_
_(B)_

Please describe the facts relating to your concern or complaint with as much specificity as possible.
Include relevant dates, times, places, names of witnesses (if applicable). Use additional paper if
necessary.

_Ms. Richardson posted to facebook (publicly)_
_contents of an attorney-client privileged_
_report which parents complained they do_
_not have access to. Also threatened parents_
_with civil lawsuit potential. Note disclosure_
_of confidential info under ARS 38-504(B)_
_carries specific statutory consequences as_

Received by _____ Date _____
     Name/Title

_(SEE attached posts)_



Joe Nicita let me clarify since your having trouble... wanting the best education is much different than laying false blame and following blindly.

4 hours ago · Unlike · 🖒 4



**Nicole Richardson** I am respectfully asking that you immediately remove the link to this blog. The author, has been seriously duped and as a reporter, she should be familiar with the laws governing libel and how seriously one should investigate claims before printing them.

Miss Cottle's complaint has been thoroughly investigated by an external investigator. Cottle's claims were deemed "spurious" at best. This was not an internal investigation which should set to rest any claim of a cover-up. I am certain the administrators of this page would not want any part of proliferating untruths and further placing the author in financial jeopardy.

2 hours ago · Edited · Like



**Joe Nicita** Nicole, you should stop intimidating. This reporter has more credentials than you can ever understand. You've already been investigated for this one time before. It is what it is.

2 hours ago · Unlike · 🖒 2



**Nicole Richardson** Joe, I am not questioning your wife's credentials, I am certain she is a fine reporter. Yes it is what it is, and what she printed is not true. She has been duped and I am just asking that the link be removed. Printing something that isn't true is libel, just sayin'

about an hour ago · Like



**Nicole Richardson** BTW, the external investigation says it isn't true. Just wanting to clarify the rumors and gossip.

about an hour ago · Edited · Like



**Joe Nicita** Nicole. you did question her "understanding on the governing laws" see above... and in this case it's clear she understands them. She simply wrote what is public information from the cottle resignation. I can post the pdf of the cottle resignation letter here if you like. Cottle is the one who made the accusation in a public record. I'm sorry if you don:t or a agree with what Lisa wrote.

# EXHIBIT "J"



EXPECT SUCCESS — Gilbert Public Schools

Interim Superintendent
hn J. Keegan, Jr., Ed.D.

GPS Governing Board
President
Staci Burk
Clerk
Julie Smith
Members
Daryl Colvin
Jill Humpherys
Lily Tram

March 6, 2014

To: Jeff Filloon

From: Jack Keegan

Re: Nicole Richardson, Complete

I have reviewed Ms. Staci Burk's complaint regarding Nicole Richardson's posting of information that was allegedly contained in an attorney/client privileged report on the website and the allegation that she threatened a parent with a libel suit as a response to a blog site entitled *mysocalledcrisis*. The blog posting was entitled, '*one "sinking ship" and oodles of anonymous sources*'. I reviewed the material that was posted by Ms. Richardson. I also consulted with Ms. Georgia Staton, our attorney, through whose firm Don Conrad was hired to conduct an investigation of the allegations made by Kami Cottle. Mr. Conrad reviewed and submitted a report detailing the results of his review of Ms. Cottle's charges and allegations. After reviewing Mr. Conrad's report, I submitted a copy of the full report, including attachments, to the Human Resources department for filing with the Cottle file. In addition, I permitted Ms. Richardson to review the report based upon her request and I consulted with Ms. Staton. I was advised that I, as superintendent, was the person who authorized the investigation and hired Ms. Staton's firm. Because as superintendent I was the client, Ms. Staton advised me that I had the authority to release the report. The client was not the School Board because it was important that the investigation be separate from the board in case after the investigation the board needed to hold a due process hearing on one or more individuals identified in the report.

Since the report and Ms. Richardson's posting I have been informed by several board members that they have received communication from Ms. Cottle stating that she would now be willing to talk with our investigator. Our investigator at this point is out of the country. Upon his return, Ms. Staton will ask him to interview Ms. Cottle and then, add an addendum to the report if appropriate. In his report, Mr. Conrad stated that he tried to contact Ms. Cottle but she never returned his calls or emails. The phone number given by Ms. Cottle to the board member is the same number the District gave Mr. Conrad. However, since this request came after the release of the original report, an addendum will also be released once Mr. Conrad completes his interview of Ms. Cottle. If necessary or appropriate, Mr. Conrad may modify his findings in his report.

As to the compliant stating that Ms. Richardson threatened parents with a potential lawsuit, I do not find what she stated on the web as threatening a lawsuit. She did mention that there are laws governing liable and that people can be held accountable for liable, when printing something that is not true. I do not find those statements as necessarily a threat of a suit.

Based on this review I am rescinding Ms. Richardson's suspension. However, she is to receive a letter stating that she did not follow my order not to respond to this posting. If you have any questions regarding this, please do not hesitate to contact me.

140 South Gilbert Road • Gilbert, AZ 85296 • Phone 480.497.3300
www.gilbert.k12.az.us

# EXHIBIT "K"

## Board Meeting July 8, 2014

*In reference to Gladis Mopecha who was reinstated, similar situation to Sarah Green. They are voting on rehiring her, once again without a position.*

Jill Humphreys: I would like to bring forward, first Gladis Mopecha was placed on an improvement plan.

Staci Burk: Hold one second.....

Daryl Colvin: Madame President Point of Order.

**Staci Burk: I just want to go ahead and say that anything that's said that hasn't been proven in a court of law may subject you to any kind of legal issues and could result in granting Mrs. Mopecha at district cost a potential name clearing hearing and may waive any right to legislative immunity. I just need to make sure that I do that.**

Jill Humphreys: I think I can say that she voluntarily resigned in 2010 and did not complete her improvement plan


48:09

Staci Burk: Moving on to item 7.01 Approval of the Consent Agenda

Lily Tram: I move that we approve the consent agenda items 7.01 through 7.07.

Staci Burk: Oh, um........ per Robert's rules, if there's any item that there is not full consent on the consent agenda, I um.... I meant to ask this in the beginning. Because now that we're doing Robert's Rules, if there's any item on the Consent Agenda that does not have complete consent from all members or by which there's any questions to be asked, that item will automatically be moved to an action item per Robert's Rules so is.... I just want to open it up to board members are there any items on the consent agenda which do not have full consent ... um *(No vote on the consent agenda has ever been preceded by this statement)*

Kishimoto: (Uninteligible) I think we want to....

Staci Burk gives her mic to Julie Smith

Julie Smith: sorry, fellow board members, my microphone just stopped working and my intent was to introduce the approval of consent agenda items with the exception of, under 7.03 Certified personnel, a request to remove the name Nicole Richardson

Dr. Kishimoto: You need to take an action to remove an item.

Staci Burk: The definition of Consent Agenda means that the item is in full consent with the board and so if it's not, then it needs to be moved to action items per Roberts Rules and other boards in Arizona do not require a vote or approval whether they use Roberts Rules or not. They just move it if a board member has a question.

Dr. Kishimoto: My question to the board is process related. And some of that will go through for the first few meetings. My question is to whether there is a motion that needs to be made to remove an item from consent for discussion.

Lily Tram: Is this 7.03 or 7.04? Which one are you referring to?

Staci Burk: I don't know…. the bottom line is any …. the question that I'm asking when I saw that Mrs. Smith had an issue with the consent agenda is, are there any items …. I believe that Mrs. Smith has said … has said a specific item…. 7.03? (Looks to Smith)

Lily Tram: Yes, I see Nicole Richardson Ceramics Teacher for Gilbert High School.

Staci Burk: Okay, so 7.03 will now be moved to an action item. And then if you'd like to remove that particular name and then when we get to it as an action item that would be the time for that motion. So 7.03 will now be moved to an action item because it's no longer on the consent agenda. Item 7.01 through 7.07, not including item 7.03 … is there a motion to approve the consent items besides 7.03?

Julie Smith: I move that the governing board approve the consent agenda 7.01, 7.02, 7.04, 7.05, 7.06 and 7.07

Staci Burk: Thank you Mrs. Smith. Is there a second?

Daryl Colvin: Second

Staci Burk: Thank you Mr. Colvin, having been moved and seconded to approve the consent agenda all those in favor, please vote aye….. motion carries 5-0…. um……

Lily Tram: Your action item.

Staci Burk: I'm looking at… um… okay. I was looking at board committee reports and realized …. sorry…. Item 7.03, action item is the classified personnel…..

Lily Tram: I move to approve action item 7.03 certified personnel.

Staci Burk: Thank you Mrs. Tram. Thank you Mrs. Humphreyss (seconded inaudibly) (Burk turns to Julie Smith)

Julie Smith: I'd like to offer a substitute motion.

Staci Burk: Thank you Mrs. Smith.

Julie Smith: My substitute motion is that we approve items 7.03 certified personnel with the removal of the name Nicole Richardson

Staci Burk: Thank you Mrs. Smith, is there a second?

Daryl Colvin: I'll second that.

Staci Burk: Thank you Mr. Colvin, having been moved and seconded.....

Lily Tram: Discussion Please

Julie Smith: I have two

Staci Burk: What was the substitute motion. Okay, having been moved to approve the consent agenda with the exception of Nicole Richardson.

Lily Tram: There can't be a discussion on that? We need to understand why.

Staci Burk: I'm trying to think if we would then have a discussion about that...

Lily Tram: We typically do.

Staci Burk: No... about...

Lily Tram: It's a motion.

Staci Burk: Will you repeat the motion Mrs. Smith so I make sure I understand.

Julie Smith: The motion is to approve item 7.03 certified personnel with the removal of the name Nicole Richardson off the list.

Staci Burk: So we wouldn't be discussing her in a separate motion, we would just be approving removing the name. Ok, we can go ahead and have debate.

Lily Tram: I need to understand why you have removed the individual.

Julie Smith: I am requesting that her name be removed. I don't understand how it is quite honestly, that she was offered a job again because she was put on administrative leave and there was an investigation going on and my understanding is that at the time of resignation the investigation had not been completed. When I talked to Dr. Keegan about it he said that he didn't finish it because she had resigned. **(See 071314_keegan020.pdf)**

Lily Tram: No, that's not true. She was on medical leave. Which we shouldn't be discussing either.

Julie Smith: I am answering your question. I am telling you what I was told but I am wondering how it is that someone who was the subject of an investigation and put on administrative leave for not following a…. (someone speaks to her off camera)

Lily Tram: But what I understand is that she was on leave but not that kind of leave, on a health leave and she hasn't resigned. And that she applied for something that she qualified for. And she fit very well in the position. The investigation… Kami Cottle hasn't even come up to do the investigation, they've been trying to contact her.

Staci Burk: We cannot discuss an employee that's not listed on the agenda.

Lily Tram: But the investigation wasn't complete because an individual has not participated when that individual had contacted the board president and Mrs. Humphreys that she wanted to participate now. At that time the investigation was complete. Dr. Keegan finished it, we were ready to move on, move forward, and then she called you and Mrs. Humphreys and said that she wanted to participate in the investigation and that was supposed to follow up. And that's why I've been sending you emails Mrs. Burk that, what is the result of the investigation on the individual?

Staci Burk: I passed those on to Mrs……

Lily Tram: It's been months.

Staci Burk: Dr. Kishimoto and Dr. Rice. (facing Kishimoto, I bet you probably …. inaudible) So I passed it on to Dr. Rice. **(Dr. Rice told me that the investigation would not be completed because the board did not want it completed unless they could find an investigator that would give them the result they wanted. They were having trouble finding someone to do that sort of work.)**

Lily Tram: She's not on administrative leave. That investigation was complete at that time. Dr. Keegan finished it. And that individual has not come forward to meet with the investigator.

Staci Burk: I have concerns that the salary is not listed. Is that addressed? I mean I'm noticing there that … inaudible, Kishimoto speaks over her)

Lily Tram: This appears like retaliation or the list.

Dr. Kishimoto: For these individuals (Speaking to an HR person in the audience) … at the same salary? Okay.

Staci Burk: But the salary is not listed so ... can we, um.... are you willing to table because typically even when it's a rehire we list the salary **(not true)** . And just in a procedural thing the board is actually approving the salary. So I think that we should.... **(Retaliation)**

Lily Tram: It's not always on there Staci.

Staci Burk: It's supposed to be.

Lily Tram: Yeah, but it's not always and we've approved them before.

Staci Burk: Because, I mean in terms of the legal sense of the word the board is you know, approving and hiring all employees. And so, as that we are entering into a contractual relationship by the approval and so the salaries are usually listed. So I would like to entertain a substitute motion to remove all five employees that do not have a salary listed. Would that create any issues? As far as... um...

Lily Tram: Of course not, we're just down 140 teachers right now.

Dr. Kishimoto: I do think, Madame President, process-wise we had followed previous process, when salaries remained the same they were not reposted. I think there's been some difference here in process. So we just went ahead and followed previous process, so if there is a change in the boards expectation, in seeing the same salary posted, we can do that moving forward. But I am concerned about not moving forward with hires. I do want to say that like this situation with a previous member of the staff, these are hires that I am putting forward. I have not received or been privy to conversations or concerns about any of these staff members. And so if there are concerns, I'd like to be able to have those conversations. These are recommendations that I am making to push these folks forward and start focusing on the other hires.

Staci Burk: When we say that there is a rehire, my understanding is ... on the employee that is being discussed, she was in an administrative position **(I was not in an administrative position)** and is now being hired in a teaching position. Does that mean that she would continue at the administrative salary rate? So in that case, it's really appropriate that we do have a salary listed because it's not a rehire in the same position. And I believe that legally we do have to have a salary if its... I mean I can understand maybe why it would be blank if it's the same and you're saying rehire and you are noting it over here. But in this situation it would more or less be a transfer?

HR Person: She's hired as a teacher

Staci Burk: So she's a new hire and comes in at the higher, new hire rate? Higher than the teachers that have been frozen?

HR: I don't have the exact number. In that particular case, she would go from her administrative ...

Staci Burk: (To the audience) PLEASE DO NOT DISRUPT THE MEETING, while Mrs . Zetner is talking.

HR: From her previous her previous position to this new position at the high school level, there would be a pay differential to the lower end. The other employees that are in question would come in at their exit salary at the time that they left the district.

Staci Burk: Mrs. Smith?

Julie Smith: I have several comments. My first comment is, Dr.Kishimoto, I left a very detailed voice mail on your phone, it was I believe on Friday about this issue. My second point is um, Nicole Richardson was on the consent agenda at some point as a resignation so she did resign. My third point is that I only know what I was told by our former superintendent. that doesn't make it true or not true. I am telling you what I was told. I was told that she was put on administrative leave **(not because of the Cottle situation which is what she is talking about),** I asked about the investigation and that it was ceased because she had resigned. And I also wish to point out, I asked for proof that this other individual , that is being claimed refused to participate in the investigation, now is willing to. I asked for proof that this person was notified. I said that there must be a certified letter or something and there was none of the above. The district was unable to provide any proof that this person was contacted and that this person had turned it down. **(See031814_BurkConrad_email.pdf)**

And this is also what this individual is alleging. So we need to be really careful about what we say. It is not fact that she turned it down. There are two sides of the story. So that's why the investigation does need to be completed.

Staci Burk: I believe that I received similar information from the superintendent, I think that we received it in writing. I can't remember. but I do remember receiving information that the reason that the investigation was suspended was because Mrs. Richardson had resigned. I am saying what I was told Mrs. Humphreys, as well as supporting.... **I was told by Jack Keegan that the reason that the investigation didn't continue at that time was because Mrs. Richardson had in fact resigned and was no longer employed and therefore it wasn't necessary expend the resources to conduct an investigation because she would be no longer with us.** So....

Lily Tram: She was on FMLA so you can confirm with HR. They have the documentation.

Staci Burk: None of us really know what's going on here....

Lily Tram: Well we have Mrs. Zettner and I'm sure that ..

Staci Burk: .... in terms of very inconsistent statement of what happened. And I think it can be easy for things like that to slip through the cracks and then become an issue like this. And I realize that it's an awkward issue for you (facing Kishimoto) when we have former superintendents telling some board members some things and other things... so I think it's probably warranted table this item, this person for you to look into what happened and maybe get back to the board with a report of the facts.... as the facts exist.

Dr. Kishimoto: Madame President if I can have the questions that the board has about a particular individual, certainly at any point when an item is posted in advance of a meeting, I know we are in a funny period, a transition. If I could have those questions ahead of time, especially when it has to do with a personnel matter, then I ensure that my staff and I come prepared to answer the questions prior to when we are doing our agenda setting. Prior to it becoming a public discussion.

Certainly I want to make sure that I am respectful of everyone of my individuals that I am putting forward. If the board considers tabling this item, I can certainly collect the questions, get those questions answered in a timely manner before the next board meeting. And have discussions with any board member that would like to discuss an item.

Lily Tram: I have one more comment. It's to be really careful because this could be age discrimination because if someone is qualified and you decide not to hire them and they are at that age, it could be age discrimination. She was not on administrative leave. Actually didn't she get suspended from Facebook, Staci wasn't that your.....

Staci Burk: Did she make some age discrimination allegations? Did Mrs. Richardson make....

Lily Tram: No, but I'm just saying be careful. Because if you don't hire this individual, it could be age discrimination and maybe that needs....

Daryl Colvin: Madame President, Mrs. Burk. I don't think any of us have every bothered to ask Mrs. Richardson about her age. I don't think any of us have dared. But we haven't.

Lily Tram: The age is over 40. so if you don't hire me, that's age discrimination.

Daryl Colvin: I don't have any proof of that and I don't care.

Staci Burk: So I guess the question at this point is we have a motion actually we could move the motin as is, because it's just removing it's removing. In order to remove an employee you could bring it back.

Lily Tram: I would table that one motion if you would.

Staci Burk: So it's not necessary to table.

Staci Burk: So having … I'm going ahead to move to call the question…

Lily Tram: You guys won't bring it back.

Staci Burk: It's Dr. Kishimoto's prerogative to bring it back.

Daryl Colvin: I'll second your motion to call the question.

Staci Burk: Thank you Mr. Colvin, all those in favor of calling the question.  Burk, Smith Colvin in favor. Tram, Humphreys against.

Staci Burk: Having been moved and seconded to approve all employees on the consent agenda with the exception of Nicole Richardson, please vote aye. *Burk, Smith, Colvin in favor.  Tram, Humphreys against.  Motion carries.* Motion carries 3-2

Lily Tram: We have hired people back who have resigned.

Staci Burk: I get that and that's why if it's Dr. Kishimoto's recommendation she can bring it back.

Daryl Colvin: Point of Order.  Mrs. Burk could you remind Mrs. Tram to follow Roberts Rules of Order…. the extra comments didn't……

Staci Burk: Let's move on to the next item.

# EXHIBIT "L"

## PHOTOS >





## POSTS TO PAGE >


**Jessica Archambault**
July 8 at 4:15pm 🌐

Will you be tweeting the meeting events this
evening?

Like · Comment                          💬 1


**Lisa Miller Lasch**
June 20 at 5:21pm 🌐

I love all the research you are doing and sharing
with us. I'm wonde... See More

Like · Comment                     👍 1  💬 2


**Lynn Marble**
June 20 at 1:15pm 🌐

Here's a text I received from a fellow teacher in my
program in GPS.... See More

Like · Comment                     👍 7  💬 4

## LIKED BY THIS PAGE >


**Committee to Elect Dr....**  | ✓ Liked ▼

---

👍 23 people like this.                              Top Comments ▼

 | Write a comment...                          📷

 **Wendy Peterson** Thank you for this clear information.
Like · Reply · 👍 7 · July 19 at 4:58pm

 **Staci Burk** It would be great if you could get your facts straight. I'm out of town
for medical care and Daryl Colvin (as acting President) set the agenda. I didn't
participate at all in the agenda setting meeting.
Like · Reply · 👍 2 · Yesterday at 8:11am · Edited

    🖼 **Myrna Sevey Sheppard** Good to know, Ms. Burk. Does this mean that
you will be placing Ms. Richardson's name on the next agenda for
rehiring, as per Dr. K's recommendation? It could actually still be added to
the agenda before Tues. night, right?
Like · 👍 5 · Yesterday at 10:20am · Edited

    🖼 **Angie Draper** There's time to amend this weeks agenda. Why don't you
request Mr. Colvin add Ms. Richardson's name per Dr. Kishimoto's
recommendation? Then she can start on the first day of school! Win! Win!
Fill a vacant position with a qualified, dedicated GPS employee!
Like · 👍 8 · Yesterday at 10:33am · Edited

 **Gilbert Public School Board Observer** Staci Burk: Thank you for the      ✕
clarification and welcome to our Facebook page. We will update the post
with your exact comments above.

That being said, wouldn't you say this issue highlights the very concern
that many community members had when you and your board majority
changed the policy on who sets the agenda? It is still unclear to us as to
why it seems Mr. Colvin has decided to not add Nicole Richardson into
the agenda. This is a matter of importance since the next board meeting
will not be until Aug 5th and the 1st day of the school year begins the
following day. This seems to further put both the district and Ms.
Richardson in a predicament since her hiring is going to be up in the air
until the last minute. Not quite an efficient way to do business don't you
think? Per our other readers' comments, it seems there is time to still add
Ms. Richardson to the agenda, will you instruct Mr. Colvin to do so?

Also if you wouldn't mind could you also help us get the facts straight on
as to why in the last board meeting you have given everyone the
impression that you are not quite sure with what is happening or
happened to Dr. Keegan's investigation of Ms. Richardson. We are no
Ben Matlock, but we find it quite peculiar that you did not know how the
investigation you started ended.

Thanks again for your time and we hope that all goes well with your
medical care.
Like · 👍 1 · 14 hours ago · Edited

 **Mike McClellan** Unless the person who now wants to "testify" against
Ms. Richardson provided the independent investigator compelling
evidence for him to recommend Ms. Richardson not be hired, there is no
reason for the board to delay. In fact, an unnecessary delay will only harm
our students, leaving GHS students without an art teacher to start the year.
That vacancy will be squarely on the shoulders of Mrs. Smith, Mr. Colvin,
and you.

 **Jessica Archambault**
July 8 at 4:15pm ☻

Will you be tweeting the meeting events this evening?

Like · Comment     🗨 1

 **Lisa Miller Lasch**
June 20 at 5:21pm ☻

I love all the research you are doing and sharing with us. I'm wonde... See More

Like · Comment     👍 1 🗨 2

 **Lynn Marble**
June 20 at 1:18pm ☻

Here's a text I received from a fellow teacher in my program in GPS.... See More

Like · Comment     👍 7 🗨 4

---

LIKED BY THIS PAGE      ›

 **Committee to Elect Dr....**    ✓ Liked ▼

 **SAVE our dedicated G....**    ✓ Liked ▼

 **Unite For Education**    ✓ Liked ▼

English (US) · Privacy · Terms · Cookies · More ▾
Facebook © 2014

!&fref=ufi

---

 **Mike McClellan** Unless the person who now wants to "testify" against Ms. Richardson provided the independent investigator compelling evidence for him to recommend Ms. Richardson not be hired, there is no reason for the board to delay. In fact, an unnecessary delay will only harm our students, leaving GHS students without an art teacher to start the year. That vacancy will be squarely on the shoulders of Mrs. Smih, Mr. Colvin, and you.
Like · 👍 2 · 13 hours ago

 Write a reply...     📷

 **Angie Draper** Well that clarifies that! I eagerly await a apology to Mr. McClellan.
Like · Reply · 👍 3 · July 19 at 9:48pm

 **Staci Burk** Mr. McClellan, an independent investigation was not completed. There was a mix up between the independent investigator and the support staff member responsible for setting up the interview with the key witness and she was not contacted for an interview. Dr. Keegan made an administrative decision that since Ms. Richardson submitted her resignation, it was not necessary to spend resources to continue the investigation. There is a difference between a completed investigation and an "interrupted" investigation. If Ms. Richardson would like to return to GPS, for the safety of our students given the allegations made by her own staff I would expect that Ms. Richardson would also want the investigation to be completed in its entirety.
Like · Reply · 👍 4 · 4 hours ago

→

 **Mike McClellan** "Mix up"? How so? Shouldn't there be a record of emails the investigator sent the employee, and her responses? What do you define as mix up? Are you suggesting the employee DID reply to calls or emails from the investigator?In addition, you state that "for the safety of our students" the investigation should be completed. This implies that hiring Ms. Richardson could potentially put the safety of students in jeopardy. That is a very serious charge, Ms. Burk, and I hope you can defend it.
Like · 👍 1 · 3 hours ago 

 Write a reply...     📷

**Staci Burk** I can defend anything I'm willing to say. I do not write posts or articles irresponsibly.
Like · Reply · 3 hours ago

**Staci Burk** The employee was not contacted. The investigator thought someone else was going to set up the interview and it was not done. The investigator misunderstood that that there were no responses from the employee when in fact the employee had not been contacted at all.
Like · Reply · 3 hours ago

 **Mike McClellan** So the investigator did not send the employee at least one email asking to interview her?
Like · 3 hours ago

 Write a reply...     📷

 **Staci Burk** I know how the investigation that I requested on behalf of several parents ended. You have outlined that. There was a letter. There was a separate investigation initiated by a district staff member that worked with Ms. Richardson



 **Jessica Archambault**
July 8 at 4:15pm

Will you be tweeting the meeting events this evening?

Like · Comment 💬 1

 **Lisa Miller Lasch**
June 20 at 5.21pm

I love all the research you are doing and sharing with us. I'm wonde... See More

Like · Comment 👍1 💬2

 **Lynn Marble**
June 20 at 1:16pm

Here's a text I received from a fellow teacher in my program in GPS.... See More

Like · Comment 👍7 💬4

**LIKED BY THIS PAGE** ❯

 **Committee to Elect Dr....** ✔ Liked ▾

 **SAVE our dedicated G....** ✔ Liked ▾

 **Unite For Education** ✔ Liked ▾

or emails from the investigator?In addition, you state that "for the safety of our students" the investigation should be completed. This implies that hiring Ms. Richardson could potentially put the safety of students in jeopardy. That is a very serious charge, Ms. Burk, and I hope you can defend it.
Like · 👍1 · 3 hours ago

 Write a reply... 📷

**Staci Burk** I can defend anything I'm willing to say. I do not write posts or articles irresponsibly.
Like · Reply · 3 hours ago

**Staci Burk** The employee was not contacted. The investigator thought someone else was going to set up the interview and it was not done. The investigator misunderstood that that there were no responses from the employee when in fact the employee had not been contacted at all.
Like · Reply · 3 hours ago

**Mike McClellan** So the investigator did not send the employee at least one email asking to interview her?
Like · 3 hours ago

 Write a reply... 📷

**Staci Burk** I know how the investigation that I requested on behalf of several parents ended. You have outlined that. There was a letter. There was a separate investigation initiated by a district staff member that worked with Ms. Richardson that has not been completed and has some serious allegations. I hope that helps clarify any misunderstandings about which investigation we may be talking about.
Like · Reply · 4 hours ago

**Staci Burk** Mrs. Sheppard, you are assuming that Dr. K made a recommendation to place her on the agenda. Could you please let me know the source of this information because I have not heard that directly from Dr K and cannot confirm the accuracy of your implication.
Like · Reply · 4 hours ago

Write a comment...

 **Gilbert Public School Board Observer** shared a link via SAVE our dedicated GPS employees.
July 19

Our deepest condolences to the Van Briesen family.



EXHIBIT "M"

| From: | Staci Burk <stacigriffinburk@yahoo.com> |
|-------|------------------------------------------|
| To: | Donald Conrad <conrad.donald@gmail.com> |
| CC: | GEORGIA STATON <GStaton@jshfirm.com>, GPS Board <board@gilbertschools.ne... |
| Date: | 3/21/2014 11:02 PM |
| Subject: | Re: Cottle Investigation |

Hello Mr. Conrad:

Thank you for being in touch. While it is true that the Board would like an interview of Kami Cottle conducted, I will need to meet with the Board along with our new Superintendent to determine the next steps and direction they would like us to go with this matter.

I will arrange for an executive session as soon as possible and will let you know what the decision is.

I have a personal concern that content from your investigation report was posted by Kami Cottles immediate supervisor Nicole Richardson, on Facebook in a derogatory manner against Ms. Cottle in what I believed was a violation of attorney client privilege and unprofessional behavior from a Supervisor. The former Superintendent Jack Keegan, sent a letter to Jeff Filloon condoning this action under the rationale that Ms. Staton gave him permission and direction to release the report and therefore the behavior of Nicole Richardson was justified.

I believe that the Board expects a higher level of professionalism and integrity out of the investigations we request. Based on comments from Board members in recent meetings, I do not believe that the Board would not support the release of investigation results in the form of social media comments.

Therefore, please do not take it personally if the Board were to seek a different individual to interview Kami Cottle. It would certainly not be about you if that were to happen. Again, it would be about protecting the rights of our employees and ensuring the highest level of professionalism in our business dealings. Again, this is not my concern about you, but rather what happens with your investigation report once it is completed.

I will let you know the results of the Board and Superintendents decision as soon as possible.

Thanks again for all of your help.

Warm regards,

Staci Burk

Sent from my iPad

On Mar 18, 2014, at 6:32 PM, Donald Conrad <conrad.donald@gmail.com> wrote:

> Dear Staci,
>
> I received a call from Shawn Mcintosh in which he told me that the Board wanted to me to conduct an interview of Ms. Cottle who has alleged that I did not contact her to request an interview as a part of the investigatin that I recently concluded.
>
> I have no doubt about Shawn's reporting of the board's decision, but I wanted to hear from you that the Board wanted me to contact Cottle.
>
> Pease confirm that the board wants me to conduct further investigation. In that my time is being billed through Ms. Staton's firm, I have copied her with this correspondence.
>
> Sincerely,

>
> Don Conrad